Receipt #067029

ORIGINAL

FILED
AUG 2 4 2007
U.S. COURT OF
FEDERAL CLAIMS

**IN THE UNITED STATES**

**COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| BEARINGPOINT, INC.<br><br>Plaintiff<br><br>v.<br><br>THE UNITED STATES OF AMERICA<br><br>Defendant. | Case No. 07-631 C |

## COMPLAINT

BearingPoint, Inc., by counsel, for its Complaint against the United States of America alleges as follows:

## PARTIES

1. Plaintiff BearingPoint, Inc. ("BearingPoint") is a Delaware corporation with its principal place of business at 1676 International Drive, Tyson's Tower, McLean, VA 22102.

2. Defendant is the United States of America ("the Government"), acting by and through the United States Department of the Interior and the GovWorks Federal Acquisition Center (collectively "DOI").

## JURISDICTION

3. This Court has jurisdiction over the subject matter of this action pursuant to the Tucker Act, 28 U.S.C. § 1491, and the Contract Disputes Act, 41 U.S.C. §§ 601-613.

## BACKGROUND

4. This action arises from DOI's improper and unauthorized termination for cause of Blanket Purchase Agreement No. 73873 (the "BPA") and Task Order 3 (Order No. 0404DO37408) under the BPA. DOI's unlawful terminations for cause of Task Order 3 and the

BPA must be converted to terminations for convenience. Alternatively, DOI's actions, described below, individually represent material breaches of Task Order 3, and combined represent a material breach of the contract's implied duty of cooperation.

5. The BPA contemplated the performance of software implementation and other related services in connection with a Department-wide enterprise resource planning ("ERP") integrated software solution to be known as the Financial and Business Management System ("FBMS"). Task Order 3 required BearingPoint to implement FBMS functionality at three (3) DOI Bureaus.

6. Because the BPA left open the design decisions antecedent to implementation of the BPA, and due to the complex subject matter of the procurement, cooperation between the parties was essential to successful performance. Notwithstanding this heightened need for cooperation, DOI consistently failed, for example, to make critical design and other decisions in a timely manner, to provide indispensable information and resources within its exclusive possession, and to make available personnel and facilities in accordance with its express contractual requirements. DOI's conduct in this regard delayed the work under Task Order 3, making it impossible to complete the Task Order 3 work in a timely fashion.

7. Notwithstanding its responsibility for BearingPoint's inability to render timely performance, BearingPoint's repeated assertions that the resulting performance delays were excusable, and the clear regulatory and contractual requirement to refer the assertion of excusable delay to BearingPoint's General Services Administration ("GSA") Schedule Contracting Officer, the DOI Contracting Officer took it upon herself to terminate Task Order 3 for cause and ordered BearingPoint to vacate immediately the premises. Weeks later, she

terminated the BPA for cause based, in part, upon BearingPoint's inability to perform additional work under the BPA absent the completion of Task Order 3.

8. Confronted with these circumstances, BearingPoint filed suit in the United States Court of Federal Claims ("Court of Federal Claims" or "this Court"). This Court accepted BearingPoint's assertions, set forth in its motion to dismiss, and held that DOI's purported terminations of Task Order 3 and the BPA for cause were improper and exceeded the scope of the DOI Contracting Officer's authority because she was required to refer BearingPoint's assertions of excusable delay to BearingPoint's GSA Schedule 70 Contracting Officer for a final decision. *BearingPoint, Inc. v. United States*, No. 06-675, 2007 WL 1276912 (Fed. Cl. Apr. 30, 2007) (Wheeler, J.). As a result, this Court dismissed BearingPoint's entire Complaint for lack of subject matter jurisdiction, as requested by BearingPoint.

9. In this action, BearingPoint seeks relief from DOI's improper and unauthorized terminations of the BPA and Task Order 3 for cause. Specifically, BearingPoint requests that this Court:

a. Hold that the procedurally defective and improper terminations for cause of Task Order 3 and the BPA were converted to terminations for convenience as a matter of law pursuant to FAR 52.212-4(m);

b. Hold that the procedurally defective and improper terminations for cause of Task Order 3 and the BPA were otherwise improper and, therefore, deemed to be terminations for convenience (or, in the alternative, find that DOI's actions amounted to breaches of contract), entitling BearingPoint to $16,522,063 in termination for convenience costs or, in the alternative, $19,842,777 in breach of contract damages;

c. Provide an increase in the Task Order 3 contract price of $5,038,000;

d. Find that Task Order 3 expired on April 6, 2005, and the Contracting Officer's direction to perform without a valid contract was a breach of contract (or, alternatively, a constructive change) for which BearingPoint is entitled to an equitable adjustment in the amount of $19,842,777;

e. Determine that BearingPoint is entitled to payment of $19,842,777 for work delivered to, and accepted by, DOI in accordance with DOI direction.

## Blanket Purchase Agreement

### Request for Quotations

10. On August 7, 2003, DOI issued Request for Quotations No. 73873 (the "RFQ"). The RFQ solicited quotations for the implementation of a commercial off-the-shelf ("COTS") ERP software package and related hardware and services to integrate DOI's administrative systems and operations. The resulting integrated solution was to be known as the FBMS.

11. The RFQ informed offerors that DOI intended to "use FAR Part 8 procedures" to issue a BPA, with one (1) base year and up to nine (9) option years, against the awardee's GSA Schedule 70 contract. The RFQ further provided that the terms and conditions of the awardee's GSA Schedule 70 contract would apply to the resulting BPA.

12. A GSA Schedule BPA is a simplified method of filling anticipated repetitive needs for supplies or services by establishing a "charge account" under a contractor's GSA Schedule contract. Acquiring agencies, such as DOI, compete, negotiate, and award GSA Schedule BPAs pursuant to FAR Part 8 and then, subsequently, issue Task Orders, also pursuant to FAR Part 8, as the need arises.

13. Consistent with FAR Part 8, the RFQ explained that DOI intended to procure equipment, software, and services for implementation of FBMS by issuing firm fixed-price Task Orders under the BPA. The RFQ provided further that deliverables under these Task Orders

would be determined by mutual agreement of the Government and the Contractor. In addition, the RFQ contemplated the post-award addition of new tasks and the incorporation of future requirements and mandated changes unknown at the time of award.

14. The RFQ indicated that FBMS was to be a Department-wide solution. In this regard, the RFQ informed offerors that FBMS would integrate the following business functions throughout the Office of the Secretary ("OS") and each of DOI's eight (8) Bureaus: Budget Formulation, Core Financials, Acquisition, Personal Property and Fleet Management, Travel, Financial Assistance, Real Property, and Enterprise Management Information. DOI's Bureaus include the Bureau of Land Management ("BLM"), the Minerals Management Service ("MMS"), the Office of Surface Mining, Reclamation, and Enforcement ("OSM"), the Bureau of Reclamation ("BOR"), the United States Geological Survey ("USGS"), the United States Fish and Wildlife Service ("FWS"), the National Park Service ("NPS"), and the Bureau of Indian Affairs ("BIA").

15. The RFQ identified the following "project specific objectives" for the BPA:

- Implement a Department-wide solution that will standardize and integrate financial and business management processes while meeting all applicable current and future security and privacy requirements.
- Provide business intelligence and analytic capabilities to financial and business management processes to strengthen decision-making capabilities to more effectively carry out the Department's missions.
- Ensure financial and business management data and transactions are recorded properly, accurately, timely, and efficiently with strong internal controls.
- Satisfy critical and routine, internal and external requests for financial and business management related information and data.
- Provide a solution that economically and efficiently leverages technology over the solution's life cycle and accommodates changes in federal laws, regulations, and financial and business management mandates.

- Implement, reform, and streamline key financial and business management processes building on available government and industry best practices to improve performance and reduce operating costs.
- Provide a solution that fosters employee retention, professionalism, creativity, excellence, and implements cultural transformation within Interior's financial and business management communities.
- Implement an effective document and records management solution for financial and business management activities that meet standard records management requirements.
- Enable an effective migration from the legacy environment to the new financial and business management solution through available risk minimization techniques.
- Provide a solution with the capability to balance financial and business management workload across DOI.

RFQ, Enclosure 1 at § 3.2.2.

16. Although the RFQ identified "definitions of success" and "sample performance measures" for each project specific objective, no specifications or requirements were included in the RFQ. Instead, offerors were instructed to prepare a Statement of Work describing how their solutions would meet the RFQ's stated objectives.

17. The RFQ also required each offeror to propose a Quality Assurance and Surveillance Plan ("QASP"). For each project-specific objective set forth in the RFQ, the QASP was required to identify the proposed performance standard, acceptable level of performance, surveillance methodology, and associated financial incentives and disincentives for performance.

18. The RFQ contemplated that the awardee's proposed solution would be subject to changes in design and pricing as the FBMS project progressed.

**BearingPoint's Proposal**

19. BearingPoint submitted its proposal for the BPA (the "BPA Proposal") on October 10, 2003.

20. BearingPoint proposed to use the "mySAP Business Suite" as the core software solution, together with a number of other tightly integrated COTS applications, including CompuSearch "PRISM" software for the Acquisition business function, and STR "eGrantsPlus" software for the Financial Assistance business function. Further, BearingPoint proposed to use IXOS "Document Manager" as an infrastructure for DOI's document management, imaging, and archival needs.

21. The BPA Proposal placed DOI on notice that BearingPoint's initial design concept for the FBMS system was preliminary in nature and that changes likely would occur during performance of the Task Orders. For example, the BPA Proposal included the following admonition: "Understand that our view of the architectural landscape *will be refined* as the final environment evolves." BPA Proposal, Volume II, Tab 1 at § 1.2 (emphasis added).

22. BearingPoint did not propose, because the RFQ did not call for, a firm fixed-price for the BPA. Instead, the BPA Proposal set forth fixed-price hourly labor rates that would be used as the basis for negotiating the fixed-price Task Orders. These rates were based upon two levels of discounts from BearingPoint's GSA Schedule 70 rates. BearingPoint offered DOI a global 10% discount across all proposed labor categories. In addition, BearingPoint offered incremental volume discounts across all individual labor category rates. In offering these two levels of discounts, the company made clear to DOI that its approach was based upon an anticipated labor staffing mix and a projected labor mix.

23. BearingPoint also offered different rates for work performed at Government facilities and work performed at contractor facilities. Specifically, BearingPoint proposed a 4.5% discount against FBMS Bid Rates to reflect Government Site Rates. This difference is reflected in Section 2.4.5 of BearingPoint's Business Quotation, entitled "Final Proposed BPA

*Rates*," which lists both the "Proposed Program BPA Contractor Site *Rate*" and the "Proposed Program BPA Government Site *Rate*." *Id.* (emphasis added). In response to DOI's questions regarding the BPA Proposal, BearingPoint clarified the use of these different rates as follows:

> As stated in our proposal, the BearingPoint Team has proposed both on-site and off-site *rates* allowing DOI to select which option best fits its perspective and *facility capabilities* for hosting the entire project team.

Responses to DOI FBMS Questions, Question 99 (November 13, 2003) (emphasis added).

24. The BPA Proposal further contemplated that travel would be billed on a cost-reimbursement basis, in accordance with the Joint Travel Regulations and GSA Domestic Maximum Per Diem Rates. No cap on travel costs was included in the BPA proposal or the BPA itself.

25. BearingPoint's proposed QASP placed all of BearingPoint's system integration labor fees and approximately 15% of its system integration direct costs into a pool that would be awarded to BearingPoint, as a matter of right, if it met certain metrics for system deployment and defined levels of customer satisfaction.

**BPA Award to BearingPoint**

26. On January 5, 2004, DOI awarded BPA No. 73873 to BearingPoint. The award document was designated by DOI as a GSA Schedule "Blanket Purchase Agreement" and prepared by DOI using GSA's standard Schedule BPA template. Although the BPA included labor hour and cost estimates, the award document did not obligate any funds or require DOI to purchase a minimum number of labor hours.

27. The BPA expressly incorporated BearingPoint's BPA Proposal, oral presentations, answers to DOI's questions, and GSA Schedule 70 contract. In addition, the BPA

provided that all orders placed against the BPA would be subject to the terms and conditions of BearingPoint's GSA Schedule Contract.

28. The BPA provided that travel would be funded on a cost-reimbursement basis in accordance with the Joint Travel Regulations. The BPA did not specify a limit on the total amount of travel costs that DOI would be required to reimburse.

29. The BPA together with the BearingPoint GSA 70 Schedule Contract, incorporated the following relevant terms and conditions:

> Default. In addition to any other clause contained herein related to termination, the following is applicable to orders placed under Federal Supply Schedule contracts.
>
> Any ordering office may, with respect to any one or more orders placed by it under the contract, exercise the same right of termination, acceptance of inferior articles or services, and assessment of excess costs as might the Contracting Officer, except that *when failure to deliver articles or services is alleged by the Contractor to be excusable, the determination of whether the failure is excusable shall be made only by the Contracting Officer of the General Services Administration*, to whom such allegation shall be referred by the ordering office and from whose determination appeal may be taken as provided in the clause of this contract entitled "Disputes."

Default (I-FSS-249-B) (May 2000) (emphasis added).

> (c) Changes. Changes in the terms and conditions of this contract may be made only by written agreement of the parties.
>
> (d) Disputes. This contract is subject to the Contract Disputes Act of 1978, as amended (41 U.S.C. 601-613). Failure of the parties to this contract to reach agreement on any request for equitable adjustment, claim, appeal or action arising under or relating to this contract shall be a dispute to be resolved in accordance with the clause at FAR 52.233-1, Disputes, which is incorporated herein by reference. The Contractor shall proceed diligently with performance of this contract, pending final resolution of any dispute arising under the contract.

* * *

(f) Excusable delays. The Contractor shall be liable for default *unless nonperformance is caused by an occurrence beyond the reasonable control of the Contractor and without its fault or negligence such as*, acts of God or the public enemy, *acts of the Government in either its sovereign or contractual capacity*, fires, floods, epidemics, quarantine restrictions, strikes, unusually severe weather, and delays of common carriers. The Contractor shall notify the Contracting Officer in writing as soon as it is reasonably possible after the commencement of any excusable delay, setting forth the full particulars in connection therewith, shall remedy such occurrence with all reasonable dispatch, and shall promptly give written notice to the Contracting Officer of the cessation of such occurrence.

* * *

(l) Termination for the Government's convenience. The Government reserves the right to terminate this contract, or any part hereof, for its sole convenience. In the event of such termination, the Contractor shall immediately stop all work hereunder and shall immediately cause any and all of its suppliers and subcontractors to cease work. Subject to the terms of this contract, the Contractor shall be paid a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system, have resulted from the termination. The Contractor shall not be required to comply with the cost accounting standards or contract cost principles for this purpose. This paragraph does not give the Government any right to audit the Contractor's records. The Contractor shall not be paid for any work performed or costs incurred which reasonably could have been avoided.

(m) Termination for cause. The Government may terminate this contract, or any part hereof, for cause in the event of any default by the Contractor, or if the Contractor fails to comply with any contract terms and conditions, or fails to provide the Government, upon request, with adequate assurances of future performance. In the event of termination for cause, the Government shall not be liable to the Contractor for any amount for supplies or services not accepted, and the Contractor shall be liable to the Government for any and all rights and remedies provided by law. *If it is determined that the Government improperly terminated this contract for default, such termination shall be deemed a termination for convenience.*

* * *

FAR 52.212-4, Contract Terms and Conditions – Commercial Items (Feb 2002) (emphasis added).

**Task Order 1**

30. DOI did not utilize the task structure set forth in the BPA, but instead required BearingPoint to submit a new proposal prior to the award of each Task Order. Consequently, each Task Order issued by DOI incorporated a different mix of effort and a different performance schedule from that initially proposed by BearingPoint in the BPA Proposal.

31. BearingPoint submitted its proposal for Task Order 1 ("Task Order 1 Proposal") to DOI on January 9, 2004.

32. The Task Order 1 Proposal included efforts related to the design of various components of the FBMS architecture and preparation of certain reports and plans preliminary to the implementation of FBMS. Illustrative deliverables included: (1) a Project Charter summarizing the activities, time frame, scope, procedures, and resources applicable to the development of FBMS; (2) a Departmental Business Blueprint describing the high-level design of the Department-wide elements of FBMS; and (3) an Architecture Report providing a high-level strategic design of issues such as data conversion, interfaces, technical infrastructure migration, and system integration.

33. DOI awarded Task Order 1 (Order No. 33532) to BearingPoint on January 22, 2004. The award document, which incorporated the Task Order 1 Proposal and the BPA, specified a firm-fixed-price of $2,830,102.79, plus travel costs to be billed on a cost-reimbursement basis. The period of performance for Task Order 1, as modified, extended through April 23, 2004.

34. Because the RFQ did not specify the requirements that BearingPoint's software would be required to meet, it was necessary for BearingPoint to work with DOI during Task Order 1 to define those requirements. This task was to be accomplished through meetings, known as "workshops," between BearingPoint personnel and DOI personnel. During the workshops, it became apparent that DOI's Bureaus had different and conflicting requirements.

35. DOI has accepted and paid for all work performed under Task Order 1.

**Task Order 2**

36. BearingPoint submitted its final proposal ("Task Order 2 Proposal") for Task 1A ("Task Order 2"), which, subsequently, the parties commonly referred to as Task Order 2, on June 25, 2004.

37. The Task Order 2 Proposal included BearingPoint's response to DOI's instruction to extend the review period for the Departmental Business Blueprint. As a result of the extended review period, BearingPoint's Task Order 2 Proposal set forth a revised implementation schedule. Pursuant to that revised schedule:

a. The Departmental Business Blueprint was to be completed by July 7, 2004.

b. Deployment 1A, to go live by February 28, 2005, was to implement Financial Assistance functionality at MMS, OSM and FWS.

c. Deployment 1B, for which no go live date was provided in BearingPoint's proposal, was to implement Travel functionality following DOI's selection of a travel application vendor.

d. Deployment 2A, to go live by October 1, 2005, was to implement Core Financials, Property, Acquisition, PCS, and EMIS functionality at BLM, OSM, and MMS.

e. Deployment 2B, to go live by November 1, 2005, was to implement Budget Formulation and Budget Planning functionality at BLM, OSM, and MMS.

f. Deployment 3 was to implement FBMS functionality in all functional areas at FWS, NPS and OS, and was to go live by November 1, 2006.

g. Deployment 4 was to implement all functional areas at USGS, BOR and BIA, and was to go live by October 1, 2007.

38. The scope of the Task Order 2 Proposal included additional activities preliminary to Deployments 1A and 2A, activities that were not part of the BPA proposal.

39. DOI issued Task Order 2 (Order No. 35880) to BearingPoint on June 28, 2004. The award document, which incorporated the Task Order 2 Proposal and the BPA, specified a period of performance through July 31, 2004. Task Order 2 was awarded with a firm fixed-price of $4,434,960.00, plus reimbursement of certain other direct costs, including travel.

40. BearingPoint submitted the revised Departmental Business Blueprint to DOI on July 15, 2004. The revised blueprint, accepted by DOI in October 2004, included a list of proposed requirements that FBMS would be required to meet.

41. DOI has accepted and paid for all work performed under Task Order 2.

## Task Order 3

### BearingPoint's Task Order 3 Proposal

42. BearingPoint submitted its initial proposal for Task Order 3 on July 15, 2004. Task Order 3 was to include Deployments 1A, 2A, and 2B. In addition, BearingPoint's initial proposal for Task Order 3 included certain interfaces and other additional work, not contemplated by the RFQ or the BPA, that were identified by DOI during Task Orders 1 and 2.

43. Following lengthy negotiations and multiple proposal revisions, the parties agreed that the additional work identified during Task Orders 1 and 2 would be removed from the scope

and price of Task Order 3 and included in BearingPoint's proposal as a list of options that DOI could add to the Task Order at a later date ("Options List"). The Task Order 3 Proposal contemplated that these optional items would be proposed, priced, and added to Task Order 3, if at all, as bilateral changes. The parties subsequently agreed to a change order process whereby BearingPoint would draft so-called "White Papers" to address these and other potential changes to Task Order 3.

44. BearingPoint submitted the final version of its proposal for Task Order 3 on September 17, 2004.

45. The scope of the Task Order 3 Proposal included implementation of Deployments 1A, 2A, and 2B in accordance with the schedule set forth in its Task Order 2 Proposal. For each of these deployments, BearingPoint's proposal identified the data to be converted and the interfaces to be provided to DOI.

46. The terms of the Task Order 3 Proposal required DOI to make decisions in a timely manner and included specific timeframes in which DOI was required to make certain types of decisions. In this regard, the Task Order 3 Proposal included the following requirements:

a. "Design resolution (direction on process procedures) will occur within 72 hours of PMO [Program Management Office] notification to ESC [Executive Steering Committee] of the design gap or design issue." Task Order 3 Proposal at § 4.1.

b. "The Executive Steering Committee . . . will review business issues and make timely decisions." *Id.*

c. "Critical Business Issues will be resolved in 3 business days." *Id.* Task Order 3 Proposal at § 4.3.1.

d. "DOI will make business decisions within 48 hours for any escalated gap that should be resolved through either process redesign or enhancements. On an exception basis only, BearingPoint Team understands that some decisions . . . will take no longer than 5 business days." *Id.*

47. BearingPoint expressly conditioned its proposal on the predicate that "DOI project team members will be empowered to make strategic and programmatic decisions on behalf of the entire DOI users community without necessity for consensus." Task Order 3 Proposal at § 4.3.1. The Task Order 3 Proposal required DOI to make a decision regarding which entity would be responsible for hosting (*i.e.*, providing facilities, hardware, applications support, and operating support) for the FBMS infrastructure by August 13, 2004. The proposal also placed DOI on notice that its failure to make a timely hosting decision could delay the project. *Id.* at § 4.3.

48. The Task Order 3 Proposal included specific requirements regarding the number and categories of personnel that both DOI and its Bureaus would be required to devote to the FBMS project. For example, DOI was required to dedicate to the FBMS Project – on a full time basis – one subject matter expert ("SME") per Bureau for each of 13 enumerated functional areas. In addition, BearingPoint's Task Order 3 Proposal required DOI to devote full time technical experts to each of those functional areas.

49. The Task Order 3 Proposal placed DOI on notice that the flow of information between the parties would be crucial to the success of the FBMS project. In this regard, BearingPoint's proposal included the following predicates and assumptions:

a. "DOI will provide all necessary software licenses and information for any current products that may be reused." Task Order 3 Proposal at § 4.1.

b. "DOI will provide access to databases, records, information, data, file layouts, as required, to support this project." *Id.*

c. "DOI will make available to the BearingPoint Team, for reference, all current systems and functional documentation such as narratives, process flows, technical architectures, and application data models." *Id.*

50. The Task Order 3 Proposal stated that "the performance location for all work is assumed to be government facilities with the appropriate network connectivity." Task Order 3 Proposal at § 4.3.1.

51. The Task Order 3 Proposal clarified that the implementation of any customized functionality not embedded in the delivered software solution, as well as any changes to the system proposed by DOI after approval of the Functional Design Specifications ("FDSs") and Technical Design Specifications ("TDSs"), would constitute changes to the Task Order.

52. The Task Order 3 Proposal included the following acceptance provision:

> When the BearingPoint Team provides the client with draft deliverables, DOI will have five (5) business days to review and approve or request changes and BearingPoint will have five business days to incorporate feedback into the final. Requested changes will be specific in nature. Deliverables not explicitly accepted or rejected by DOI within the time period allotted will be deemed accepted.

Task Order 3 Proposal at § 4.3.1.

53. BearingPoint's proposed firm fixed price for Task Order 3 was $26,353,263 plus a holdback of $3,952,990 for the performance incentive incorporated into BearingPoint's QASP. Task Order 3, Proposal at § 6.3. BearingPoint's proposal also included an estimate for other direct costs, including travel ($2,619,853) and certain hardware ($245,070), to be provided on a cost-reimbursement basis. *Id.* The proposal did not specify a cap on travel costs.

**Award to BearingPoint**

54. Task Order 3 (Order No. 0404DO37408) was issued to BearingPoint on September 20, 2004. The award document incorporated BearingPoint's Task Order 3 Proposal and the terms and conditions of the BPA. Task Order, Block 17.

55. The award document indicated that Task Order 3 would be funded incrementally. The funding for Task Order 3, as awarded, was $7,800,000.

**Deployment 1A**

56. Deployment 1A required BearingPoint to implement Financial Assistance functionality at MMS, OSM, and FWS by February 28, 2005.

57. Deployment 1A went live on March 1, 2005.

58. BearingPoint was required to provide technical support for Financial Assistance functionality for 30 days following the go live date for Deployment 1A. DOI, however, continued to rely on BearingPoint for support well beyond the contractual 30 day transition period. As a result, BearingPoint's Financial Assistance team was required to divert critical resources away from activities related to Deployment 2A.

**Deployment 2A**

59. Deployment 2A required BearingPoint to implement Core Financials, Property, and Acquisition Functionality at BLM, OSM, and MMS by October 1, 2005.

60. From the outset, Deployment 2A was plagued with delays caused by DOI.

***DOI's Failure to Approve Functional Design Specifications for Interfaces***

61. Commercial ERP packages such as SAP generally provide functionality for most, but not all, of the business processes of a large and complex organization such as DOI. In particular, software integrators frequently must design and develop customized code for enhancements, interfaces to external applications, data conversion, and custom reports.

62. In general terms, the accepted procedure for designing, developing, and testing customized software functionality is as follows:

a. The software integrator first prepares a Functional Design Specification ("FDS"), which provides high level, technical descriptions of what the software must accomplish and how it must perform.

b. After the FDS has been finalized, the integrator prepares a Technical Design Specification ("TDS"), which describes the functionality at a more detailed technical level. Because TDSs are derived from, and depend upon, FDSs, it is standard industry practice to finalize an FDS before work on the corresponding TDS begins.

c. Once the TDS has been accepted, the integrator writes the code that will implement the customized functionality. The integrator then performs unit testing, which tests the functionality in isolation from other components of the system.

d. Integration testing is performed after all application components are configured and the programs have been unit tested. Integration testing tests the end-to-end business process of an entire system.

63. BearingPoint's Project Plan, a deliverable accepted by DOI on November 14, 2004, contemplated that development and testing would proceed in accordance with the sequence described above. In this regard, the Project Plan identified "sign off" of each FDS as a "predecessor" to the development of the corresponding TDS, and "sign off" and baselining of each TDS as the "predecessor" to development and testing of the corresponding functionality. The Project Plan further provided that DOI would approve most FDSs within one day of submission.

64. For the FBMS project, customizations to SAP were required for interfaces to numerous external applications. In many cases, DOI failed to approve the FDSs for these interfaces, either because DOI continued to add functionality or because it was unable to make timely decisions regarding the nature of the functionality it required. In other cases, DOI approved FDSs, but continued to request changes after they were accepted and baselined.

65. BearingPoint timely notified DOI of delays associated with its failure to approve BearingPoint's FDSs in email correspondence and weekly status reports and meetings.

66. Because the Project Plan did not provide for preparation of a TDS until DOI approved the corresponding FDS, or for development until DOI approved the TDS, delays associated with DOI's approval of the FDSs impacted the overall project schedule for Deployment 2A. Changes made to an interface after acceptance of the FDS also impacted the project schedule by requiring BearingPoint to revise the FDS and TDS and code the change.

67. The following examples illustrate the delays occasioned by DOI's failure to timely approve and finalize the FDSs for various FBMS interfaces.

a. BearingPoint submitted its proposed FDS for the FBMS interface to the Federal Personnel and Payroll System ("FPPS") by the first week of November 2004. Completion and approval of the FDS, however, was delayed by DOI's failure to make a decision regarding how to resolve an issue associated with the interface's 23 character field limitation. Although BearingPoint's Status Reports repeatedly notified DOI of the need for a decision regarding this issue, no such decision was forthcoming from DOI. Even after the FPPS interface was "finalized" in mid-January 2005, DOI continued to request changes to the interface through August 2005, months after the date for acceptance identified in BearingPoint's approved Project Plan. BearingPoint informed

DOI that these design changes would require a long development time and could delay the October 1 "go live" date. Nevertheless, DOI chose to proceed with the changes. These delays and continuing changes directly impacted BearingPoint's ability to timely complete Deployment 2A.

b. BearingPoint submitted its proposed FDS for the FBMS interface to MAXIMO, an external application for inventory and asset management, on November 1, 2004. DOI continued to request revisions to the MAXIMO interface for approximately eight months. BearingPoint notified DOI of these delays and the impact on the program schedule in weekly status reports beginning in December 2004 and continuing through June 2005. Further, status reports provided in February 2005 and March 2005 placed DOI on notice that BearingPoint had been forced to commence work on the MAXIMO TDSs before DOI finalized the corresponding FDSs. These delays and continuing changes directly impacted BearingPoint's ability to timely complete Deployment 2A.

***Data Conversion Delays Caused by DOI***

68. DOI failed to timely approve numerous data conversion FDSs submitted by BearingPoint, thereby delaying the data conversion process. DOI also failed to fulfill to its obligations with respect to the Portal and Interfaces, including, but not limited to, making a timely encryption decision. In addition, BearingPoint could not complete certain data conversion FDSs because DOI attempted to require BearingPoint to transform historical data in a manner that was not within the scope of Task Order 3.

69. The various Bureaus also delayed data conversion by failing to provide BearingPoint with usable data/extracts for executing mock conversions, attempting to require BearingPoint to comply with audit standards that exceeded the scope of Task Order 3, and unilaterally declining to assist BearingPoint during certain "blackout" periods.

70. BearingPoint timely notified DOI of delays associated with data conversion in weekly status reports and email correspondence.

71. DOI precluded timely completion of the data conversion process. Delays associated with data conversion, in turn, delayed the overall completion of Deployment 2A.

***DOI's Failure to Baseline System Requirements in a Timely Manner***

72. In the software design and implementation context, a "requirement" refers to a function that the software must perform. Examples of requirements include the ability to collect particular data, to interface with particular systems, and to generate particular reports.

a. Requirements are the foundation for software design and implementation. Because software must be designed or configured to meet the requirements, the requirements must be agreed upon, or "baselined," before development and configuration begin.

b. Requirements also define the scope of a software implementation, *i.e.*, what functions the software must perform, and constitute the criteria against which the software is to be tested.

c. Once the software integrator and the client have "baselined" the requirements, either the system must be configured to meet those requirements or an FDS and TDS must be written and custom code must be designed and developed. The integrator then prepares "test scripts" that will be used to verify compliance of the code with the baselined requirements. Each requirement must be linked to a test script that defines how the software should respond to a specified input. If, upon entering the input specified in the test script, the desired output is obtained, then the designed or configured software meets the requirement to which the test script is linked.

73. BearingPoint's BPA Proposal and Task Order 3 Proposal, in accordance with applicable industry standards, required the parties to baseline requirements before the commencement of integration testing. Further, BearingPoint's Requirements Management Plan, a deliverable first submitted by BearingPoint in late 2004 and belatedly accepted by DOI on April 15, 2005, provided that the requirements would be baselined by April 30, 2005.

74. BearingPoint provided an initial list of requirements to DOI as an attachment to the Departmental Business Blueprint and submitted revised requirements lists in September 2004 and February 2005.

75. Despite multiple requests from BearingPoint, DOI made little effort to review BearingPoint's proposed requirements for several months. DOI took no serious interest in the requirements submittals until late May 2005, over a month after the baselining was required to be completed. Further, DOI continued to add Property requirements until September 2005, approximately five (5) months after the deadline for baselining specified in the Requirements Management Plan, eight (8) months after BearingPoint submitted its revised requirements list to DOI, and approximately one month prior to the scheduled "go live" for Deployment 2A. In addition, many of the additional Property requirements proposed by DOI were not within the scope of Task Order 3, as DOI ultimately conceded.

76. BearingPoint timely notified DOI of the need to baseline the requirements in weekly status meetings held in November and December 2004. DOI was advised of the need to finalize the requirements baseline, and the delays being experienced, in status reports between May and September 2005. Further, in April 2005, BearingPoint verbally informed DOI that it could not begin integration testing as scheduled because the requirements had not been

baselined. The Test Readiness Review ("TRR"), conducted on May 25, 2005, provided DOI with additional notice of the need to baseline the requirements.

77. On November 5, 2004, DOI's Independent Verification and Validation Contractor advised DOI of the need to promptly baseline DOI's requirements, and delineated to DOI various adverse consequences that might occur if it failed to do so.

78. DOI's delay in baselining the Property requirements alone delayed Deployment 2A by at least four (4) months. Extensive negotiations regarding the Property requirements also diverted key BearingPoint resources from other tasks, thereby causing additional delays.

***DOI's Failure to Approve and Fund White Papers in a Timely Manner***

79. During the FBMS project, BearingPoint prepared approximately 80 "White Papers" designed to facilitate DOI's ability to make certain decisions about the project. Each White Paper explained an issue relevant to the project, analyzed DOI's options, and presented BearingPoint's recommendations.

80. The parties agreed to written procedures for the submission and review of White Papers in November 2004. Pursuant to those procedures, DOI was required to resolve the issues identified in a White Paper by the "Critical Resolution Date" identified in the document in order to avoid impacting the project schedule. Further, BearingPoint was not permitted to begin the work identified in a White Paper until it received approval from DOI and, in the case of options that entailed additional costs, a written modification from the Contracting Officer.

81. DOI failed to approve approximately one third of BearingPoint's White Papers by the respective Critical Resolution Date and also failed to fund several additional White Papers by the Critical Resolution Date. Of the White Papers that were not timely approved or funded, approximately seven were between one and two months past the Critical Resolution Date, approximately twenty-one were between two and four months past the Critical Resolution Date,

approximately four were four to six months past the Critical Resolution Date, and approximately seven were more than six months past the Critical Resolution Date.

82. Several causes contributed to DOI's failure to make timely decisions regarding the White Papers. In many cases, DOI required BearingPoint to submit multiple revisions because one or more Bureaus could not agree on a resolution or desired additional functionality. In other cases, DOI's Project Management Office determined that it could not make a decision regarding a White Paper and wanted to elevate the issue to the Executive Steering Committee, but failed to place White Papers on the Executive Steering Committee's agenda, thereby delaying their consideration. Even when the Executive Steering Committee finally made decisions, DOI frequently failed to fund the work described in the approved White Paper for a number of additional weeks or even months.

83. BearingPoint timely notified DOI of delays occasioned by its failure to timely approve and fund White Papers. BearingPoint maintained and tracked the status of each White Paper in an Issues Database that was accessible to DOI. Further, BearingPoint notified DOI of delays associated with the White Papers in weekly status reports and also provided to DOI several email analyses of delays associated with particular White Papers.

84. BearingPoint needed DOI to approve each White Paper by the Critical Resolution Date in order to implement the functionality described in that White Paper by the October 2005 deadline for Deployment 2A. FBMS could not go live without certain functionality described in the White Papers, either because DOI so stated or because the system would not have passed user acceptance testing. As a result, DOI's failure to timely approve and fund the White Papers delayed Deployment 2A as a whole.

***DOI's Failure to Make Available Online Service Support Connectivity***

85. Online Service Support ("OSS") is a "help line" service provided by SAP to software integrators such as BearingPoint. It is an invaluable aid to software integration because it accelerates greatly the resolution of questions and problems. For the service to be effective, SAP must be able to access the user's system remotely.

86. DOI was required to establish and maintain OSS connectivity throughout the implementation of FBMS. DOI, however, did not provide OSS connectivity until August 2005, only weeks before Deployment 2A was scheduled to go live.

87. BearingPoint timely brought the lack of OSS connectivity to DOI's attention in June 2004, and subsequently raised the issue and its impact on the project in weekly status reports provided between January and August 2005, in email correspondence, and in special meetings devoted to developing a solution to the OSS connectivity issue. An SAP Functional Assessment Report, provided to DOI and BearingPoint in April 2005, also underscored the severity of the issue, as did the May 25, 2005 Test Readiness Review ("TRR").

88. DOI's failure to provide OSS connectivity for over a year delayed BearingPoint and prevented the timely resolution of numerous open issues, with several issues remaining unaddressed at the time of termination. BearingPoint could not have proceeded with the project because resolution of these issues was a prerequisite to the commencement of integration testing. Accordingly, the lack of OSS connectivity delayed Deployment 2A.

***Non-Contiguous Testing***

89. BearingPoint staffed the FBMS project consistent with its contractual understanding that testing would take place at a single location. BearingPoint informed DOI in December 2004 of the problems, difficulties, and negative impacts of testing at two locations.

90. Over BearingPoint's objection, DOI required BearingPoint to conduct simultaneous testing in Denver, Colorado and Herndon, Virginia.

91. As a result of testing in two locations, DOI personnel often improperly signed-off on test scripts, either because they lacked expertise in the relevant testing area or because they failed to obtain input from teams located at the other venue. DOI's actions in this regard precluded the subsequent identification of errors in a timely fashion and forced BearingPoint to comb through earlier test results to ascertain the cause of software problems.

92. Testing in multiple locations also hindered communication and unduly burdened BearingPoint personnel. Had testing occurred at one location, BearingPoint could have assigned one individual from each functional team to conduct testing and another to support testing activities. With testing split between two locations, however, each location had only one individual who was responsible for both conducting tests and performing supporting tasks. Despite extended working hours, this additional workload both decreased productivity and diverted resources from other tasks.

93. The problems and difficulties that resulted from non-contiguous testing delayed Deployment 2A as a whole beyond its scheduled "go-live" date.

***DOI's Failure to Provide Adequate Facilities***

94. Notwithstanding the express requirements of Task Order 3, DOI failed to make available adequate facilities to BearingPoint personnel.

95. Dozens of BearingPoint personnel lacked access cards for the Herndon project facility. BearingPoint submitted multiple written requests for additional access cards between May and June 2005, and also addressed the need for its personnel to obtain access to the Herndon facility in weekly status reports submitted between April and September 2005.

96. As of the date of termination, however, the issue remained unresolved. As a result, BearingPoint personnel that possessed access cards wasted valuable time escorting their co-workers in and out of the Herndon project facility.

97. DOI also failed to provide for adequate parking at the Herndon facility. Cars at the Herndon facility were occasionally towed, which required BearingPoint personnel to stop work while they reclaimed their cars. BearingPoint notified DOI by email dated June 28, 2005 that inadequate parking at the Herndon facility was impacting performance. The only proposed solution offered by DOI was for BearingPoint personnel to park their cars at a National Park Service building and call an FBMS team member for a ride. As a result, BearingPoint personnel were required to waste valuable time shuttling each other between the Herndon facility and the satellite parking lot.

98. Further, DOI failed to provide BearingPoint personnel sufficient office space at the Herndon facility. At times, as many as three desks were placed into a cubical designed for a single person. BearingPoint timely notified DOI of the need for additional space beginning in February 2005 and identified the issue in weekly status reports provided to DOI from March through September 2005. The resulting working conditions not only undermined efficient performance, but also contributed to an increased rate of illness and staff turnover, which further contributed to inefficiencies.

99. The lack of building access, parking, and office space at the Herndon facility contributed to inefficient performance and caused additional delays to the timely completion of Deployment 2A.

***DOI's Failure to Provide Adequate Staffing***

100. Notwithstanding the requirements set forth in BearingPoint's Task Order 3 Proposal, DOI provided no full time Subject Matter Experts for eleven of thirteen functional areas, and provided only one Subject Matter Expert for the remaining two functional areas.

101. The need for additional Subject Matter Experts was timely raised by BearingPoint in May 2005 and acknowledged by DOI in the Lessons Learned Worksheet, a deliverable accepted by DOI in June 2005.

102. The lack of full time Subject Matter Experts impeded BearingPoint's ability to obtain crucial information in a timely manner, increased the time required for DOI to make decisions, and required BearingPoint to make changes later in the project than necessary due to untimely input from the Bureaus.

103. Notwithstanding the requirements set forth in BearingPoint's Task Order 3 Proposal, DOI provided only one full time technical expert for the FBMS project until mid-2005, when a second technical expert was added. BearingPoint timely addressed the need for technical experts in weekly status reports and meetings held throughout February and March 2005.

104. The lack of full time technical experts prevented BearingPoint from obtaining information necessary to complete and obtain approval of its TDSs, and also delayed testing because such personnel were necessary to provide and validate data.

105. DOI's failure to meet the staffing requirements set forth in BearingPoint's Task Order 3 Proposal delayed the overall timely completion of Deployment 2A.

***DOI's Failure to Make a Timely Hosting Decision***

106. Task Order 3 required DOI to make a decision regarding hosting of the FBMS by August 13, 2004.

107. DOI failed to make a FBMS hosting decision until October 22, 2005.

108. BearingPoint timely notified DOI of delays associated with its failure to make a hosting decision and of the resulting impact in correspondence beginning in August 2004. BearingPoint provided additional notice to DOI in weekly status reports and meetings from August through October 2004.

109. As a result of DOI's failure to make a timely hosting decision, the schedule to complete Deployment 1A was extremely compressed and BearingPoint was forced to divert technical resources from Deployment 2A so that Deployment 1A would be completed by March 1, 2005. This diversion of resources directly impacted BearingPoint's ability to meet the October 2005 deadline for Deployment 2A.

***Interference by DOI's Independent Verification and Validation Contractor***

110. DOI employed The Titan Group ("Titan") as an Independent Verification and Validation ("IV&V") contractor for the FBMS project.

111. Titan repeatedly submitted comments requiring BearingPoint to address issues that previously had been resolved. DOI refused BearingPoint's request to remove from any list of comments provided by Titan issues that already had been resolved by the parties. As a result, BearingPoint was forced to waste valuable time and personnel resources addressing issues that were no longer relevant to its performance. The overall completion of Deployment 2A was thereby delayed.

**BearingPoint's Compliance with Certain Contractual Requirements**

***Project Control Reporting***

112. Earned Value Management ("EVM") is a technique for monitoring project schedule and cost. All work is planned, budgeted, and scheduled in time phased "planned value" increments. When the contractor completes a task or milestone, it is said to have earned the

value associated with that task or milestone. Earned value can be compared with planned value and actual cost to measure schedule and cost variance, respectively.

113. The parties defined the EVM requirements applicable to Task Order 3 in Appendix D of BearingPoint's Schedule Management Plan. The Schedule Management Plan, a contract deliverable, was accepted by DOI in December 2004.

114. BearingPoint complied with the applicable EVM project control reporting requirements as approved in the Schedule Management Plan. DOI was fully apprised of BearingPoint's level and quality of compliance with the requirements established by the Schedule Management Plan for fourteen months prior to the Task Order 3 termination.

115. The EVM project control reporting requirements applicable to Task Order 3 were not material contract requirements.

***Project Quality Assurance***

116. The BPA Proposal and the Task Order 3 Proposal included certain quality assurance provisions.

117. BearingPoint complied with the quality assurance provisions included in the BPA and the Task Order 3.

118. The quality assurance provisions included in the BPA Proposal and Task Order 3 were not material contract requirements.

**DOI Funding of BearingPoint's Performance**

119. Task Order 3 was issued on September 20, 2004 as a segmented Task Order, with each segment to be separately funded, and with initial funding set at $7,800,000. This amount included 100 percent of the labor portion of the first segment of Task Order 3, including the 15 percent deferred amount for achieving the performance standards of the QASP.

120. The initial funding for Task Order 3 was exhausted in November 2004.

121. Modification 0001 to Task Order 3 ("Modification 1"), issued on November 29, 2004, increased the total funds "available and allotted" to Task Order 3 to $15,177.086.00. This amount included 100 percent of the labor portion of the second segment of Task Order 3, including the 15 percent deferred amount to be paid to BearingPoint for achieving the performance standards of the QASP. In addition, Modification 1 added the following language to Task Order 3: "[T]he Government shall not be obligated to reimburse the Contractor for costs in excess of the current allotment, nor will the Contractor be obligated to continue performance and incur costs in excess of the amount allotted." Modification 1, Block 14.

122. Modifications 0002 through 0005 included only minor increases in funding. As of Modification 0005 ("Modification 5"), issued on March 29, 2005, the total amount of funds allotted to Task Order 3 was $15,182,930.00. This amount was sufficient to cover 100 percent of the labor portion of the second segment of Task Order 3, including the 15 percent deferred amount to be paid to BearingPoint for achieving the performance standards of the QASP.

123. The funding issued pursuant to Modification 5 lasted until April 2005.

124. On April 26, 2005, DOI provided BearingPoint with a draft of Modification 6, which would have increased the amount of funds allotted to Task Order 3 to $27,572,218.00.

125. If accepted by BearingPoint, Modification 6 would have materially changed the terms and conditions of Task Order 3 in a number of respects. In particular, Modification 6, among other things, would have:

a. Added FAR 52.232-18, Availability Of Funds to Task Order 3;

b. Added new CLIN 0013, "QASP Holdback," which provided in part "This line item is not currently fully funded. . . . An additional $1,651,812.00 is needed to fund this line item fully;"

c. Changed the reimbursement of travel from a not-to-exceed amount for the entire funding period to a not-to-exceed amount for each month of performance, thereby exposing BearingPoint to the risk of not receiving full compensation for travel costs incurred during travel-intensive months of the project;

d. Created additional requirements for the reporting of travel costs, thereby imposing an administrative burden to which BearingPoint had not agreed; and

e. Failed to fund all work ordered under the CLIN by failing to fund the 15 percent of the labor portion of the third segment of Task Order 3, representing the deferred amount to be paid to BearingPoint for achieving the performance standards of the QASP, thereby exposing BearingPoint to the risk that it would not receive the performance incentives for which it had bargained.

126. These material changes to Task Order 3 were unacceptable to BearingPoint. Accordingly, by letter dated April 26, 2005, BearingPoint rejected the proposed modification, as permitted by the terms of its GSA Schedule 70 contract. Further, BearingPoint expressly advised DOI that any continued performance by BearingPoint should not be construed by DOI as acceptance of the draft modification.

127. On April 29, 2005, the DOI Contracting Officer informed BearingPoint that he did not intend to cure the deficiencies in, or otherwise reissue, the draft Modification 6 in any fashion. Later that day, he confirmed by email his intent not to "alter or re-issue the modification."

128. By letter dated May 9, 2005, BearingPoint once again advised DOI of its rejection of Modification 6.

129. As a result of the parties' failure to reach a bilateral agreement, Modification 6 never became effective and Task Order 3 remained unfunded. As such, BearingPoint's obligations under the Task Order were suspended and the company was entitled to stop work until such time as the Task Order was properly funded.

130. BearingPoint continued to perform Task Order 3 notwithstanding its rejection of Modification 6 because (1) BearingPoint viewed DOI's assertion of the right to issue the modification unilaterally as contractual direction to perform in accordance with Modification 6, and (2) continued performance was needed in order to mitigate any further DOI delay to the FBMS project.

**DOI's Waiver of the October 2005 Deadline for Deployment 2A**

***DOI's Knowledge of BearingPoint's Inability to Meet the Deadline***

131. Upon information and belief, Titan notified DOI of the potential for untimely performance under Task Order 3 as early as December 2004.

132. Based upon BearingPoint's weekly project status reports, DOI knew or should have known by no later than April 2005 that BearingPoint would be unable to meet the October 2005 deadline for Deployment 2A.

133. As early as April 2005, the parties discussed whether the May 2005 Test Readiness Review should proceed because the program was not ready.

134. At a May 10, 2005 Executive Steering Committee Meeting, BearingPoint made clear that the deadline to begin integration testing would be missed.

135. BearingPoint's failure to pass the Test Readiness Review in May 2005 provided an additional indication that BearingPoint would not meet the October 2005 deadline for Deployment 2A. DOI personnel acknowledged the inability to achieve Deployment 2A by the

scheduled October date and discussed at the Test Readiness Review the need for negotiating a new schedule.

136. In June 2, 2005, BearingPoint's Project Manager announced at a weekly status meeting that BearingPoint would not meet the October 2005 deadline and presented four alternate approaches to DOI.

137. By letter dated June 3, 2005, the DOI Contracting Officer, who had attended the June 2, 2005 weekly status meeting, acknowledged BearingPoint's announcement that it would be unable to implement Deployment 2A by October 2005.

***DOI Actions Inconsistent with an Intent to Terminate***

138. Between April 2005 and August 2005, DOI took numerous affirmative actions inconsistent with an intent to terminate Task Order 3 for cause.

139. Between April and July 2005, BearingPoint worked closely with DOI to develop a revised schedule for Deployment 2A. Email correspondence between the parties indicates that, as early as June 2005, both BearingPoint and DOI understood that the deadline for Deployment 2A had been extended to October *2006*.

140. DOI participated actively in the re-planning effort. For example, by email dated June 10, 2005, the DOI Contracting Officer requested BearingPoint to provide analyses of, and potential schedules for, several alternatives to the October 2005 implementation of Deployment 2A.

141. The DOI Project Management Office, the Bureaus, and the Department's IV&V contractor played active roles in the schedule re-planning effort. For example, each participated in meetings, and provided extensive comments, regarding proposed revisions to the project schedule for Deployment 2A.

142. Email correspondence exchanged between the parties indicates that both BearingPoint and DOI understood that the deadline for Deployment 2A would be extended to October 2006.

143. The Executive Steering Committee's July 26, 2005 Project Schedule Status Meeting constitutes additional evidence of DOI conduct inconsistent with an intent to terminate Task Order 3. The PowerPoint presentation provided at the meeting indicated that the "ESC expressed a preference and OCIO recommended to delay Deployment 2a for an entire year."

144. The Re-Planning Effort – Frequently Asked Questions document ("Re-Planning FAQs"), prepared jointly by BearingPoint and DOI, also indicated that the deadline for Deployment 2A had been extended until October 2006. This document was reviewed and edited by various members of the DOI Project Management Office, including the Contracting Officer's Representative.

145. DOI agreed to revised completion dates beyond the October 2005 deadline for Deployment 2A. The attachment to an email from DOI dated the same day as the Task Order 3 Termination Notice indicates that the "Revised Completion Date[] Agreed to [on] 8/31/2005" for the Labor Interface was December 23, 2005, approximately two months after the original October 2005 deadline for Deployment 2A.

146. Other DOI conduct inconsistent with an intent to terminate Task Order 3 included:

a. Supporting BearingPoint's Task Order 3 activities;

b. Funding Titan's IV&V contract;

c. Converting its legacy systems to ensure the proper interface with BearingPoint's proposed system;

d. Providing data conversion and data cleanup support to BearingPoint in a manner consistent with BearingPoint's proposed approach;

e. Working with BearingPoint to define requirements;

f. Unilaterally issuing draft Modification 6 to Task Order 3 and advising BearingPoint that DOI considered the modification effective;

g. Reaching decisions on White Papers; and

h. Approving contract submittals.

147. DOI failed to issue a Cure Notice to BearingPoint until approximately eight months after the Titan report, four months after it knew that BearingPoint would not pass the Test Readiness Review, approximately three months after BearingPoint failed the Test Readiness Review, and approximately two months after BearingPoint expressly informed DOI that it would not meet the October 2005 deadline for Deployment 2A.

148. The delay between the time that DOI knew that BearingPoint would not meet the Deployment 2A deadline and its issuance of a default notice is unreasonable.

***BearingPoint's Reliance on DOI's Decision Not to Terminate Task Order 3***

149. BearingPoint reasonably continued to perform and incur significant costs based upon its understanding that DOI did not intend to terminate Task Order 3.

150. BearingPoint continued to pay its subcontractors, although BearingPoint was not itself being paid.

**Oracle License Issue**

151. In May 2005, the parties discussed the number of Oracle licenses that might be required to implement the FBMS system. BearingPoint informed DOI that the final architecture of the FBMS system would require DOI to purchase more Oracle software licenses than BearingPoint had estimated in the BPA Proposal.

152. On June 8, 2005, DOI informed BearingPoint that it considered the company responsible for the cost of all licenses in excess of the number estimated in the BPA Proposal. DOI requested adequate assurance of future performance by BearingPoint.

153. BearingPoint responded to DOI's request for adequate assurances by letter dated June 20, 2005. BearingPoint's response reiterated its commitment to perform in accordance with the requirements of Task Orders issued under the BPA and any Contracting Officer direction issued pursuant to the Task Orders. With regard to the Oracle license issue, BearingPoint set forth its position, noting that the estimated license quantities in the BPA proposal were not contractually binding because the BPA was not a contract. In this regard, BearingPoint explained that the BPA did not require DOI to purchase any minimum quantity or dollar value of services, permitted BearingPoint to reject orders above a certain dollar threshold, and contemplated that pricing discussions would occur on a Task Order basis. BearingPoint's letter also reminded DOI that the BPA Proposal placed the agency on notice that the preliminary solution proposed by BearingPoint was likely to change as work progressed.

154. In subsequent communications and correspondence between the parties, BearingPoint reiterated that, while it disagreed with the DOI position regarding the Oracle license, it was fully committed to performance in accordance with the requirements of Task Orders issued under the BPA and any direction of the Contracting Officer. At no time prior to the termination of Task Order 3 and the BPA did BearingPoint receive any formal direction from the DOI Contracting Officer instructing BearingPoint to take any specific action with regard to Oracle licenses.

**DOI's Purported Termination of Task Order 3**

155. By letter dated August 23, 2005, DOI issued a cure notice with regard to Task Order 3 ("Task Order 3 Cure Notice"). In relevant part, the Task Order 3 Cure Notice provided

as follows: "You are hereby notified that the Government considers BearingPoint's failure to provide timely delivery of Deployment 2A, project control reporting, and quality assurance to endanger performance of the subject contract." An attachment to the Cure Notice provided further detail regarding each of the foregoing points.

a. With regard to BearingPoint's purported "failure to provide timely delivery of Deployment 2A," the attachment stated: "To date, the TRR has not been passed, nor has the Integration Testing itself begun. BearingPoint has informed us that, due to this delay, deployment of 2A in October 2005 is not possible. Therefore, we have no choice but to consider this an anticipatory breach of our contract."

b. With regard to "project control reporting," the attachment stated: "Task Order 03 requires BearingPoint to provide project control reporting for Earned Value Management Data in accordance with ANSI/EIA 748-A standards and Project schedules using effort-driven methods (see Task Order 03, Section 4.3, page 42, bullet 3; and BPA 73873, Technical Proposal, Section 3.1.6). . . .[W]e regard BearingPoint to be in actual breach of this portion of our contract."

c. With regard to "quality assurance," the attachment stated: "Task Order 03 requires BearingPoint to provide project controls and quality assurance requirements (see Task Order 03, Sections 2.1.1 and 2.1.1, and BPA 73873, Technical Proposal, Sections 3.1.8 and 3.2). The requirements of this task have not been met by BearingPoint."

156. In addition to requesting a response to the foregoing points, the Task Order 3 Cure Notice invited BearingPoint to submit a proposal for completing Task Order 3 under revised terms.

157. BearingPoint submitted an initial response to the Task Order 3 Cure Notice by letter dated August 30, 2005 and a more detailed response by letter dated September 2, 2005. In addition to requesting prompt negotiations with DOI regarding a revised Task Order 3, BearingPoint's September 2, 2005 letter outlined its preliminary positions with regard to each of the three grounds identified in the Task Order 3 Cure Notice as a potential basis for termination.

a. BearingPoint explained that its inability to meet the schedule for Deployment 2A was the result of excusable delay, and informed DOI that DOI had waived the October 2005 delivery date.

b. BearingPoint explained that its project control reporting requirements were not governed by ANSI/EIA 748-A, but instead by Appendix D of its Schedule Management Plan, a deliverable accepted by DOI in December 2004. In addition, BearingPoint informed DOI that any failure to comply with ANSI/EIA 748-A would not constitute a material breach of contract and offered to implement a new project control reporting system that would comply with ANSI/EIA 748-A.

c. BearingPoint explained that it was in compliance with the cited quality assurance requirements, and that the mere fact that its quality assurance procedures identified areas for improvement did not establish a breach.

158. BearingPoint's September 2, 2005 response to DOI also informed DOI that it lacked authority to terminate Task Order 3 for cause without referring the issue of excusable delay to BearingPoint's GSA Schedule 70 Contracting Officer, as required by the terms of BearingPoint's GSA Schedule 70 contract, which the BPA and each Task Order incorporated by reference.

159. By letter dated September 12, 2005, DOI requested more detailed information and documentation regarding BearingPoint's assertion of excusable delay. BearingPoint responded to this request, by letter dated September 15, 2005, with additional details regarding certain DOI-caused delays identified in September 2, 2005 letter.

160. By letter dated September 29, 2005 ("Task Order 3 Termination Notice"), DOI purported to terminate Task Order 3 for cause. DOI explained its "Reasons for Termination" as follows: "Task Order 3, Reference (a) is being terminated for cause because of BearingPoint's failure to perform and failure to provide the Government adequate assurance of future performance as outlined in Reference (b) [the Task Order 3 Cure Notice]."

161. The Task Order 3 Termination Notice gave no indication that DOI had referred the issue of excusable delay to BearingPoint's GSA Schedule 70 Contracting Officer for a final decision. To the contrary, the notice indicated that the DOI Contracting Officer had taken it upon herself to resolve the issue of excusable delay.

162. The Task Order 3 Termination Notice also provided the following "Special Instructions" to BearingPoint:

> All BearingPoint personnel and subcontractors shall take all personal belongings and promptly exit the building. Hard copies of documents should be left at workstations. At the exit, DOI-issued identification badge, building access badge, keys, and any other government property in their possession shall be returned to the DOI FBMS personnel or the guards stationed at the exit. . . . All personnel shall exit through the front doors of the building only.

163. The Task Order 3 Termination Notice further directed BearingPoint to deliver all work-in-process. On information and belief, the work-in-process submitted by BearingPoint to DOI was utilized by both DOI and the contractor on the follow-on contract.

164. BearingPoint complied with the instructions set forth in the Task Order 3 Termination Notice, including the requirement to stop work, surrender all DOI property, and exit DOI's facilities.

165. By letter dated October 11, 2005, BearingPoint informed DOI that its unauthorized termination of Task Order 3 and corresponding eviction of BearingPoint from the premises constituted a material breach of contract that discharged BearingPoint of any further obligations under Task Order 3. In relevant part, BearingPoint's October 11, 2005 letter to DOI provided as follows:

> As [the Task Order 3 Termination Notice] was issued without authority, DOI's direction to cease all work, stop all subcontractors, furnish notices of termination to each subcontractor, surrender all DOI access badges, and immediately depart our work stations at all DOI/FBMS installations lacks any legal foundation and has resulted in a material breach of [Task Order 3] by DOI by improperly frustrating and rendering impossible BearingPoint's continued performance of its contractual obligations. As a result of DOI's material breach, the Task Order is considered canceled and our obligations thereunder at an end. BearingPoint, nevertheless, will perform the tasks identified by DOI in the notice in order to mitigate damages that BearingPoint suffers as a result of the DOI's breach.

**Task Order 4**

166. Due to its inability to make a timely hosting decision, DOI requested BearingPoint to submit a proposal for interim hosting services.

167. On September 10, 2005, BearingPoint submitted its proposal for Task Order 4 ("Task Order 4 Proposal"). The Task Order 4 Proposal contemplated that BearingPoint would provide an interim hosting environment at its Broadband Solution Center to support testing activities for Deployment 1A.

168. DOI awarded Task Order 4 to BearingPoint on September 16, 2004. The award document, which incorporated the BPA and the Task Order 4 Proposal, specified a price of

$104,425. The award document further indicated that the period of performance for Task Order 4 was to be from September 16, 2004 to February 28, 2005.

169. By modification dated February 11, 2005, the parties agreed to extend the period of performance for Task Order 4 through April 30, 2005.

170. BearingPoint performed Task Order 4 in accordance with its terms.

171. DOI has accepted and paid BearingPoint for all services performed under Task Order 4.

**Task Order 5**

172. On October 13, 2004, BearingPoint received a solicitation from DOI for implementation, configuration, and operational support services for the hosting environment to be provided by NBC.

173. BearingPoint submitted its proposal for Task Order 5 ("Task Order 5 Proposal") to DOI on October 15, 2004.

174. DOI awarded Task Order 5 (Order No. 0405DO40356) to BearingPoint on October 22, 2004. The award document, which incorporated the BPA and the Task Order 5 Proposal, specified a firm fixed price of $584,034.65 for support services, plus reimbursement of travel costs in an amount not to exceed $71,060.00. The award document further indicated that the period of performance for Task Order 5 was to be from October 22, 2004 to December 31, 2005.

175. DOI purported to terminate Task Order 5 for convenience via telephone on October 13, 2005. BearingPoint submitted a termination settlement proposal, which DOI accepted and pursuant to which DOI paid BearingPoint.

176. DOI has accepted and paid for all services provided by BearingPoint under Task Order 5.

## Task Order 6

177. On November 17, 2004, BearingPoint received a solicitation from DOI for application management support services.

178. BearingPoint submitted its proposal for Task Order 6 ("Task Order 6 Proposal") to DOI on November 19, 2004. The Task Order 6 Proposal contemplated the performance of application and database monitoring and administration services and functional help desk support for SAP environments and other non-SAP Oracle databases.

179. DOI awarded Task Order 6 (Order No. 0405TO41264) to BearingPoint on December 2, 2005. The award document, which incorporated the BPA and the Task Order 6 Proposal, specified a not-to-exceed price of $1,810,187.17.

180. The period of performance for Task Order 6 was from the date of award through October 31, 2005, with three (3) option years.

181. By letter dated November 1, 2005, DOI confirmed that Task Order 6 ended on October 31, 2005. DOI did not exercise any of its options under Task Order 6.

182. DOI has accepted and paid BearingPoint for all services performed under Task Order 6.

## DOI's Purported Termination of the BPA

183. By letter dated October 20, 2005, DOI issued a cure notice with respect to the BPA (the "BPA Cure Notice"). The BPA Cure Notice informed BearingPoint that DOI "consider[ed] deployment of the Financial and Business Management System (FBMS) under BPA No. 73873 to be endangered" in four (4) respects.

a. The BPA Cure Notice claimed that BearingPoint repudiated the BPA by taking the position that it was not a contract.

b. The BPA Cure Notice claimed that BearingPoint's announcement that DOI would need to purchase more Oracle licenses than originally anticipated "demonstrates a critical and troubling lack of accountability."

c. The BPA Cure Notice claimed that DOI's termination of Task Order 3 "is yet another reason for the Government to deem performance under the remainder of the contract (Deployments 3 and 4) to be endangered."

d. The BPA Cure Notice claimed that an analysis performed by The MITRE Corporation ("Mitre") – which purportedly concluded that BearingPoint's Schedule for Deployment 2A was "incomplete, unreasonable, and unlikely to be achieved" – constituted "an additional reason for the Government to deem performance under the remainder of this contract to be endangered."

184. The BPA Cure Notice explained that DOI intended to terminate the remainder of the BPA for cause unless BearingPoint provided to DOI, within five days of its receipt of the Cure Notice:

- An affirmation of the accuracy of the representations set forth in its original FBMS proposal (*e.g.*, the amount and types of software that must be provided by the Government) and intent to be bound by its representations;
- A plan of action that details how BearingPoint intends to fulfill its obligations under the BPA with respect to the remaining deployments under the BPA; and
- Assurances that BearingPoint will abide by its promises.

185. By letter dated October 24, 2005, BearingPoint requested five additional days to prepare a complete response to the BPA Cure Notice and noted that it was unclear how the DOI

expected BearingPoint to perform future work having terminated Task Order 3, a necessary predicate for such future work.

186. By letter dated October 27, 2005 ("BPA Termination Notice"), DOI denied BearingPoint's request for additional time to respond to the BPA Cure Notice and purported to terminate the BPA for cause.

187. The Termination Notice identified the "Reasons for Termination" as follows:

> The subject contract is terminated for cause because of BearingPoint's failure to (1) make adequate progress; (2) affirm the accuracy of the representations set forth in its original FBMS proposal (*e.g.*, the amount and types of software that must be provided to the Government) and its intent to be bound by its representations; (3) provide a plan of action that details how BearingPoint intends to fulfill its obligations under the BPA with respect to the remaining deployments under the BPA; and (4) provide assurances that BearingPoint will abide by its promises.

188. The BPA Termination Notice did not indicate that DOI had referred the issue of excusable delay to BearingPoint's GSA Schedule 70 Contracting Officer.

189. The BPA Termination Notice failed to inform BearingPoint of its right to appeal the termination to the Court of Federal Claims.

**<u>Court of Federal Claims Decision and Procedural History</u>**

190. On July 28, 2006, BearingPoint timely filed, with both the GSA and the DOI Contracting Officers, a certified claim challenging the terminations for cause of Task Order 3 and the BPA. Subsequently, BearingPoint appealed the terminations to the Court of Federal Claims on September 26, 2006 ("the Complaint") in order to protect its rights against the impending running of the one-year statute of limitations.

191. Based on the absence of a valid Contracting Officer's decision with respect to both terminations, BearingPoint filed a motion to dismiss its own Complaint under RCFC

12(b)(1) on January 19, 2007. The United States Department of Justice responded on February 20, 2007, and BearingPoint replied on March 9, 2007.

192. After consideration of the parties' pleadings, the Court of Federal Claims issued its decision dismissing BearingPoint's Complaint for lack of subject matter jurisdiction on April 30, 2007. The Court issued a subsequent Order on May 15, 2007, clarifying a single sentence in its Opinion.

193. BearingPoint had alleged, in part, in its Complaint and subsequent motion, that the DOI Contracting Officer lacked authority unilaterally to terminate Task Order 3 and the BPA because BearingPoint asserted that its delays were excusable. BearingPoint explained that the DOI Contracting Officer lacked the authority to terminate Task Order 3 and the BPA for cause without referring the issue of excusable delay to BearingPoint's GSA Schedule 70 Contracting Officer, as required by the plain language of the I-FSS-249-B Default (May 2000) clause of BearingPoint's GSA Schedule 70 Contract, which the BPA and Task Order 3 incorporated by reference.

194. Because the DOI Contractor Officer terminated Task Order 3 and the BPA for cause, without forwarding BearingPoint's assertions of excusable delay to the GSA Schedule Contracting Officer, as required by I-FSS-249-B, the Court reached the following conclusions:

a. The purported terminations of Task Order 3 and the BPA were (1) "jurisdictionally invalid" and (2) to be "treated as 'legal nullities'";

b. Task Order 3 and the BPA "[w]ere not terminated through affirmative actions of an authorized Government contracting officer"; and

c. "[T]here were no terminations properly before the Court."

*BearingPoint, Inc. v. United States*, No. 06-675C, 2007 WL 1276912, slip. op. at 12 (Fed. Cl. Apr. 30, 2007); *see also BearingPoint, Inc. v. United States*, No. 06-675C (Fed. Cl. May 15, 2007) (order granting motion for clarification and denying motion for reconsideration).

195. As a result, the Court dismissed BearingPoint's Complaint for lack of subject matter jurisdiction.

**COUNT I**
**Termination for Convenience as a Matter of Law (Task Order 3 and BPA)**

196. Plaintiff repeats and incorporates by reference each and every paragraph above as if fully set forth herein.

197. As this Court held previously, pursuant to the termination clause of BearingPoint's GSA Schedule 70 contract, incorporated by reference into the BPA and each Task Order, DOI agreed to refrain from making any determination regarding whether a performance delay under the Task Order was excusable, and instead to refer any assertion of excusable delay to BearingPoint's GSA Schedule 70 Contracting Officer for a final determination.

198. The requirement to refer any assertion of excusable delay to BearingPoint's GSA Schedule 70 Contracting Officer was a material contract requirement.

199. Prior to receiving the Task Order 3 Termination Notice, BearingPoint asserted, both verbally and in writing, that its inability to meet the deadline for Deployment 2A resulted from excusable delay.

200. The DOI Contracting Officer did not refer the assertion of excusable delay to BearingPoint's GSA Schedule 70 Contracting Officer, as she was required to do, but instead, as this Court held previously, improperly terminated Task Order 3 and the BPA based upon her own determination that BearingPoint's performance delays were not excusable.

201. BearingPoint is entitled to a declaration that pursuant to the termination for cause clause of BearingPoint's GSA Schedule 70 Contract, incorporated by reference into the BPA and each Task Order, DOI's improper and unauthorized terminations of Task Order 3 and the BPA for cause were converted to terminations for the convenience of the Government as a matter of law.

202. At the time of termination of Task Order 3, BearingPoint estimates that contract performance was approximately seventy-five percent (75%) complete (based on a seventy-one percent (71%) complete estimate as of June 30, 2005). The labor contract value of Task Order 3 at the time of termination was $30,306,253. To this amount must be added, as discussed below, the estimated $5,038,000 of increased costs due to the breach of contract caused by DOI added work and changed work, establishing a revised labor contract value of $35,344,253. Seventy five percent (75%) of that labor contract value is $26,508,190, of which BearingPoint had been paid $11,777,938. Thus, BearingPoint estimates that it is entitled to $14,730,252 for the labor portion of the work. In addition, BearingPoint is entitled to full payment of its unreimbursed, incurred Other Direct Costs of $1,791,812.

203. Based on the foregoing, BearingPoint is entitled to termination for convenience costs of $16,522,063.

**COUNT II**
**Breach of Contract / Constructive Change – Modification #6 (Task Order 3)**

204. Plaintiff repeats and incorporates by reference each and every paragraph above as if fully set forth herein.

205. Modifications 1 through 5 to Task Order 3 provided incremental funding of separate performance segments through April 6, 2005. At that point, BearingPoint would no longer be obligated to perform, because Modification 1 to Task Order 3 had provided that "the

Government shall not be obligated to reimburse the Contractor for costs in excess of the current allotment, nor will the Contractor be obligated to continue performance and incur costs in excess of the amount allotted." Task Order 3, Modification 1, Block 14.

206. Although proposed Modification 6 would have added funds to Task Order 3, BearingPoint immediately notified the Contracting Officer that it considered the Modification unacceptable. The proposed Modification would have made material changes to Task Order 3, which, pursuant to the terms of BearingPoint's GSA Schedule contract, could "be made only by written agreement of the parties." FAR 52.212-4(c).

207. Over BearingPoint's repeated objections, the Contracting Officer unequivocally refused to alter or reissue the modification. BearingPoint had no choice but to perform in accordance with the Contracting Officer's direction or face the risk of being terminated for cause.

208. Modification 6 was invalid because it purported to make unilateral, material changes to the Task Order, in breach of the Changes clause of BearingPoint's GSA Schedule contract, which provides for bilateral changes only. *See* FAR 52.212-4(c).

209. Because Modification 6 did not provide appropriated funds for all the work to be performed, and imposed material changes without BearingPoint's agreement, Modification 6 never became effective and Task Order 3 expired, by its terms, on April 6, 2005.

210. By directing BearingPoint to perform without a valid contract in place, the Contracting Officer breached, or in the alternative, constructively changed, Task Order 3. In either case, the appropriate remedy must include all reasonable direct and indirect costs incurred by BearingPoint pursuant to the improper direction, as well as reasonable profit.

211. As a result, BearingPoint is entitled to recover $19,842,777.00.

## COUNT III
## Breach of Contract – Improper Termination Procedure (Task Order 3)

212. Plaintiff repeats and incorporates by reference each and every paragraph above as if fully set forth herein.

213. Upon execution, Task Order 3 was a valid and binding contract between BearingPoint and DOI.

214. As this Court held previously, pursuant to the termination clause of BearingPoint's GSA Schedule 70 contract, incorporated by reference into the BPA and each Task Order, DOI agreed to refrain from making any determination regarding whether a performance delay under the Task Order was excusable and instead to refer any assertion of excusable delay to BearingPoint's GSA Schedule 70 Contracting Officer for a final determination.

215. The requirement to refer any assertion of excusable delay to BearingPoint's GSA Schedule 70 Contracting Officer was a material contract requirement.

216. Prior to receiving the Task Order 3 Termination Notice, BearingPoint asserted, both verbally and in writing, that its inability to meet the deadline for Deployment 2A resulted from excusable delay.

217. The DOI Contracting Officer did not refer the assertion of excusable delay to BearingPoint's GSA Schedule 70 Contracting Officer, as she was required to do, but instead, as this Court held previously, terminated improperly Task Order 3 based upon her own determination that BearingPoint's performance delays were not excusable.

218. DOI's failure to refer the assertion of excusable delay to BearingPoint's GSA Schedule 70 Contracting Officer constituted a material breach of Task Order 3.

219. As a result, BearingPoint is entitled to recover $19,842,777.00 in breach of contract damages.

**COUNT IV**
**Breach of Contract – Lockout (Task Order 3)**

220. Plaintiff repeats and incorporates by reference each and every paragraph above as if fully set forth herein.

221. Under Task Order 3, DOI had an implied duty to cooperate with BearingPoint and to refrain from taking any actions that would delay, hinder, or otherwise interfere with BearingPoint's performance.

222. Following issuance of the Task Order 3 Termination Notice, DOI ordered BearingPoint, among other things, to cease all work and immediately exit the project facilities.

223. DOI's direction to stop work and exit the project facilities unreasonably interfered with BearingPoint's performance by rendering it impossible for BearingPoint to continue performance.

224. DOI's conduct materially breached its duty to cooperate and not hinder BearingPoint's performance of Task Order 3.

225. BearingPoint also is entitled to a declaration that DOI's direction to stop work and exit the project facilities relieved BearingPoint of any further obligations under Task Order 3.

226. Based on the foregoing, BearingPoint is entitled to recover $19,842,777.00 in breach of contract damages.

**COUNT V**
**Excusable Delay (Task Order 3)**

227. Plaintiff repeats and incorporates by reference each and every paragraph above as if fully set forth herein.

228. DOI significantly delayed the overall completion of Task Order 3 by, among other things:

a. Failing to approve and make timely decisions regarding BearingPoint's FDSs for interfaces and data conversion;

b. Requiring BearingPoint to meet data conversion, interface, and other requirements outside the scope of the BPA and Task Order 3;

c. Failing to approve and make timely decisions regarding BearingPoint's proposed system requirements;

d. Failing to timely approve and fund BearingPoint's White Papers;

e. Requiring BearingPoint to perform testing at multiple locations;

f. Failing to provide BearingPoint personnel with adequate facilities;

g. Failing to adequately staff the FBMS project, including the failure to provide contractually required Subject Matter Experts and other technical experts;

h. Failing to timely provide information necessary for performance;

i. Failing to make a timely decision regarding hosting; and

j. Permitting Titan to interfere with BearingPoint's performance.

229. The foregoing causes of delay were beyond BearingPoint's control, occurred without BearingPoint's fault or negligence, and were unforeseeable at the time the parties entered into the BPA or Task Order 3.

230. Pursuant to the termination for cause provision of BearingPoint's GSA Schedule 70 Contract, incorporated by reference into the BPA and each Task Order, BearingPoint's failure to make progress under Task Order 3 was excusable.

231. BearingPoint's indication that it would be unable to meet the original delivery schedule for Task Order 3 did not manifest an unequivocal intention on the part of BearingPoint that it would not render performance by the contractually required delivery date because the original delivery schedule was required to be adjusted as the result of excusable delay.

232. DOI's termination of Task Order 3 on the grounds of failure to make progress and/or anticipatory repudiation was improper because any delay encountered was the direct result of excusable delays.

233. Pursuant to the termination for cause clause of BearingPoint's GSA Schedule 70 Contract, incorporated by reference into the BPA and each Task Order, DOI's improper termination of Task Order 3 for cause must be converted to a termination for the convenience of the Government.

234. As a result, BearingPoint estimates that it is entitled to recover $16,522,063 in termination for convenience costs.

235. In the alternative, DOI's improper termination constituted a breach of contract and, as a result, BearingPoint is entitled to recover $19,842,777.00 in breach of contract damages.

**COUNT VI**
**Waiver of Delivery Schedule (Task Order 3)**

236. Plaintiff repeats and incorporates by reference each and every paragraph above as if fully set forth herein.

237. DOI knew or should have known that BearingPoint would be unable to meet the delivery schedule for Task Order 3 as early as December 2005, and had actual knowledge of BearingPoint's inability to meet the delivery schedule by no later than early May 2005.

238. Despite its knowledge that Deployment 2A would be delayed, DOI engaged in affirmative acts and conduct inconsistent with an intent to terminate Task Order 3 by, among other things:

a. Holding meetings with BearingPoint to negotiate a new schedule;

b. Supporting BearingPoint's Task Order 3 activities;

c. Encouraging BearingPoint to continue performance;

d. Continuing to fund Titan's IV&V contract;

e. Converting its legacy systems to ensure the proper interface with BearingPoint's proposed system;

f. Providing data conversion and data cleanup support to BearingPoint in a manner consistent with BearingPoint's proposed approach;

g. Working with BearingPoint to define requirements;

h. Unilaterally issuing draft Modification 6 to Task Order 3 and advising BearingPoint that DOI considered the modification effective;

i. Reaching decisions on White Papers;

j. Approving contract submittals; and

k. Initiating discussions with BearingPoint to enter into a bilateral modification of Task Order 3.

239. DOI failed to terminate Task Order 3 within a reasonable time of its knowledge that Task Order 3 completion would be delayed.

240. BearingPoint reasonably relied upon DOI's failure to timely terminate Task Order 3 to its detriment by continuing to perform and incur significant costs under Task Order 3.

241. DOI waived the delivery schedule set forth in Task Order 3 and failed to establish a new deadline for the completion of performance.

242. BearingPoint was not bound by the delivery schedule for Task Order 3 or any other deadline for the implementation of Deployment 2A.

243. DOI's termination of Task Order 3 on the grounds of failure to make progress and/or anticipatory repudiation was improper.

244. Pursuant to the termination for cause clause of BearingPoint's GSA Schedule 70 Contract, incorporated by reference into the BPA and each Task Order, DOI's improper termination of Task Order 3 for cause must be converted to a termination for the convenience of the Government.

245. As a result, BearingPoint estimates that it is entitled to recover $16,522,063 in termination for convenience costs.

246. In the alternative, DOI's improper termination constituted a breach of contract and, as a result, BearingPoint is entitled to recover $19,842,777.00 in breach of contract damages.

**COUNT VII**
**<u>Improper Termination (Task Order 3)</u>**

247. Plaintiff repeats and incorporates by reference each and every paragraph above as if fully set forth herein.

248. BearingPoint fully complied with all requirements applicable to Task Order 3, including those related to project control reporting and quality assurance.

249. BearingPoint did not fail to make adequate progress on Task Order 3 or repudiate Task Order 3 by acknowledging an inability to meet the performance deadline because:

a. The delays encountered by BearingPoint were excusable; and

b. DOI waived the original delivery schedule for Task Order 3 and failed to establish a new deadline for completion of performance.

250. The Task Order 3 Termination Notice failed to identify any valid basis, and no such basis existed, for terminating Task Order 3 for cause.

251. DOI's termination of Task Order 3 for cause was improper.

252. Pursuant to the termination for cause clause of BearingPoint's GSA Schedule 70 Contract, incorporated by reference into the BPA and each Task Order, DOI's improper termination of Task Order 3 for cause must be converted to a termination for the convenience of the Government.

253. As a result, BearingPoint estimates that it is entitled to recover $16,522,063 in termination for convenience costs.

254. In the alternative, DOI's improper termination constituted a breach of contract and, as a result, BearingPoint is entitled to recover $19,842,777.00 in breach of contract damages.

**COUNT VIII**
**Breach of Duty to Cooperate and to Not Hinder Performance (Task Order 3)**

255. Plaintiff repeats and incorporates by reference each and every paragraph above as if fully set forth herein.

256. Under Task Order 3, DOI had an implied duty to cooperate with BearingPoint and to refrain from taking any actions that would delay, hinder, or otherwise interfere with BearingPoint's performance.

257. DOI breached its duty to cooperate and not hinder performance by, among other things:

a. Failing to reach a bilateral agreement with BearingPoint regarding the material changes contained in Modification 6 and insisting that BearingPoint continue performance;

b. Failing to approve and make timely decisions regarding BearingPoint's FDSs for interfaces and data conversion;

c. Requiring BearingPoint to meet data conversion, interface, and other requirements outside the scope of the BPA and Task Order 3;

d. Failing to approve and make timely decisions regarding BearingPoint's proposed system requirements;

e. Failing to timely approve and fund BearingPoint's White Papers;

f. Requiring BearingPoint to perform testing at multiple locations;

g. Failing to provide BearingPoint personnel with adequate facilities;

h. Failing to adequately staff the FBMS project;

i. Failing to timely provide information necessary for performance;

j. Failing to make a timely decision regarding hosting; and

k. Permitting Titan to interfere with BearingPoint's performance.

258. BearingPoint timely notified DOI of the conduct that constituted breach.

259. DOI's breach of its duty to cooperate and not hinder performance was a material breach of Task Order 3 and relieved BearingPoint of further obligations under the contract.

260. Pursuant to the termination for cause clause of BearingPoint's GSA Schedule 70 Contract, incorporated by reference into the BPA and each Task Order, DOI's improper termination of Task Order 3 for cause must be converted to a termination for the convenience of the Government.

261. DOI's breach of its duty to cooperate and not hinder performance represents, in the alternative, a material breach of Task Order 3 or a constructive change to that Task Order entitling the Company to its increased cost of performance. BearingPoint estimates its increased costs to be $5,030,000.00. This amount covers substantial inefficiencies associated with DOI's failure to make timely decisions and provide information, repeated changes in requirements, delays in data conversion, and its failure to make available on-line connectivity. It also includes the increased cost resulting from increased numbers of personnel brought on to contract performance in an attempt to maintain schedule (acceleration) and to meet the needs of non-contiguous testing.

**COUNT IX**
**Work-In-Process (Task Order 3)**

262. Plaintiff repeats and incorporates by reference each and every paragraph above as if fully set forth herein.

263. Upon termination of Task Order 3, DOI required the delivery of all work-in-process. BearingPoint fully complied with that direction. BearingPoint conferred a benefit on DOI by performing the work-in-process pursuant to the terms of Task Order 3. DOI accepted and retained the benefits of the work-in-process.

264. DOI has not paid BearingPoint for the work-in-process.

265. It would be inequitable for DOI to retain the benefit of the contract work, including the work-in-process, without rendering payment to BearingPoint. The reasonable value of the contract work not yet paid for by DOI, including the work-in-process, is estimated to be $19,842,777.00.

266. As a result, BearingPoint is entitled to payment in the estimated amount of $19,842,777.00 from DOI for the contract work, including work-in-process, delivered to and accepted by DOI but for which BearingPoint has not yet been compensated.

**COUNT X**
**Declaratory Judgment (BPA)**

267. Plaintiff repeats and incorporates by reference each and every paragraph above as if fully set forth herein.

268. The BPA was not a binding contract.

a. The FAR expressly states that a BPA is not a contract.

b. The BPA lacked mutuality of consideration because it did not obligate any funds, did not require DOI to purchase any minimum quantity of services, and did not bind BearingPoint to accept individual Task Orders.

269. Because the BPA was not a binding contract, DOI lacked the ability to terminate the BPA for cause.

270. BearingPoint is entitled to a declaration that DOI's termination of the BPA for cause was without legal effect or, in the alternative, that the termination for cause must be converted to a termination for the convenience of the Government.

**COUNT XI**
**Breach of Contract – Lockout (BPA)**

271. Plaintiff repeats and incorporates by reference each and every paragraph above as if fully set forth herein.

272. If it is determined that the BPA was a contract, DOI had an implied duty to cooperate with BearingPoint and to refrain from taking any actions that would delay, hinder, or otherwise interfere with BearingPoint's performance under the BPA.

273. Following termination of Task Order 3, DOI required BearingPoint, among other things, to cease all work and immediately exit the project facilities.

274. DOI's direction to stop work and exit the project facilities unreasonably interfered with BearingPoint's performance of the BPA by rendering it impossible for BearingPoint to continue work on the remaining deployments.

275. In the event it is determined that the BPA is a contract, DOI's conduct materially breached its duty to cooperate and not hinder the performance under the BPA and the BPA terminated as a result.

**COUNT XII**
**Breach of Contract – Improper Termination (BPA)**

276. Plaintiff repeats and incorporates by reference each and every paragraph above as if fully set forth herein.

277. BearingPoint did not fail to make adequate progress in connection with Task Order 3 because the performance delays encountered by BearingPoint were excusable and because BearingPoint was not bound to the delivery schedule for Deployment 2A, which DOI had waived.

278. In the event it is determined that the BPA is a contract, BearingPoint did not repudiate the BPA or fail to provide adequate assurances that it would perform in accordance with its contractual obligations.

a. BearingPoint's position that the number of Oracle licenses set forth in the BPA Proposal was merely an estimate, subject to change as the project progressed, accurately described the parties' rights and obligations under the BPA.

b. BearingPoint repeatedly provided DOI adequate assurances of its intent to fully perform its obligations pursuant to each Task Order issued under the BPA and any direction provided by the Contracting Officer.

279. BearingPoint's inability to provide a plan of action to continue performance under the BPA was a direct and proximate result of DOI's breach of its duty to cooperate and not hinder performance, as DOI's eviction of BearingPoint personnel from the project facilities following the Termination of Task Order 3 made it impossible to continue performance under the BPA.

280. The BPA Termination Notice failed to identify any valid basis, and no such bases existed, for DOI to terminate the BPA for cause.

281. In the event it is determined the BPA is a contract, DOI's purported termination of the BPA for cause was improper, and, as previously decided by this Court, without legal effect, because it failed to refer the issue of excusable delay to the GSA Schedule Contracting Officer for a final decision. Additionally, DOI's purported termination (i) failed to provide BearingPoint a reasonable time to respond to the BPA Cure Notice and (ii) failed to include the required notice of BearingPoint's rights under the Disputes Clause.

282. In the event it is determined that the BPA is a contract, pursuant to the termination for cause clause of BearingPoint's GSA Schedule 70 Contract, incorporated by reference into the BPA and each Task Order, DOI's improper termination of Task Order 3 for cause must be converted to a termination for the convenience of the Government.

283. In the alternative, in the event it is determined that the BPA is a contract, DOI's actions constituted a breach of contract.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, BearingPoint, requests this Honorable Court:

a. Hold that the procedurally defective and improper terminations for cause of Task Order 3 and the BPA were converted to terminations for convenience as a matter of law pursuant to FAR 52.212-4(m);

b. Hold that the procedurally defective and improper terminations for cause of Task Order 3 and the BPA were otherwise improper and, therefore, deemed to be terminations for convenience (or, in the alternative, find that DOI's actions amounted to breaches of contract), entitling BearingPoint to $16,522,063 in termination for convenience costs or, in the alternative, $19,842,777 in breach of contract damages;

c. Provide an increase in the Task Order 3 contract price of $5,038,000;

d. Find that Task Order 3 expired on April 6, 2005, and the Contracting Officer's direction to perform without a valid contract was a breach of contract (or, alternatively, a constructive change) for which BearingPoint is entitled to an equitable adjustment in the amount of $19,842,777.00;

e. Determine that BearingPoint is entitled to payment of $19,842,777 for work delivered to, and accepted by, DOI in accordance with DOI direction;

f. Award such other relief as the Court deems just and proper.

Respectfully Submitted,

Jonathan S. Aronie
Attorney for BearingPoint, Inc.

1300 I Street, NW, 11th Fl., East
Washington, DC 20005-3314
Tel: (202) 218-0039
Fax: (202) 218-0020

Date: August 24, 2007

Of Counsel:

Louis D. Victorino
Keith R. Szeliga
Marko W. Kipa
Sheppard Mullin Richter & Hampton LLP

Domingo Maradiegue
BearingPoint, Inc.