GSA®

GSA Federal Acquisition Service

December 19, 2007

Mr. Matthew Peebles
Managing Director
BearingPoint, LLC
1676 International Drive
McLean, VA 22102-4828

Subject: Certified Claim of BearingPoint, LLC Claim dated July 28, 2006

This contracting officer's decision is issued pursuant to the U.S. Court of Federal Claims' opinions and orders in the matter of BearingPoint, Inc. v. United States (Fed. Cl. No. 07-631C) to determine whether the Department of Interior's (DOI) terminations of BearingPoint, Inc.'s (BearingPoint) Blanket Purchase Agreement (BPA), and the task orders placed thereunder, were terminations for cause (default) or for convenience. Central to this determination is the impact of the excusable delays alleged by BearingPoint concerning its performance.

Because the General Services Administration (GSA) contracting officer was not contemporaneously involved in the project at issue, the GSA contracting officer relied on documentation provided by BearingPoint and DOI. The GSA contracting officer requested further information from BearingPoint regarding its allegations of excusable delay. The GSA contracting officer allowed the parties to submit comments to each others' submissions. The GSA contracting officer reviewed the following documentation submitted by BearingPoint; (1) Original Claim submission, dated July 28, 2006; (2) Exhibits and Documents (BearingPoint's Claim), dated June 21, 2007; (3) Summary Document of Claim, Exhibits and Documents, dated August 31, 2007; (4) Response to DOI's letter (October 18, 2007), dated November 7, 2007; and (5) Powerpoint Presentation, dated November 19, 2007.

The GSA contracting officer reviewed the following information submitted from DOI: (1) Solicitation cite RFQ No. 73873, (2) Blanket Purchase Agreement (BPA) 73873, (3)

U.S. General Services Administration
2200 Crystal Drive
Arlington, VA 20406-0003
www.gsa.gov

Task Order 3; (4) Cure Notice, dated September 12, 2005; (5) Letter to GSA, dated October 18, 2007; and (6) Letter to GSA, dated November 29, 2007.

For the reasons set forth below, I find that the delays were not excusable, as they were either not supported, were not beyond the control of or without the fault or negligence of BearingPoint, or, in one instance, were due to the fault of both parties. Therefore, I conclude that DOI's termination for cause of Task Order 3 was proper.

**1. Description of Claim**

BearingPoint submitted a certified claim, dated July 28, 2006, addressed to Aprell Joyce, Contracting Officer, DOI GovWorks and the GSA contracting officer. BearingPoint references in its claim – Improper Termination for Cause, Breach of Contract Damages, and Work-in-Process delivered and accepted under Task Order No. 0404DO37408 and BPA Number 73873 (issued Pursuant to General Services Administration Multiple Award Schedule Contract Number GS-35F-4338D, Schedule Group 70, awarded January 29, 2003).

In BearingPoint's claim, the company states, "Specifically, this claim requests that the appropriate Contracting Officer issue a final decision (1) finding that Task Order 3 expired on April 26, 2005, and the Contracting Officer's direction to perform with a valid contract was breach of contract (or alternatively, a constructive change) for which BearingPoint is entitled to an equitable adjustment in the amount of $19,842,77.00; (2) finding that the termination for cause of Task Order 3 was improper and is, therefore, deemed to have been a termination for convenience, (3) providing an increase in the Task Order 3 contract price of $5,038,000, (4) finding BearingPoint entitled to recover termination for convenience costs of $16,522,063, or in the alternative, (5) determining that BearingPoint is entitled to payment of $19,842,777 for work delivered to DOI in accordance with DOI direction and accepted by DOI, and (6) a determination that DOI's attempted termination for cause of the BPA is a nullity without legal effect or otherwise improper." (BearingPoint claim, July 28, 2006, p.2)

In a letter dated January 16, 2007, the GovWorks Contracting Officer, Aprell Joyce, issued a decision that the termination for cause of Task Order 3 was based not only upon BearingPoint's failure to make progress on Deployments 2A and 2B, but also upon failure to give adequate assurances of future performance and anticipatory breach. Further, the decision stated that the October 26, 2005, termination of the balance of the BPA was based principally on BearingPoint's position, among other things, that it was not obligated to accept individual task orders issued by the Department of Interior; was not obligated to honor any order for a combination of items in excess of the Federal Supply Schedule contract maximum order threshold; and the quantities contained in BearingPoint's proposal were not binding.

DOI concluded that BearingPoint is not entitled to any relief under the claim because the performance delays and failures leading to BearingPoint's termination for cause were not excusable. Furthermore, DOI believes that the agency is entitled to re-procurement costs.

**2. Background**

The GSA Schedule 70 contracts are awarded pursuant to Federal Acquisition Regulation (FAR) Part 12 – Acquisition of Commercial Items and Part 8.4 – Federal Supply Schedules. The resultant Schedule 70 contracts are firm fixed-priced contracts with Economic Price Adjustment for Information Technology (IT) Hardware, Software, Maintenance, Leasing, Training, and Information Technology Professional Services. The IT Professional Services include fully burdened labor hour rates. BearingPoint was awarded GSA Schedule 70 contract number GS-35F-4338D on July 10, 1996. The clause that pertains to BearingPoint's claim is the IT Solicitation Clause C.34 Default (I-FSS-249-B) (MAY 2000). This clause directs the GSA Contracting Officer to issue a contracting officer's decision as it relates to excusable delay, which BearingPoint cited in its claim.

**3. Summary of Events Leading to DOI's Termination for Cause**

In August 2003, DOI GovWorks issued a competitive Request for Quotations No. 73873. DOI GovWorks was soliciting technical proposals for a needed solution to implement

DOI's Financial and Business Management Systems (FBMS) Project. The FBMS is a multi-phased, department-wide information technology system intended to replace older, disparate software systems. The new system would provide a platform for DOI business functions such as travel, accounting, procurement and personnel management. The solicitation informed offerors that DOI intended to award a single BPA to the offeror that submitted the best value proposal conforming to the solicitation requirements.

As a result of the competitive acquisition process, on January 5, 2004, DOI GovWorks contracting activity awarded BPA Number 73873 to BearingPoint, Inc. The total award value was $124,939,133 with a period of performance from January 5, 2004, through January 4, 2014.

The BPA put forth a structure that utilized Task Orders for certain steps in the process of creating the FBMS. Consequently, each Task Order issued by DOI, incorporated a different mix of effort and a different performance schedule.

Task Order 1 (Order No. 33532) was proposed on January 9, 2004, awarded on January 22, 2004, against BPA 73873, with performance through April 23, 2004. The award document specified a firm-fixed-price of $2,830,102.79. The Task Order included efforts related to the design of various components of the FBMS architecture and preparation of certain reports and plans preliminary to the implementation of FBMS. The requirements were to be defined during performance of Task Order 1

Task Order 2 (Order No. 35880) was awarded on June 28, 2004, against BPA 73873 with performance through July 31, 2004. Task Order 2 primarily set forth a revised implementation schedule for Deployments 1A, 1B, 2A, 2B, 3 and 4. These deployments set forth implementation of certain functionality in designated DOI bureaus. The revised schedule set forth the following:

a. The Departmental Business Blueprint was to be completed by July 7, 2004.

b. Deployment 1A, to go live by February 28, 2005, was to implement Financial Assistance functionality at MMS, OSM and FWS.

c. Deployment 1B, for which no completion date was provided in BearingPoint's proposal, was to implement Travel functionality following DOI's selection of a Gov travel vendor.

d. Deployment 2A, to go live by October 1, 2005, was to implement Core Financials, property, Acquisition, PCS, and EMIS functionality at BLM, OSM, and MMS.

e. Deployment 2B, to go live by November 1, 2005, was to implement Budget Formulation and Budget Planning functionality at BLM, OSM, and MMS.

f. Deployment 3 was to implement FBMS functionality in all functional areas at FWS, NPS, and OS, and was to go live by November 1, 2006.

g. Deployment 4, to go live by October 1, 2007, was to implement all functional areas at USGS, BOR, and BIA.

On September 20, 2004, DOI GovWorks awarded Task Order 3 (Order No. 0404DO37408) against BPA 73873. Task Order 3 was incrementally funded in the amount of $7,800,000. The proposed Task Order 3 was firm fixed-price for $26,353,263 with a reserve of $3,952,990 for performance incentives, and included travel of $2,619,853 and select hardware totaling $245,070 on a cost-reimbursement basis.

The purpose of Task Order 3, as proposed by BearingPoint on September 17, 2004, was to continue work that was performed under Task Order 2. Task Order 3 was to address the technical, business, and management requirements necessary for the successful implementation of DOI's FBMS for Deployments 1A, Financial Assistance; Deployment 1B, eTravel; Deployment 2A, Core Financials, Property, Acquisitions, PCS and EMIS; and Deployment 2B, Budget Formulation/Budget Planning. The proposed period of performance for Task Order 3 was August 1, 2004 through December 31, 2005. Below is a timeline provided by DOI of events leading up to the termination of Task Order 3.

a. On November 29, 2004, Task Order 3, Modification 1, was issued unilaterally to add $7,377,086 in incrementally funding to the project. The funds

covered the period from November 25, 2004 through April 6, 2005. The modification required BearingPoint to complete deliverables including a 4 cycle test due by April 6, 2005.

b. On February 15, 2005, Task Order 3, Modification 4, was issued unilaterally to incorporate into Task Order 3 the QASP, dated February 10, 2005. In Spring 2005, BearingPoint began to fall behind schedule under Task Order 3. Representations by BearingPoint management and self-assessments for EVM reports were not in synch with actual progress (*see* more specific entries for May 2005, below).

c. Task Order 3, Modification 6, was issued unilaterally to add $12,389,288 in incremental funding to the project bringing the total funded to date to $27,572,218. The original award amount of the Task Order 3 was $29,218,186. The unfunded amount of $1,651,812 was subject to the availability of funds.

d. In April 2005, BearingPoint stopped invoicing based, ostensibly, on disagreement over Task Order 3, Modification 6.

e. On May 2, 2005, the FBMS EVM Report (supplied by BearingPoint) showing the percentage of work complete for Deployment 2A Realization had been 92% on the previous report, dropped to 83%.

f. On May 4, 2005, DOI invited BearingPoint to a contract review to be held May 12, 2005. One of the four items on the agenda was the schedule slippage.

g. On May 12, 2005, during the contract review meeting, Susan Weersing of BearingPoint stated that there was no room left, no flexibility in the schedule and that it was at a "tipping point."

h. On May 13, 2005, at the Sponsor's Meeting, Brad Bends of BearingPoint stated that there was a deployment slippage. BearingPoint requested that Interior propose scope reductions and/or schedule changes.

i. On May 17, 2005, at a meeting between BearingPoint and DOI senior management, Robin Lineberger of BearingPoint stated that the schedule is very tight and risky. Brad Bends stated, "if everything goes perfectly, we will

make it. We have consumed all the slack, but we are on schedule. We have enough time to complete."

j. On May 18, 2005, BearingPoint's Richard Tucker's e-mail indicated that the negative trend in Deployment 2A Realization was temporary, and better EVM reporting, including support of DOI's Insight project schedule analytical tool, would be delivered by month end. *The new EVM report issued by BearingPoint stated that 2A Realization percent work complete is again 92%.* [Emphasis added by BearingPoint]

k. On May 23, 2005, at a meeting between BearingPoint and Interior senior management, Robin Lineberger of BearingPoint stated that the Test Readiness Review (TRR) will get a failing score. Mr. Lineberger also stated that an October deployment for Deployment 2A is still theoretically possible.

l. On May 25, 2005, in the Deployment 2A Integration TRR, 90% of the items listed are not ready. Ready dates for listed items extend out to late September, 2005 (year end processes). BearingPoint's summary is that it is not ready to initiate Integration testing. No new start date is provided by BearingPoint.

m. On May 26, 2005, at a schedule review meeting and during the Lessons Learned portion, BearingPoint's employees stated:

- DOI should have signed off on requirements when it signed off on the blueprint.
- Schedule dependencies must be improved.
- No one wants to deliver bad news.
- We should have had a TRR for Integration Cycle 1.

n. On June 2, 2005, during a meeting between BearingPoint and DOI senior management, Matt Peebles stated that given TRR results and constraints, Deployment 2A as currently planned was not achievable. Without reduction in scope, deployment will move out to April of 2006, possibly further.

o. In BearingPoint's June, 2005, quality assessment, it identified the following lessons learned and action plan: The project schedule should be updated to include actual individual resources assigned to specific tasks, as well as the

actual work effort required for those tasks and task dependencies, in order to plan for significant changes in resource requirements.

p. On June 8, 2005, the GovWorks contracting officer issued a letter seeking adequate assurance of future performance. This was prompted by the schedule slippage and by an indication that BearingPoint will require up to $29,000,000 for 202 additional software licenses beyond those included in BearingPoint's proposal.

q. On June 20, 2005, BearingPoint's response to the June 8, 2005, letter took the position that, with respect to future task orders, BearingPoint was not bound to its proposal to implement FBMS within a certain schedule and a fixed price because the contract was structured as a "blanket purchase agreement."

r. On June 22, 2005, BearingPoint confirmed by e-mail that "we do not believe an October go-live [for Deployment 2A] is achievable."

s. On August 23, 2005, the GovWorks contracting officer, Aprell Joyce, submitted a Cure Notice to BearingPoint stating, "You are hereby notified that the Government considers BearingPoint's failure to provide timely delivery of Deployment 2A, required functionality of Deployment 2B, project control reporting, and quality assurance to endanger performance of the subject contract." Further reasons were given in an enclosure.

t. On August 30, 2005, BearingPoint responded to the Cure Notice with citations of excusable delay.

u. On September 12, 2005, Ms. Joyce responded, noting that: "Your letter fails to provide an adequate plan for curing BearingPoint's performance failures, as requested in our Cure Notice. In light of that, this letter provides BearingPoint with formal notice that the Government reserves the right to proceed with the termination for cause of Task Order 3. To that possible end, the Government will continue its evaluation of BearingPoint's performance to determine whether such a termination would be in the best interest of the Government."

v. On September 15, 2005, BearingPoint's response to the September 12th letter enumerated alleged instances of excusable delay. BearingPoint generally argued that (a) because it never agreed to Modification 6, its work has been unfunded since April 2005 and, thus, it has no obligation to deliver to schedule, and (b) the Government is responsible for other delays.

w. On September 29, 2005, Ms. Joyce notified BearingPoint that Task Order 3 was being terminated for cause "because of BearingPoint's failure to perform and failure to provide the Government adequate assurance of future performance" as stated in the August 23rd Cure Notice.

x. By Cure Notice, dated October 20, 2005, Ms. Joyce notified BearingPoint (in part) that: "the Government considers deployment of the Financial and Business Management System (FBMS) under BPA No. 73873 to be endangered on the following grounds:

- Continuing, express unwillingness to be bound to contractual obligations. By letter dated June 20, 2005, BearingPoint took the position, among other things that it is not obligated to accept individual task orders issued by DOI.
- Lack of accountability with respect to number of Oracle Licenses. ...[In] its proposal, BearingPoint represented that twenty (20) *Oracle 9i* and four (4) *Oracle 9iAS* licenses would be required to "fully satisfy all of DOI's FBMS functional business requirements." Later, BearingPoint announced that up to *202* Oracle licenses would be required, increasing the cost to DOI by an estimated $29 million.
- Failure to Make Adequate Progress. BearingPoint's failure to make adequate progress, among other identified deficiencies, under [Task Order 3], and its failure to provide adequate assurances after receiving a cure notice,

resulted in DOI terminating that Task Order for cause on September 29, 2005.

- MITRE Analysis: Demonstrated inability to develop and implement a schedule. In August 2005, DOI contracted with the MITRE Corporation to conduct an independent assessment of BearingPoint's ability to achieve project milestones. MITRE evaluated BearingPoint's revised 2A Deployment schedule, dated September 6, 2005, (and also a "resource loaded" version dated September 7). Among other things, MITRE found that project "activities and dependencies" were missing from the schedule, the schedule did not tie into earlier past-due activities ("dependencies"), it was not compliant with industry standard practices in several respects, and it was not useful as a management tool." In addition, MITRE found that project team members were working in "stove-pipe" environments, preventing the development of an integrated solution, "resource loading" had not been accomplished, and unlimited government resources were assumed. This all led MITRE to conclude that BearingPoint's deployment schedule was incomplete, unreasonable, and unlikely to be achieved. BearingPoint's demonstrated inability to schedule and execute complex "activities and dependencies"—a critical capability under this requirement—is an additional reason for the Government to deem performance under the remainder of this contract to be endangered.

y. On October 27, 2005, Ms. Joyce issued a Termination for Cause Notice for BPA 73873. The reasons given were "BearingPoint's failure (1) to make adequate progress; (2) affirm the accuracy of the representations set forth in its original FBMS proposal …; (3) provide a plan of action that details how BearingPoint intends to fulfill its obligations under the BPA with respect to the

remaining deployments under the BPA; and (4) provide assurances that BearingPoint will abide by its promises."

**4. Summary of Events Leading to GSA Involvement**

By Opinion and Order of April 30, 2007, the U.S. Court of Federal Claims found that the GovWorks contracting officer's terminations of BearingPoint were "jurisdictionally invalid" and "legal nullities." The BPA and Task Order had not been "terminated through the affirmative actions of an authorized Government contracting officer." The Court also noted that the Opinion "does not extend to any issue regarding the merits of whether the BPA or Task Order 3 are still in effect or may have expired for some other reason." In reaching this conclusion, the Court noted that, "on January 29, 2003, when GSA awarded the Schedule Contract to BearingPoint, both FAR § 8.405-5(a)(2) and the standard GSA Default clause, I-FSS-249-B, provided that only the GSA Contracting Officer had authority to issue a default termination notice when the contractor had alleged excusable delay as a defense." Of course, the Court also considered that, at the time GovWorks issued Task Order 3, FAR subpart 8.4 already had changed to permit ordering agencies, even where the "contractor asserts that the failure was excusable," to "issue final decisions on disputes arising from performance of the order." But the Court reasoned that the Schedule Default clause was controlling because BearingPoint had "bargained for the benefit of review by the GSA Contracting Officer in the event that BearingPoint asserted excusable delay in response to a termination by DOI Contracting Officer." A careful reading of the Opinion—and particularly the sentence quoted immediately above—reveals that it was BearingPoint's assertion of excusable delay that has triggered GSA's review.

**5. Points of Excusable Delay Cited by BearingPoint**

BearingPoint alleges ten instances of excusable delay: (A) Failure to Approve of Functional Design Specifications (FDS); (B) Failure to timely approve and fund White Papers/Change Orders; (C) Failure to undertake timely data conversion extracts; (D) Failure to provide adequate staffing: (E) Failure to provide adequate facilities (F) Failure to prevent interference by DOI's IV&V contractor; (G) Failure to Baseline System

Requirements in a Timely Manner ; (H) Failure to make available Online Support System connectivity; (I) Failure to make a timely hosting decision; and (J) Change regarding non-contiguous testing. Below is a brief description of BearingPoint's alleged excusable delays, DOI's position on the allegations of delay; and the GSA contracting officer's decision on each allegation of excusable delay.

**A. DOI's Failure to Approve of Functional Design Specifications ("FDS")**

BearingPoint asserts that DOI failed to timely approve numerous FDS because (1) DOI continued to add functionality and (2) DOI was unable to make timely decisions regarding the nature of the functionality it required. BearingPoint asserts that the project plan accepted by DOI in November 2004 contemplated that development and testing would proceed in the following sequence: (1) The software integrator first prepares an FDS, which provides a high level technical description of what the software must accomplish and how it performs; (2) After the FDS has been finalized, the integrator prepares a TDS, which describes the functionality at a more detailed technical level; (3) After the TDS has been accepted, the integrator writes the code that will implement the customized functionality; and (4) Integration testing is performed.

<u>BearingPoint's Position:</u> BearingPoint identifies the reasons for delay in its claim. It states that because the Project Plan did not provide for preparation of a TDS until DOI approved the corresponding FDS, or for development until DOI approved the TDS, delays associated with DOI's approval of the FDSs impacted the development effort. BearingPoint further states that testing could not begin until development was complete. As a result, DOI's failure to finalize and baseline the FDSs delayed the overall project schedule for deployment 2A.

<u>DOI's Response:</u> DOI's letter, dated October 18, 2007, addresses BearingPoint's summary document, dated August 2007. DOI has indicated that BearingPoint provided many documents with "To Be Determined" ("TBD") in the FDS. DOI has written that BearingPoint did not clearly understand the functionality to be

programmed and BearingPoint did not outline its methods or processes for programming requirements identified as "TBD".

Contracting Officer's Decision: The delay by BearingPoint is not excusable because BearingPoint states that certain *undocumented* [emphasis added] agreements were in place to better enhance the performance schedule and understanding. BearingPoint's assertions are vague and do not support a slippage in the program schedule. BearingPoint alleges that DOI was slow to provide FDS approvals. The documentation shows one or two vague mentions of warnings about risk to the schedule. These warnings fail to name specific FDS impacts, rather, they only name 2A interfaces and conversions. I find no conclusive evidence that BearingPoint continually experienced schedule delays as a result of delayed receipt of FDS approvals.

**B. DOI's Failure to Timely Approve and Fund White Papers/Change Orders**

BearingPoint stated approximately 80 White Papers were submitted to DOI. White Papers were designed to facilitate a decision about the project in a timely fashion or support a change order request. Each White Paper explained an issue that had arisen relevant to the project, analyzed DOI's options, and presented BearingPoint's recommendations. BearingPoint and DOI agreed that DOI would resolve issues identified in the White Papers by the Critical Resolution Date.

BearingPoint's Position: BearingPoint has included in their letter of August 2007 that DOI failed to approve one third of BearingPoint's White Papers by the Critical Resolution Date and also failed to fund several additional White Papers by the Critical Resolution Date. BearingPoint stated that several causes contributed to DOI's failure to make timely decisions regarding the White Papers. BearingPoint identified the following: (1) DOI required BearingPoint to submit multiple revisions because one or more Bureaus could not agree on a functionality; (2) The Project Management Office wanted to have the Executive

Steering Committee review the White Papers; (3) DOI failed to fund the work described in the White Papers.

For example, White Paper 2210 was delayed according to BearingPoint for approximately seven months. BearingPoint alleges this resulted in performance delays. White Paper 2210 was submitted to DOI on February 24, 2005, with a "Critical Resolution Date" of March 31, 2005. Status reports between March and June 2005 reminded DOI of the need to make a decision. As a result of DOI's inaction, BearingPoint was precluded from even commencing work on functionality critical to achieving GovWorks go-live.

DOI's Response: DOI argues that DOI did, in fact, approve white papers timely. DOI provided the following examples:

(1) Unilateral modification #2 to Task Order 3 was issued on December 27, 2004, to BearingPoint to fund White Paper #1326 for eGrants enhancements.

(2) Via email from DOI to BearingPoint, dated March 28, 2005, DOI contracting officer issued approval for BearingPoint to proceed with work on white paper #75. The modification for the definition portion of the project provided for the following:

FDS for required enhancements $26,000 target date 5/30/2005
TDS $26,000, 6/28/2005
Development and unit test $140,800, 7/14/2005
Documentation $6,400, 8/1/2005

DOI approved 35 White Papers during an Executive Steering Committee meeting in February 2005. At the end of May 2005, BearingPoint had not begun performance of the work in the approved White Papers.

BearingPoint informed DOI that the white papers would follow a parallel track to

be integrated into user acceptance testing. The planned go-live for Deployment 2A should not be affected.

However, DOI admitted that White Paper 2210 was not approved until August 2005, but DOI acknowledged that this component would not be ready for a go-live in the Fall, but DOI had a manual workaround in place until such time as the automation could be developed.

Contracting Officer's Decision: BearingPoint did not demonstrate excusable delay. BearingPoint has not shown that any delays in the approval of certain White Papers resulted in any specific performance delays. The exception is when DOI admitted they were late in approving White Paper 2210. DOI provided evidence that it supplied a "workaround" until the automation could be developed; thereby, not impacting BearingPoint's ability to perform.

**C. DOI's Failure to Undertake Timely Data Conversion Extracts**

BearingPoint's Position: BearingPoint stated that DOI provided BearingPoint with unusable data for executing mock conversions.

Deployment 2A – "As of August 26, 2005, BearingPoint was waiting on the OSM's Non-Reimbursable Receivable files, which had been requested "several times".

| REQ. DATES | BUREAU | TASK(S) |
|---|---|---|
| 6-24-05 | DOI-FBMS | Mock 2 data requests have gone to OSM Ex. 47 |
| 8-26-05 | DOI-FBMS | DOI-FBMS Data Conversion SR at 2 (Ex. 98) |

| | | |
|---|---|---|
| 9-16-05 | DOI-FBMS | DOI-FBMS Data Conversion SR at 203 (Ex. 101) |

BearingPoint stated that DOI was made aware of this issue through DOI-FMBS Conversion Status Report (Exhibits 98-102). "Correcting the deficient OSM data caused a delay in mock data conversions."

BearingPoint also experienced a Black-Out Period. BearingPoint was denied access for six weeks until October 14, 2005, due to year end close activities. DOI was made aware on September 16, 2005 (Exhibit 59), of the lack of access privileges. BearingPoint continued to work with the National Business Center on a solution to access data to mitigate delay. .

DOI's Response: BearingPoint failed to understand DOI's data conversion requirements and failed to communicate these conversion requirements to its subcontractor. These communication failures resulted in a project delay as identified below:

(1) BearingPoint did not provide DOI clear communications about its conversion process for acquisition, finance and property data.

(2) BearingPoint did not provide adequate reports to DOI bureaus that demonstrated the conversion process or the results of data used during conversion.

(3) BearingPoint provided DOI bureaus a report with limited findings that failed to identify the specific problems and the locations of the problem. The functional teams identified this lack of information as the highest risk to achieving the projects go-live date.

(4) BearingPoint did not provide crosswalk files for DOI bureaus to identify the transformation (legacy data and the FBMS result) and validate the conversion by spot checking the records.

(5) During Deployment 1A (i.e., Financial Assistance), BearingPoint's strategy was ineffective and inefficient. DOI had little confidence in BearingPoint's ability to convert data successfully.

Contracting Officer's Decision: It appears there was lack of communication between BearingPoint and DOI throughout the project. This resulted in an equal measure of culpability for the delays in Task Order 3. DOI failed to submit documentation pinpointing BearingPoint's failure to understand the data conversation requirements. Also, DOI presented one email from BearingPoint that expressly states, "We believe full BLM deployment by October 31 is not achievable or at a minimum, highly doubtful.... Factors such as BLM resource availability, delays in mock data conversions and issues arising in connection with Legacy Systems interfaces all have contributed to the inability to meet an October deadline". There is also documentation that BLM mock 1 was slipping because of lack of access. It is clear that DOI failed to address the denial of access of their BLM data in its responses. (*See* Exhibit 59, p.7).

**D. DOI's Failure to Provide Adequate Facilities**

BearingPoint's Position: BearingPoint claims that DOI failed to provide access cards to BearingPoint employees for the Herndon facility. The issue was raised in BearingPoint's weekly status reports. BearingPoint submitted multiple requests for access cards, which went unaddressed by DOI. While BearingPoint waited for a response, the number of BearingPoint personnel without access badges continued to increase. BearingPoint wasted valuable time escorting co-workers in and out of the Herndon facility. BearingPoint's claim states that the lack of building access, parking, and office space at the Herndon facility contributed to inefficient performance and caused additional delays to the completion of Deployment 2A.

DOI's Response: In reply to BearingPoint's claim, DOI stated that "access cards do not equal access". No BearingPoint personnel was denied access to FBMS

facilities and access cards were only needed to leave the offices to use the rest rooms. A person without access needed to be escorted. DOI stated the problem centered around communications within a certain timeframe which resulted in facility problems and with parking availability. This caused the landlord to stop issuing access cards. On some days, parking was so overloaded that fire lanes were blocked. DOI did not guarantee that BearingPoint personnel would have free parking. BearingPoint failed to address the parking situations. DOI stated that BearingPoint and DOI jointly decided that the maximum number of BearingPoint personnel at the Herndon office would be 75 and the maximum of 25 personnel at the Denver facility.

DOI cited a provision in the contract: "BearingPoint will provide a list of personnel to [the] DOI's COTR 10 days prior to coming on board". BearingPoint failed to notify DOI when the number of personnel increased by 50% to 150 at the Herndon's location.

Contracting Officer's Decision: BearingPoint failed to provide a staffing plan to DOI; therefore, BearingPoint is responsible for delays resulting from the access issues.

**E. DOI's Failure to Provide Adequate Staffing**

BearingPoint's Position: BearingPoint stated that DOI was required to dedicate full-time Subject Matter Experts (SME) for each of the 13 enumerated functional areas. BearingPoint alleges that DOI failed to provide full-time SMEs in 11 of the 13 functional areas, and provided only 1 full-time SME for the remaining two functional areas. BearingPoint raised the issue in May 2005 and July 2005. DOI acknowledge the need for additional SMEs. According to BearingPoint, its inability to obtain crucial information from DOI bureaus in a timely manner required BearingPoint to make changes late in the project.

Also, BearingPoint stated DOI was required to provide a Technical Point of Contact (TPOC) for each 2A interface. DOI was notified in the weekly reports. Due to the fact a TPOC was not identified for every interface, signoffs on TDS were delayed and put the development schedule at risk (Feb 25, 2005 SR at 6 issue Ex. 31).

BearingPoint stated DOI's failure to provide the required number of SMEs and TPOCs, which prevented BearingPoint from obtaining information to complete and obtain approval of its TDS, delayed testing because such personnel were necessary to provide and validate data. It created a risk of rework.

DOI's Response: DOI stated DOI Bureau SMEs and Functional Area Specialists were available to assist BearingPoint on the projects. DOI never agreed to make these personnel available full time. Instead, DOI stated they were available as needed for specific activities, such as FDS review, integration testing and UAT. DOI never received an invitation to participate in Deployment 2A. DOI provided full cooperation and representation throughout the project.

DOI further argues that BearingPoint did not fill critical positions and many that were filled were deficient in the required skills and experience to manage the critical project positions of functional manager, project manager, and test manager. The effects of BearingPoint's failure to adequately manage and staff critical project positions had a significant cost impact on DOI. DOI believes this hindered BearingPoint in its contractual obligations to deliver the scope of the contract on time.

Contracting Officer's Decision: BearingPoint's assumption that DOI personnel would be available full time was erroneous and resulted in project delays due to poor project planning.

**F. DOI's Failure to Prevent Interference by DOI's IV&V Contractor (Titan)**

BearingPoint's Position: BearingPoint cited in its claim that DOI employed the Titan Group as an Independent Verification and Validation (IV&V) contractor for the FBMS project. Titan Group repeatedly submitted comments that required BearingPoint to address issues with DOI that previously had been resolved or were not a part of the deliverable review cycle. BearingPoint requested DOI to remove resolved issues. DOI declined. BearingPoint indicates that valuable time was wasted reviewing issues that had been approved. Because of this BearingPoint indicated that the overall project was delayed.

DOI's Response: DOI stated that the primary role of the IV&V Contractor was to perform reviews throughout the project lifecycle to identify project risk for FBMS. In performing its duties, the IV&V contractor was required to identify software/configuration errors, validate that systems requirements were being captured and properly tested, assure that risks were being managed properly, verify the validity of testing, ensure effective training was provided, ensure QASP metrics were being accurately gathered, and ensure project management practices were of high quality.

DOI indicated that BearingPoint had so many defects in its written deliverables that the IV&V contractor comments were numerous and DOI agreed to consolidate the review comments to eliminate duplication, thereby, avoiding additional cost from BearingPoint having to consolidate the comments and responses.

Contracting Officer's Decision: The IV&V process, while admittedly inconvenient, is a standard Information Technology project management methodology. BearingPoint should have anticipated the impacts in its Risk Management Plan, dated June 9, 2005. The IV&V Contractor performed the duties required by DOI; therefore this is not considered an excusable delay.

**G. DOI's Failure to Baseline System Requirements in a Timely Manner**

BearingPoint's Position: BearingPoint's claim alleges that DOI was responsible for its inability to baseline the requirements in a timely manner. Between June 2005 and September 2005, DOI attempted to add 2,738 new requirements to the 446 Property requirements submitted by BearingPoint in early 2005. BearingPoint alleges that DOI's delay in baselining the Property requirement alone delayed Deployment 2A by at least four months.

DOI also was informed that the failure to baseline the requirements had an impact on the Test Schedules configuration and development, and delayed the test script development/scope.

DOI's Response: DOI asserts that one bullet point in a July, 2004, weekly report and, again, nearly a year later in May, 2005, do not constitute adequate evidence that this issue was communicated to DOI in a timely and appropriate fashion. DOI provided a list of its original requirements as reference material in the solicitation received by all prospective vendors, including BearingPoint. Once BearingPoint received the firm fixed price, performance-based contract award, its process included the development of workshops to create a blueprint. The blueprint serves as the baseline document to create the requirements necessary to configure and design the system and to begin developing test scenarios. During this phase of the project, BearingPoint did not originally have a Requirements Manager, as required in the awarded Task Order, to manage this task and ensure the proper loading of approved requirements. Section 3.1.5 of BearingPoint's Proposal presents three pages of details describing its methodology to perform Baseline Management on the FBMS Project. This methodology clearly shows that establishing and baselining requirements are the first step before beginning configuration, design, or development work. When BearingPoint completed the blueprint phase, it did not immediately begin the requirements development and baselining process due to a personnel issue. BearingPoint elected to use one individual to fill the Requirements Manager position and the Test Manager

position. This individual was focused on the testing and deployment of 1A, which resulted in a delay of the testing and deployment of 2A.

Contracting Officer's Decision: BearingPoint elected to use one individual to fill two positions, which resulted in project delays. These delays are the result of BearingPoint's management decision versus any action or inaction on the part of DOI; therefore, they are not excusable delays.

**H. DOI's Failure to Make Available On-line Support System Connectivity**

BearingPoint's Position: BearingPoint presented the Online Support System (OSS) Connectivity as a failure by DOI to provide OSS connectivity for over a year. This, in turn, prevented the timely resolution of numerous open issues, several of which remained open at the time of termination. The Lack of OSS connectivity delayed Deployment 2A beyond its scheduled date.

BearingPoint has indicated that DOI was required to establish and maintain OSS connectivity throughout the project.

BearingPoint made it clear that the lack of OSS Connectivity did affect BearingPoint's ability to resolve problems quickly, did have a major impact on 2A go-live, and did impact the functional design and defect resolution.

DOI's Response: BearingPoint attempted to hire foreign nationals to support the OSS Connectivity. DOI clearly outlined the security requirements for all prospective contractors during the solicitation phase and prior to awarding the contract [BPA]. DOI noted that BearingPoint did not have a permanent SAP technical support on hand throughout this project.

BearingPoint was made aware of the challenges with foreign nationals receiving access to federal financial systems in the solicitation. BearingPoint's grasp of this issue of hiring foreign nationals was evidenced in conversations regarding

BearingPoint's experience with Internal Revenue Service and other jobs with federal agencies similar to DOI.

Contracting Officer's Decision: The delay was due to security issues arising from the fact BearingPoint did not allow sufficient time for background investigations to hire foreign nationals to support OSS connectivity. Therefore this is not considered an excusable delay

**I. DOI's Failure to Make a Timely Hosting Decision**

BearingPoint's Position: BearingPoint alleges that DOI agreed to make a hosting decision by August 13, 2004. DOI was informed that delaying the hosting decision beyond that date could have an impact on cost and BearingPoint's ability to go-live for Deployment 1A by March 1, 2005. DOI did not make a hosting decision until October 22, 2004, more than two months after the specified deadline. DOI's failure to make a timely hosting decision compressed the schedule to complete Deployment 1A and forced BearingPoint to divert resources from Deployment 2A to ensure that Deployment 1A was completed on time.

DOI's Response: In the fall 2003, FBMS Hosting services were part of the technical proposals presented by the vendors competing for the DOI BPA. BearingPoint's proposed solution included an IBM hosting solution at a high-availability, fortified data center located in the Denver, CO area. BearingPoint was awarded the contract in January 2004. BearingPoint's proposal included a $24,000,000 hosting solution. A hosting decision regarding whether DOI would exercise BearingPoint's hosting offer was due by August 1, 2004. When DOI attempted to exercise the hosting option as proposed, BearingPoint submitted a revised IBM hosting solution proposal with costs that were three to four times greater than the originally proposed price.

DOI informed BearingPoint this was an unacceptable price increase. DOI again attempted to exercise the hosting solution originally proposed by BearingPoint with IBM as its subcontractor.

BearingPoint presented, via PowerPoint slides, a hosting solution with AT&T as its subcontractor. The AT&T hosting solution was more expensive than BearingPoint's original proposal of $24,000,000, but less expensive than the IBM hosting solution. DOI informed BearingPoint that the contract included a firm fixed-price hosting solution.

DOI informed BearingPoint that because DOI relied on and awarded the contract based on BearingPoint providing a hosting solution with IBM as its subcontractor, specific requirements had to be met before DOI could entertain the substitution or changes to the contract. BearingPoint had to quantify and qualify the substitution. BearingPoint had to identify how the AT&T hosting solution was comparable to IBM's hosting solution. BearingPoint had to confirm that AT&T facility had successfully completed an SAS70 audit. BearingPoint informed DOI that AT&T was in the process of receiving an SAS70 audit. BearingPoint further provided DOI assurances that BearingPoint and AT&T had reached agreement with AT&T to provide the hosting solution.

BearingPoint failed to negotiate successfully the AT&T hosting solution. DOI determined it was not a viable solution.

After it became apparent that BearingPoint was incapable of finding a commercial hosting partner, BearingPoint's untested hosting solution presented unacceptable risks for DOI, and because time was of the essence, DOI accepted the joint BearingPoint/NBC proposal in October, 2004.

BearingPoint's proposed contract substitutions and changes added months of delay to achieving the permanent hosting solution. DOI incurred additional costs

by leasing equipment from BearingPoint during the interim period to avoid any additional performance delays.

Contracting Officer's Decision: BearingPoint's original proposal proposed IBM as the hosting contractor. BearingPoint decided to change the host offering from that which was awarded under the BPA because the service originally sought was no longer an option due to a price increase. DOI had the option of finding another vendor for the desired solution; however, DOI chose to weigh the options given by BearingPoint, and thus cannot be faulted with having to take time to determine the best solution. BearingPoint should have been aware that this would be an issue, and planned accordingly. BearingPoint claim of excusable delay is not accepted.

**J. Change Regarding Non-Contiguous Testing**

BearingPoint's Position: BearingPoint staffed the FBMS project at a two locations: Denver, CO and Herndon, VA, per the solicitation. BearingPoint expected testing to occur at only one of these locations. DOI insisted that BearingPoint conduct simultaneous testing in Denver and Herndon, whereby BearingPoint experienced difficulties as reported in its April 15, 2005, status report as follows:

> Testing simultaneous in Herndon & Denver requires more functional resources time to support testing and less time to complete open items. Functional team has to do the configuration of remaining items, create test scripts, provide support to technical team to unit test interfaces, conversions, enhancements, provide support to training team and also work on white papers and FDS on open items. BearingPoint told DOI about the challenges and difficulties that resulted from non-contiguous testing and limitations in the Denver Test space. did not allow BearingPoint personnel to use their laptops, which DOI knew. This delayed Deployment 2A. DOI failed to address these concerns

DOI's Response: DOI's position remained unchanged from the beginning of the acquisition process. DOI required testing in two locations: Herndon and Denver. Furthermore, additional exhibits submitted by BearingPoint do not support the claim but instead identify BearingPoint's failure to properly notify DOI on numerous occasions of perceived issues regarding data conversion. BearingPoint was aware that the FBMS project provided for co-location of key DOI team members and its BearingPoint counterpart in both Herndon and Denver.

Contracting Officer's Decision: BearingPoint's claim is unsubstantiated. DOI required two locations for testing at the time of award. Therefore this is not considered an excusable delay.

**6. Remaining Claims**

A. BearingPoint's Compliance with Certain Contractual Requirements.
DOI's position: DOI asserts that not only did BearingPoint fail to timely achieve Deployment 2A, but also states that BearingPoint failed to satisfy its duty to comply with all contractual requirements, specifically in the areas of (a) Project Control Reporting and (b) Project Quality Assurance. This failure led to proper basis for a termination for cause of Task Order 3.

BearingPoint's Response: BearingPoint states that it, in fact, complied with the applicable project control reporting requirements and kept DOI fully apprised. In regards to Project Quality Assurance, BearingPoint also states that it complied with the quality assurance provisions included in the BPA proposal and the Task Order 3 proposal. BearingPoint responds that in any event, if there was any failure to comply with these contract provisions, these failures do not rise to a level of materiality that would provide a valid basis for a termination for cause of Task Order 3.

Contracting Officer's Decision: BearingPoint has not fully met the requirements of Project Control Reporting and Quality Assurance as indicated in DOI Response. Project Quality Assurance was an integral part of the overall project and as a direct result of it not being completed satisfactorily the project was impacted negatively. DOI reported concerns to BearingPoint on the failures of Project Control Reporting. BearingPoint was given an opportunity to correct this area, but failed to do so. Therefore, I agree with DOI that BearingPoint did not meet these specific contract requirements and that these were material breaches that are a proper ground for a termination for cause of Task Order 3.

B. DOI's Waiver of the October 2005 Deadline for Deployment 2A.

BearingPoint's Position: Even if BearingPoint's delays are found to be not excusable, BearingPoint asserts that by October 2005, DOI had waived the delivery schedule of Task Order 3. BearingPoint states that DOI's IV&V contractor notified DOI of the potential for BearingPoint's inability to meet the completion date of Task Order 3 as early as December 2004. BearingPoint argues that a January 7, 2005 Status Report was evidence that BearingPoint was failing to make progress so as to endanger timely performance and, thus DOI was on notice. BearingPoint states that it notified DOI that it would miss the deadline to begin integration testing in May 2005 and that it failed to pass the Test Readiness Review on May 25, 2005. BearingPoint claims that DOI personnel acknowledged the inability to achieve Deployment 2A during this May 2005 timeframe. At a meeting on June 2, 2005, BearingPoint announced that it could not meet the October 2005 deadline for Deployment 2A and presented four alternate approaches to DOI. DOI acknowledged this meeting and announcement in follow-up correspondence. Despite BearingPoint's statements of not being able to meet the October 2005 deadline, DOI worked with BearingPoint to develop a revised schedule for Deployment 2A. BearingPoint further states that the parties understood that the deadline for Deployment 2A would be extended to October 2006. BearingPoint claims that such conduct is inconsistent to terminate Task Order 3 and the delay and that, in fact, by its conduct, DOI had waived the Task

Order 3 delivery schedule. Because of this waiver, the termination for cause of Task Order 3 was improper.

DOI's Response: DOI states that there was no waiver. In its January 16, 2007 determination, DOI claims that "[t]here is no waiver where 'the facts indicated that [the Government] was aggressively attempting to require [the contractor] to provide a completion schedule in order to determine whether forbearance was appropriate.'" (citing *A.R. Sales Co. v. United States*, 51 Fed Cl. 370, 374 (2002)). DOI argues that its conduct is consistent with this standard and that it in fact was working aggressively with BearingPoint to provide a completion schedule.

Contracting Officer's Decision: DOI did not waive the delivery schedule. In fact, DOI actively sought assurances of future performance on the project. Therefore, I deny this portion of the claim submitted by BearingPoint.

C. DOI's Purported Termination of the BPA for Cause Is Invalid.

BearingPoint's Position: BearingPoint argues that DOI's termination of the BPA is invalid because the BPA is not a binding contract. BearingPoint cites the definition of a BPA in the Federal Acquisition Regulation (FAR). Because the BPA is not a binding contract, DOI could not terminate the BPA for cause and its attempt to terminate is a nullity. BearingPoint argues that because it is a nullity, then the termination for cause must be converted to a termination for the convenience to the Government.

DOI's position: From DOI's oral presentation on November 19, 2007 to GSA, DOI stated that it had a firm, fixed-price contract with BearingPoint in the form of a BPA.

Contracting Officer's Decision: As stated in the FAR 13.201(a), a BPA is not a contract. BearingPoint and DOI both were aware of the type of contract vehicle that RFQ 73873 was being issued under, namely a BPA. However, BearingPoint

was awarded task orders under the BPA and performed work as a result of the award of each task order. Even though the termination of the BPA is a nullity, this does not affect the termination for cause for Task Order 3.

7. **Contracting Officer's Final Decision**

In summary, the Contracting Officer's decision is to concur with DOI's Contracting Officer's determination to terminate BearingPoint for Default for Task Order 3. Furthermore, I find that BearingPoint's claim of excusable delay is unsubstantiated for nine of the ten instances. The tenth instance, C. Undertake Timely Data Conversion Extracts, is clearly due to poor communication on the project and both parties are equally at fault. I hereby conclude that BearingPoint is not entitled to any relief under the claim, including any claims for monetary relief, because the performance delays and failures leading to BearingPoint's termination for default are not excusable delay. As stated above, I also find that DOI's attempt to terminate the BPA was improper.

This is the final decision of the Contracting Officer. You may appeal this decision to the agency board of contract appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the agency board of contract appeals and provide a copy to the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number. With regard to appeals to the agency board of contract appeals, you may solely at your election, proceed under the board's small claim procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. Instead of appealing to the agency board of contract appeals, you may bring an action directly in the United States Court of Federal Claims (except as provided in the Contract Disputes Act of 1978, 41 U.S.C. 603, regarding Maritime Contracts) within 12 months of the date you receive this decision.

Jacqulin M. Draughn
Contracting Officer
FAS/Integrated Technology Services
Office of Acquisition Operations
Contract Operations Division (QTADD)
2200 Crystal Drive, CP 4, Room 606
Arlington, VA 20406