# EXHIBIT A

DATE: August 7, 2003

TO: [GSA Schedule 70 Contractors]

FROM: James E. MacKay
Contracting Officer

SUBJECT: Department of the Interior, Financial and Business Management System Project

REFERENCE: Request for Quotation (RFQ) No. 73873

## Background

This RFQ includes a Statement of Objectives (SOO) which outlines the Project's objectives and the definitions of success for each objective, as well as identifies the Project's technical and management considerations and constraints. (See Enclosure 1, Background and Statement of Objectives.) The GSA contractors responding to this request are instructed to use the SOO and its related information to prepare their quotations which should include a Statement of Work describing how DOI's objectives will be met with the contractor's unique solution. The participating contractors are required to align their solutions with the Project's objectives and to identify their performance measures, incentives, and disincentives for meeting these objectives. (See Enclosure 2 which contains the entire set of instructions for preparing quotations.)

In addition to the Statement of Objectives, information on the FBMS Project is included at Enclosure 3, DOI Technical & Other Related Reference Information. The information contained in this Enclosure is divided into three parts. First is data that was developed earlier on the functional areas within the FBMS Project. It was current as of January 2002. It is provided as background information only. ***The RFQ should be used for ensuring your proposed solution meets the FBMS Project's objectives, constraints and considerations.*** The next part is relevant information on current technology trends within Interior such as the Enterprise Architecture and other existing documents. Finally, this Enclosure contains relevant security reference documents. This information is provided as background to help Offerors develop the best possible solution using your experience on projects of a similar size and complexity.

## Blanket Purchase Agreement (BPA)

The term of this BPA is one base year with up to 9 additional option years, to be awarded on a yearly basis by exercise of option(s) to extend the agreement by the Government. The BPA cannot exceed the successful Offeror's Federal Supply Schedule contract period. The Government reserves the right to award follow-on task orders on a sole source basis to the awardee.

This BPA may include incentive fees. As a result, Offerors are required to provide information on proposed incentives in both the Technical/Management Quotation and Price Quote. Offerors' proposed Quality Assurance and Surveillance Plan (with its incentives) will be evaluated based on how well it meets DOI's SOO. The incentives included in responses to the RFQ will be evaluated as part of the overall price.

Offerors are expected to propose a total solution that addresses all objectives, considerations, and constraints on a stand-a-lone basis. The Government reserves the right to make final decisions on implementation BPA task orders for total system support (e.g., hosting, LAN, WAN, etc.).

## Applicable Terms and Conditions and Quotation Instructions

The terms and conditions in the Offerors' GSA Schedule 70 Contract will apply to the BPA established as a result of this solicitation, as well as any additional terms and conditions listed in this solicitation. See Enclosure 4 which contains certain terms and conditions from the GSA Schedule 70 Contract which are restated for emphasis and any additional special provisions. In addition, it is the Offeror's responsibility to know and comply with all current laws or regulations pertaining to this requirement (e.g., Treasury regulations, IRS reporting requirements, etc.). Instructions for quotation preparation and submission are included in Enclosure 2, Quotation Submission Instructions.

## Offerors' Due Diligence

Approximately two weeks after the release of the RFQ, the contractors that received the RFQ will be given the opportunity to meet with appropriate DOI staff to perform Due Diligence prior to the quotation due date. Each Offeror will be given up to eight days (may not be consecutive) to meet with DOI staff members. The Due Diligence meetings will be held with one contractor at a time, to ensure protection of proprietary information and may be in both the District of Columbia and Denver metropolitan areas. The Contracting Officer will choose the order for scheduling by lottery and will notify Offerors of their scheduled dates within five workdays of RFQ release.

The objective of these meetings is to facilitate information exchange between Offerors and the Government on DOI's requirements and the Offerors' technical approaches in order for industry to be able to propose optimal solutions. Offerors are invited to discuss their proprietary technical, management, and solution-based quotations. Any information designated as proprietary, released by Offerors to DOI, will be protected accordingly by the Government. Offerors are encouraged to have all significant team members and subcontractors participate in these sessions.

## Evaluation Factors and Basis for Award

The Government reserves the right to award without negotiations and/or establish a competitive range based on its evaluation of quotations. The

Government intends to award a single BPA to the Offeror whose solution is the most advantageous to the Government, price and other factors considered. The following Factors and Subfactors will be used to evaluate offers:

1. Technical/Management Factor
   - Technical Solution
   - Security Solution
   - Management Solution
   - Operations and Maintenance Solution
   - Quality Assurance and Surveillance Solution
   - Training Solution

2. Past Performance Factor

3. Price Related Factor
   - Price Realism
   - Price Completeness
   - Price Reasonableness

The Technical/Management Factor is slightly more important than the Past Performance Factor. The Subfactors within each factor are of equal importance. The Price Factor is the least important Factor. All evaluation Factors other than Cost or Price, when combined, are significantly more important than Price. Additional evaluation information is provided in Enclosure 5, Evaluation Factors, and Enclosure 6, Price Model and Instructions.

An award will be made to the responsive Offeror submitting a quote, which conforms to the solicitation requirements and which is most advantageous to the Government, considering all price and non-price factors in accordance with Enclosure 5. A tradeoff process may be used when it is considered to be in the best interest of the Government to award to other than the lowest priced Offeror, or other than the highest technically rated Offeror. This process permits tradeoffs among price and technical evaluation factors so that the Government may accept other than the lowest priced or highest technically rated offer.

At any time prior to selection, including upon receipt of quotations, the Government may exclude a quotation from further consideration for reasons such as (but not limited to): non-compliance with instructions related to this Request for Quotation; failure to meet evaluation criteria; when the Government determines that the quotation is not among the most advantageous to the Government; or that the Offeror's quotation, even with corrections, is so flawed that it does not have a reasonable chance of being selected for award.

## Oral Presentations and Operational Capability Demonstration

Oral Presentations and an Operational Capability Demonstration (OCD) will be held during the quotation evaluation period. The information from both will be

used to support the evaluator's ratings in the Technical/Management Factor/Subfactor areas. Contractors will be contacted by the Contracting Officer to schedule these events. See Enclosure 7, Instructions for Oral Presentations and Operational Capability Demonstration.

## Quotation Submission

The Government is not responsible for the cost of Offeror's proposal preparation. Quotations are to be submitted in both hard and soft copy to DOI. Offeror's shall submit an original and twenty hard (paper) copies of the Technical/Management Quotation Volume and an original and five hard (paper) copies of the Business Quotation Volume. Offeror's shall also provide a soft copy of the quotations using electronic media in MS Word, Excel, and PowerPoint format, as appropriate, on CD-ROM.

The quotations are due October 10, 2003 at 12:00 PM, Eastern Daylight Time. All questions are due September 26, 2003, 12:00 PM, Eastern Daylight Time. Quotations may be hand carried, couriered or mailed to:

U.S. Department of the Interior
Minerals Management Service
381 Eldon Street MS 2510
Herndon, VA 20170
Attn: James E. MacKay

## Inquiries

The Offerors may ***contact only the Contracting Officer*** issuing the solicitation about any aspect of this requirement prior to contract award. Offerors may not directly contact technical personnel of DOI with regard to this solicitation prior to contract award.

Submitted by: /s/ August 7, 2003

James E. MacKay, Contracting Officer — Date

| | |
|---|---|
| Enclosure 1 | Background and Statement of Objectives |
| Enclosure 2 | Quotation Submission Instructions |
| Enclosure 3 | DOI Technical & Other Related Reference Information |
| Enclosure 4 | Terms and Conditions |
| Enclosure 5 | Evaluation Factors |
| Enclosure 6 | Price Model and Instructions |
| Enclosure 7 | Instructions for Oral Presentations and Operational Capability Demonstration |

# EXHIBIT B

BearingPoint

1676 International Drive
McLean, VA 22102-4828
Tel: +1.703.747.3000
Fax: +1.703.747.8500

www.bearingpoint.com

June 20, 2005

Mr. Peter Hunter
Contracting Officer
Gov. Works
381 Elden Street, MS 2510
Herndon, Virginia 20170

Re: Adequate Assurance of Future Performance:
FBMS – Oracle License Issue

Dear Mr. Hunter:

This letter responds to your June 8, 2005 request that BearingPoint, Inc. provide to the Department of the Interior ("DOI") "Adequate Assurance of Future Performance." Frankly, we were surprised and disappointed to receive the June 8 letter. Surprised because the letter takes such an extreme, aggressive position. Disappointed because, until recently, we believed both parties have manifested a cooperative relationship focused on achieving the absolute best Financial and Business Management System ("FBMS") possible within the budgetary constraints of DOI. The relationship has been flexible with both parties amenable to changes that have been necessary to address the myriad of decisions and issues that are inherent in a project of the scope and complexity of the FBMS program. We hope that the June 8 letter does not represent a fundamentally different approach on the part of DOI.

In addition to seeking "adequate assurances," the Department's letter requests that we provide a "a history and discussion of the problem" and a "proposed remedy to solve the problem." By "the problem," the Department appears to be referring to the fact that the number of Oracle licenses needed to implement the FBMS program in full is greater than originally anticipated by either BearingPoint or DOI. This letter responds to all three specific requests.

The short response to your request for adequate assurance of future performance is that BearingPoint is, and always has been, fully committed to performing all work ordered by a Task Order or otherwise directed by the DOI Contracting Officer (as long as, of course, the work ordered or directed is within the scope of the Blanket Purchase Agreement ("BPA") and our

GSA Schedule contract). Indeed, BearingPoint continues fully to perform even though DOI improperly rejected our latest invoice without timely notification of the reasons for its action.

Focusing specifically on the issue related to the Oracle licenses, we believe that DOI's position is inconsistent with the BPA and applicable regulations. As set forth more fully below, BearingPoint has no obligation to bear any costs associated with DOI's acquisition of Oracle licenses, irrespective of the number of licenses required for FBMS. Nevertheless, we are prepared to move forward and follow your direction on this issue. If we continue to disagree with that direction, we will consider exercising those rights afforded to us by the BPA/Task Order, applicable regulations, and law to seek appropriate compensation through the disputes process, if necessary. At the same time, we expect that DOI similarly will meet its obligations under the BPA/Task Order, applicable regulations, and law, regarding the disputes process, including avoiding retributive action. And, thus, both parties will be moving forward in a cooperative fashion.

BearingPoint has initiated an extensive review of the Oracle licensing issue. Given the short time available to prepare this response, our review is not yet complete. Based on the current status of our review, however, we provide for your consideration the following:

## A. Factual Background

On August 7, 2003, DOI issued Solicitation Number 73873 (the "Solicitation") to BearingPoint and three additional potential sources. The solicitation contemplated an award of the BPA. The solicitation included enclosures identifying data relevant to DOI's resources and needs. *See* Solicitation, Enclosure 1 and Appendices. The data were provided to offerors to enable proposed solutions and to enable the submission of offers. *See, e.g.*, Solicitation, Enc. 1, ¶ 4.1.3, Appendix 5 and Appendix 6. The solicitation data were supplemented by Due Diligence reviews and answers to offerors' questions. *See, e.g.*, "FBMS RFQ Clarification Questions and Answers."

Based on the data supplied by DOI together with the functionality requirements and tasks identified in the solicitation, each offeror was invited to propose a design solution. Each offeror also was required to submit its estimated price for the solution proposed. In its proposal, BearingPoint proposed SAP software as the core solution software, a multi-phased roll-out with two of the eight DOI Bureaus implemented in Fiscal Year 2004, and with Integrated Logistics to be supplied by the BearingPoint team.

Importantly, the BearingPoint solution included the use of Oracle database software. The number of database software licenses required for a project such as the FBMS program depends on a number of factors. Some of the more significant factors include:

1. <u>System Architecture</u>: Servers from certain manufacturers can be partitioned such that only the processors required to operate the database are allocated to the database. Processors on that server that are not allocated to the partition in which

Mr. Peter Hunter
Department of the Interior
June 20, 2005
Page 3

the database is operating would not be included when determining the number of licenses needed when using a processor-based licensing model. If the servers used cannot be partitioned, all processors on the server, regardless of their relevance to database processing, would be included when calculating required licenses. Processor speeds also affect how many processors are needed to support the particular applications and number of users being estimated.

2. Performance/availability expectations: Higher performance and availability expectations increase the number of processors in the system landscape. This has a direct impact on the number of software licenses required.

3. The form of software license: Software vendors use a wide variety of software licensing models. Some offer a single flat fee without regard to the number of processors running the software. Some vendors charge a fee based on the number of processors reported by the operating system. A number of vendors charge based on the number of processors that exist on the server on which the software is running. Some vendors charge based on the number of users that will access the software.

4. The software implementation philosophy: Software can operate in a number of environments, for example, development, quality assurance, production, and training. If these operational environments are planned to occur seriatim, or with minimal overlap, the number of processors needed can be reduced. The degree of concurrency of these activities can influence the amount of hardware needed and, thus, the number of software licenses.

5. Configuration Management (CM) philosophy: "Commercial-off-the-shelf" ("COTS") software typically can be operated on a variety of database platforms. Once the production database platform is chosen, a decision is made as to whether the development, quality assurance, and training environments will be built as replicas (potentially scaled down) of the production environment. If it is not a requirement to replicate production, a different, lower cost database alternative could be chosen to reduce the number of licenses required.

The BearingPoint proposal for Oracle software was based on a processor-based license, IBM servers, and a phased implementation with only two Bureaus to be rolled-out in the first Fiscal Year of operation. The proposed architecture and overall solution was based on the data provided by DOI and BearingPoint's teammates. Indeed, an SAP tool (SAP Sizer) was utilized to estimate hardware quantities. The SAP Sizer gathers information about an organization's business requirements (e.g., user load, transactions and business objectives) and translates these data into generic system requirements. An analysis was performed on both the SAP Sizer results and the input parameters in order to determine the minimum hardware configuration required to support the BearingPoint solution, including a phased roll-out. This sizing methodology has proven successful for numerous other projects and is the only method recommended by SAP. It

Mr. Peter Hunter
Department of the Interior
June 20, 2005
Page 4

was clear that the final design of the system was not intended to be achieved at the proposal stage. Changes to the proposed solution almost always are necessary as performance progresses and requirements are refined. Indeed, it was for this reason, presumably, that a BPA form of contracting was selected by DOI to facilitate the FBMS procurement.

DOI was fully informed by BearingPoint that changes to the design likely would occur during performance of the task orders. In its proposal to DOI, BearingPoint made clear that its design solution was fluid. For example:

- Volume II, Figure 1-7 of BearingPoint's Proposal "shows a production landscape of the components required for the DOI, as currently understood, and how those components interact." The presentation asked DOI to "understand that our view of the architectural landscape **will be refined** as the final environment evolves." BearingPoint Proposal, Volume II at 1-10 (emphasis added).

- The BearingPoint proposal also had the following to say regarding "databases":

  "1.5 Databases
  The solution proposed by the BearingPoint Team will include multiple synchronized databases. The mySAP system is delivered with components that allow either real-time or batch synchronization of data between systems. **At this point of time,** the BearingPoint Team is envisioning the following six instances of databases. . . ." *Id.* at 1-22 (emphasis added).

- The RFQ provided that proposed prices for the base year and all nine option years were to be submitted "**for proposal purposes**" only. RFQ, Enclosure 4 at § 4.1.3 (emphasis added).

- The RFQ instructed offerors to propose prices that were "**representative of the** skill required and work to be performed under the BPA." *Id.* (emphasis added).

- The RFQ contemplated the post-award addition of **additional tasks** "within the scope of the BPA." *Id.* at § 4.6.6.

- The RFQ contemplated the post-award incorporation of future "**potential requirements and mandated changes** . . . ." RFQ, Enclosure 6 at 1 (emphasis added).

- The RFQ required DOI to make a "**most probable** price determination" in conjunction with its evaluation of proposals. RFQ, Enclosure 6 at 1 (emphasis added).

With this history and understanding regarding the nature of BearingPoint's proposal, on January 5, 2004, the DOI awarded BPA No. 73873 to BearingPoint to facilitate the development

of the Department's FBMS program. *See* BPA 73873. The BPA, which was issued under BearingPoint's GSA Schedule Contract No. GS-35F-4338D pursuant to FAR 8.405-3, covers one base year and nine option years.

Since award of the BPA, the FBMS program has, in keeping with the reservations provided by BearingPoint during the solicitation stage, undergone substantial changes from the solicitation/proposal state. Some of the more significant changes include:

1. The design approach was changed to conduct a "Departmental Blueprint" for the entire system in the opening stages of work.
2. The schedule for the deployment of the new system to bureaus was revised.
3. The system is now hosted by NBC, rather than a private concern such as IBM or BearingPoint.
4. Funding restraints have influenced the content of Task Orders and the timing of activities.
5. Sun servers were deployed instead of IBM servers.
6. A detailed design and architecture has been developed.

BearingPoint is not criticizing the fact that these changes were made, nor are we suggesting that all were directed by DOI. As noted in our proposal and briefing, such changes are normal in a project of this scope and complexity, and are contemplated by the inherent nature of a BPA. Indeed, the changes (1) prove the wisdom of selecting a flexible contracting mode for the program, and (2) demonstrate that estimates of work provided in the solicitation were just that – estimates to be re-evaluated as the Program progressed and Task Orders were issued.

## B. Analysis

The DOI position regarding Oracle licenses seems to be that the BPA is a fixed price contract and that BearingPoint, therefore, must acquire the actual number of Oracle license over and above the number estimated in its proposal without additional compensation. This assumption is not correct.

The FAR explicitly authorizes the issuance of BPAs under GSA Schedule contracts. FAR 8-405-3(a)(1); *see also* FAR 13.303-2(c) ("BPA's may be established with . . . Federal Supply Schedule contractors, if not inconsistent with the terms of the applicable schedule contract. . . ."). A BPA is "a simplified method of filling anticipated repetitive needs for supplies or services by establishing 'charge accounts' with qualified sources of supply." FAR 13.303-1(a); *see also* "Doing Business With the Bureau of Land Management" (NSTC10/04) at 4. Acquiring agencies, such as the DOI, compete, negotiate, and award BPAs

pursuant to FAR Part 8 and then, subsequently, issue Task Orders, also pursuant to FAR Part 8, as the need arises. *See, generally*, FAR Part 8.

The terms and conditions of the FBMS solicitation made clear that this is precisely how DOI intended to use its BPA:

> During the course of this Project, Task Orders for equipment, software, and services will be issued under the BPA.

RFQ, Enclosure 4 at § 4.1.2. The solicitation similarly provided that such task orders would be issued on a "firm, fixed-price" basis. RFQ, Enclosure 4 at § 4.1.

While BPAs clearly are authorized by the FAR, they equally clearly are not contracts. *See, generally*, FAR Part 13; *Boehringer Mannheim Corporation*, B-279238, May 21, 1998 (citing to FAR 13.201(a) for the proposition that "[a] BPA is not a contract" in the context of a GSA Schedule procurement); GSAM 552.238-79 (noting, in the context of Cooperative Purchasing that "a BPA is not a contract"); *see also* Memorandum from U.S. Army Materiel Command Chief Counsel entitled "The Use of Blanket Purchase Agreements and 'Mini-Competitions' Under General Service Administration Federal Supply Schedule Contracts" (August 12, 1999) ("A normal BPA is not a complete contract in itself until an order is issued under it . . . ."); *cf* FAR 16.702(a)(2) ("A basic agreement is not a contract."), FAR 16.703(a)(3) ("A basic ordering agreement is not a contract.").

The BPA issued by DOI in this case, like the countless other BPAs issued by the federal Government under the GSA Schedule Program, also is not a contract. Not only was it (i) designated by the DOI as a GSA Schedule "Blanket Purchase Agreement" and (ii) prepared by the DOI using GSA's standard Schedule BPA template, but it incorporated all the indicia of a traditional non-contractual "charge account." For example:

- The BPA did not obligate any funds. BPA at 2 ("This BPA **does not obligate** any funds" (emphasis in original)).
- The BPA only estimated the number of labor hours to be acquired. It committed the Government to purchase no minimum number of hours. *Id.* at 2 ("Total Number of Labor Hours: Est. . . ." (emphasis added)).
- The BPA only estimated the cost of the BPA. It did not commit the Government to expend any funds. *Id.* at 2 ("Total Estimated Cost" (emphasis added)).
- The BPA contemplated additional discussions regarding price on a task-order by task-order basis. *Id.* at 2 (advising awardee that DOI could ask for additional price reductions at the time of placing a given task order).

Mr. Peter Hunter
Department of the Interior
June 20, 2005
Page 7

- The RFQ contemplated the post-award addition of new tasks, unknown at the time of BPA award. RFQ, Enclosure 4 at § 4.6.6.
- The RFQ contemplated the post-award incorporation of future "potential requirements and mandated changes" also unknown at the time of BPA award. RFQ, Enclosure 6 at 1.
- The BPA afforded DOI the discretion to perform work in-house, an opportunity of which DOI took advantage in the area of Integrated Logistics Support (ILS) subsequent to awarding the BPA to BearingPoint.

Additionally, and quite importantly, the BPA did not – and does not – obligate BearingPoint to accept all of the individual orders issued by DOI under the BPA. While BearingPoint is contractually bound to accept some Task Orders from DOI pursuant to the terms of the company's underlying GSA Schedule contract, BearingPoint had the unequivocal right to reject any and all larger orders, including Task Order 1, Task Order 2, and Task Order 3. See BearingPoint GSA Schedule Contract § C.10 ("The Contractor is not obligated to honor any order for a combination of items in excess of" the maximum order threshold.). The right to reject orders, while not dispositive in itself, is yet another indicia of the absence of a contract.

In light of the foregoing, it is clear that the DOI BPA, like all GSA Schedule BPAs, is not a contract and the quantities estimated in the BPA are not binding.

In contrast, the Task Orders issued under a BPA are contracts. This important distinction between a BPA and a Task Order has been described well by the Armed Services Board of Contract Appeals:

> In general, a BPA is not considered to be a contract because it lacks mutuality of consideration. . . . Under a BPA, neither party actually commits itself nor assumes any duty toward the other. . . . Thus, separate contracts would come into being each time the Government ordered services and appellant provided such services. But until a purchase of services was actually made, neither party was obligated to the other, no mutuality of consideration was present, and no contract existed. . . .

*Julian Freeman*, ASBCA 94-3 BCA ¶ 27,280 (Oct. 27, 1994). The Board's description of the BPA/Task Order structure applies equally to a BPA issued under a Schedule contract. *see, e.g., generally*, GSA's Frequently Asked Questions regarding Blanket Purchase Agreements.

Because each Task Order issued under a GSA Schedule BPA constitutes a separate contract, GSA's regulations make clear that

Mr. Peter Hunter
Department of the Interior
June 20, 2005
Page 8

> [o]rders placed under such agreements shall be issued in accordance with all applicable regulations and the terms and conditions of the contract.

GSA Schedule Clause I-FSS-646. Further, FAR Part 8 provides that the

> ordering activity is responsible for considering the level of effort and the mix of labor proposed to perform **a specific task** being ordered.

FAR 8.405-2(d) (emphasis added). This requirement, obviously, applies at the "specific task" level because the "specific task" constitutes the contract between the parties.

The foregoing regulatory direction is summarized well in GSA's guidance to the federal procurement community, which explicitly discusses the use of the pre-approved BPA hourly rates to negotiate the prices of the discrete Task Orders issued under the BPA:

> All orders under the Schedule BPA must specify a price for the performance of the tasks identified in the statement of work. For example, the Schedule BPA may include a task to perform project management. An order can require the contractor to perform that type of management for a specific project and period of time. The price for the order must be based on the hourly labor prices for project management labor identified in the BPA.

Federal Acquisition Institute On-Line University (BPA Module).

In accordance with the foregoing regulatory framework, BearingPoint provided DOI discounted hourly labor prices for all of the services that would be ordered by DOI under any of its contemplated Task Orders. *See, e.g.*, BearingPoint Proposal, Vol. 1, Tab 2 at § 2.0 ("BearingPoint has consistently delivered, and will continue to deliver, quality services and products on an economical cost-per-task basis."); Proposal, Vol. I, Business Quotation at § 2.4.5 ("Final Proposed BPA Rates). BearingPoint, in fact, offered DOI two levels of discounts. First, BearingPoint offered DOI a "global 10% discount across all proposed labor categories . . . ." Proposal, Business Quotation, Volume I, § 2.4.3. Second, BearingPoint offered "incremental volume discounts" "across all individual labor category rates." *Id.* at § 2.4.4. In offering these two levels of discounts, the company made clear to DOI that its approach was based upon an "**anticipated** labor staffing mix" and a "**projected** labor mix." Proposal, Vol. I, Business Quotation at §§ 2.4.2, 2.4.4 (emphasis added).

In issuing the Task Orders under the BPA, however, DOI chose not to adopt the task structure set forth in the RFQ or the structure proposed by BearingPoint in response thereto. While the Department's approach has created some logistical obstacles for both parties, it is

admittedly an approach that is consistent with the nature of a GSA Schedule BPA. It also is an approach that is consistent with the nature of the BPA awarded to BearingPoint, which:

- Provided that proposed prices for the base year and all nine option years were to be submitted **"for proposal purposes"** only. RFQ, Enclosure 4 at § 4.1.3 (emphasis added).
- Instructed offerors to propose prices that were **"representative of** the skill required and work to be performed under the BPA." *Id.* (emphasis added).
- Contemplated the post-award addition of **additional tasks** "within the scope of the BPA." *Id.* at § 4.6.6.
- Contemplated the post-award incorporation of future **"potential requirements and mandated changes . . . ."** RFQ, Enclosure 6 at 1 (emphasis added).
- Required DOI to make a **"most probable** price determination" in conjunction with its evaluation of proposals, a determination that would have been unnecessary had the agency expected to award a firm, fixed-price contract. *See* RFQ, Enclosure 6 at 1 (emphasis added).

It is also, of course, an approach for which the FAR's commercial items Changes Clause was created. *See* FAR 52.212-4 (providing for bilateral changes only).

Consistent with its chosen approach to deviate from the discrete tasks and schedule proposed by BearingPoint in response to the BPA solicitation, and consistent with the nature of a BPA, DOI requested BearingPoint to submit new proposals prior to the award of each Task Order under the BPA. *See, e.g.*, BearingPoint Proposal for Task Order 3. Consequently, each Task Order issued by DOI incorporates a *different mix of effort and a different performance schedule* from that initially proposed by BearingPoint in its BPA proposal. Likewise, each Task Order incorporates a new firm, fixed-price, which, while different from that proposed by BearingPoint originally, is based upon the discounted hourly rates established by the BPA. *See, e.g.*, BearingPoint Cost Proposal dated October 10, 2003, page 2-4, Figure 2-5 entitled "Program BPA Rates."

Notwithstanding some increased administrative burden, the changes to Task Orders 1, 2, and 4 were acceptable to BearingPoint, and have been performed, delivered, accepted by DOI, and paid for. *See* BearingPoint BPA Proposal, Vol. I at 14 ("Deliverables not explicitly accepted or rejected by DOI within [5 business days] will be deemed accepted."). Task Orders 5 and 6 are currently being performed and delivered. The changes incorporated into Task Order 3 are the subject of current discussions between BearingPoint and DOI.

Notwithstanding its ongoing discussions with DOI regarding Task Order 3, and notwithstanding the Department's modification of BearingPoint's initial proposed approach,

Mr. Peter Hunter
Department of the Interior
June 20, 2005
Page 10

BearingPoint has continued performing since the award of the BPA. Recently, however, some within DOI have taken the position that BearingPoint should be required to adhere to its initial proposed Task Order prices (as set forth, "for proposal purposes," in the BPA) even though DOI has chosen to materially alter those initially proposed Task Orders. For the reasons set forth in this paper, this position is (i) inconsistent with the nature of a BPA, (ii) inconsistent with the law, (iii) completely unfair to BearingPoint, and (iv) quite frankly, makes no sense. BearingPoint has made this point clear to DOI.

For example, on March 15, 2005, BearingPoint's contracts manager, Ms. Virginia Baxter, met with DOI's then-contracting officer for the FBMS acquisition, Mr. William Archambeault. During their meeting, Ms. Baxter and Mr. Archambeault discussed BearingPoint's right to be compensated for work beyond the scope of any given Task Order. Mr. Archambeault agreed that BearingPoint could not be required to honor its initially proposed Task Order pricing where those task orders had been modified by DOI. In a confirmatory e-mail to Mr. Archambeault that same day, Ms. Baxter confirmed their conversation in this regard.

> I mentioned that it is BearingPoint's position that we are not contractually obligated to perform this work, and that the cost of doing this work will be in excess of the firm fixed price that DOI expects of us (based on our original proposal submitted pursuant to the RFQ) for the work to be performed pursuant to this task order. I mentioned to you BearingPoint's position that we do not have a firm, fixed price BPA and that BearingPoint cannot be held to the pricing originally proposed in light of the changes that DOI has requested since execution of the BPA. **You indicated to me that you concur with this position.**

Email from Virginia Baxter to William Archambeault (March 15, 2005) (emphasis added). Mr. Archambeault has not taken issue or even tried to distance himself from this remark. Nor would one expect him to, since, as set forth above, the remark is wholly consistent with all applicable law and regulations.

## C. Further Considerations

DOI's request for "Adequate Assurance of Future Performance" necessarily implicates the BPA/Task Order "Termination for Cause" clause. FAR 52.212-4(m). As you know, that clause provides DOI with the right to terminate a Task Order for cause if DOI determines that BearingPoint has not provided "adequate" assurances of future performance. If DOI is considering such a drastic action, we believe it important that DOI understand our position on such action. A Termination for Cause of an FBMS Task Order is in the best interest of neither DOI nor BearingPoint. The impact on BearingPoint is evident. The impact on DOI and the FBMS program, however, also must be understood and appreciated before reaching a decision to Terminate for Cause. *See, e.g.*, FAR 49.401, *et. seq.* To assure that the parties fully understand each other's position on this issue, we provide the following for your consideration:

First, BearingPoint has responded fully to your request for adequate assurances of future performance. Thus, Termination for Cause is not justified. As we stated at the outset of this letter, the company is prepared to follow the direction of the DOI Contracting Officer. If that direction is to supply all Oracle licenses required for the FBMS program without additional compensation, we will do so. We disagree that a proper interpretation of the FBMS BPA and Task Orders reaches that result. Thus, we reserve our rights, as provided by contract, regulation, and law, to seek redress for additional compensation under the disputes provision of the BPA and Task Orders.

Second, DOI's rights and remedies under the Termination for Cause provision are limited. As a result of those limits, it is clearly not in DOI's best interest to terminate BearingPoint for cause. The following summarizes some of the more important limitations.

1. Scope of Termination for Cause Provisions

As noted above, a BPA is not a contract. *See Boehringer Mannheim Corp., supra*. Thus, termination or cancellation of a BPA is neither necessary nor possible. Rather than terminating a BPA, the Government need only refrain from placing further orders or calls thereunder. *Dr. Petersen Equipment, Inc.*, AGBCA No. 94-163-1, 95-2 BCA ¶ 27,676 (May 3, 1995); *Chauncey L. Duran d/b/a Chesapeake Orthopedics*, ASBCA No. 35773, 90-1 BCA ¶ 22,386 (Oct. 16, 1989). As also noted above, each *order* placed pursuant to a BPA, however, constitutes a separate contract. *Julian Freeman, supra*; *Janice L. Cox d/b/a/ Occupro Limited*, ASBCA No. 50587, 03-1 BCA ¶ 32,205, (Mar. 17, 2003). Hence, a BPA termination provision, whether for the convenience of the Government or for cause, is applicable only to the particular task order implicated in the termination.

The Government cannot terminate a task order for cause if it already has accepted the deliverables provided under the task order. *Fischer Imaging Corp.*, VABCA Nos. 6125, 6126, 6127, 02-2 BCA ¶ 32,003 (Sept. 10, 2002) ("*Fischer I*"); *see also Fischer Imaging Corp.*, VABCA No. 6343, 02-2 BCA ¶ 32,048 (Oct. 22, 2002) ("*Fischer II*"); *cf.* Federal Acquisition Regulation ("FAR") 52.212-4(m) (OCT 2003). In this regard, the BPA inspection/acceptance clause provides, in pertinent part, that the government must exercise its post acceptance rights within "a reasonable time after the defect was discovered or should have been discovered . . . before any substantial change occurs in the condition of the item, unless the change is due to the defect in the item." FAR 52.212-4(a) (OCT 2003). In addition, BearingPoint's proposal, incorporated into the BPA (BPA, at 1 (incorporating proposal into BPA)) and hence, each task order (*see* BPA at 3, Item 9, incorporating BPA into each task order), provides:

> When the BearingPoint Team provides the client with draft deliverables, DOI will have five (5) business days to review and approve or request changes and BearingPoint will have five business days to incorporate feedback into the final. Requested changes will be specific in nature. Deliverables not explicitly

> accepted or rejected by DOI within the time period allotted will be deemed accepted.

BearingPoint Proposal, Tab 2 – Pricing, at 2-14.

Based on the foregoing, all BPA work (deliverables) required under Task Orders 1, 2, 4, and 5, as well as portions of both Task Order 3 and 6, have been delivered, accepted, and paid for by the Government. These task orders, which constitute separate contracts under the BPA, have been fully performed. Therefore, termination by the government of these task orders is neither possible nor proper. *See Fischer I* and *Fischer II*, *supra*.

A close relationship between the work performed on one task order and the work performed on a subsequent task order does not turn the task orders into a single contract for termination purposes. In *Infotec Development, Inc.*, the Board held that even though the Government's objective was to secure a single usable software solution at the end of a 3-year software development contract, for funding purposes, it chose to issue three separate delivery orders for each year of contract performance. In such instances, the failure of the software at the end of the third delivery order did not otherwise negate the acceptance of the deliverables provided under the first two task orders. *Infotec Development, Inc.*, ASBCA Nos. 31809, 32235, 91-2 BCA ¶ 23,909 (Mar. 12, 1991). Significantly, the Board states:

> The Government's contentions boil down to saying it was a poor bargain for the Government as written. However, this was the bargain crafted by the Government in drawing the contract.

*Infotec Development, Inc.*, *supra*. DOI, likewise, crafted its FBMS BPA.

2. <u>Damages Recoverable Under the Termination for Cause Provision</u>

The commercial item Termination for Cause provision states that the government may "terminate for cause" in the event of any default by the Contractor, failure to comply with contract terms or conditions, or failure to provide adequate assurance of future performance upon request. FAR 52.212-4(m) (OCT 2003). Further, the Termination for Cause provision states that the Government must accept or reject supplies promptly, or lose the right to a remedy. *Id.*

Thus, under open task orders – Task Orders 3, 5, and 6 – payment for deliverables duly accepted by the government cannot be withheld or recovered. *See, e.g.*, *Trinity Installers, Inc.*, AGBCA No. 2004-139-1, 05-1 BCA ¶ 32,868 (Feb. 8, 2005) (termination for cause converted to one for convenience where government withheld funds far in excess of work remaining to be completed; question existed as to whether work was unacceptable as opposed to merely mediocre, and Government continued to use contract deliverables despite alleged deficiencies). As a result of these principles applicable to Terminations for Cause, should DOI attempt to terminate BearingPoint, DOI will be unable to recover from BearingPoint payments made for work thus far performed and accepted.

Regarding remedies available to the government in a commercial item Termination for Cause context, the FAR states that the primary remedy is the recovery of "reprocurement costs," together with any incidental and consequential damages. FAR 12.403(c)(2). Reprocurement costs generally are calculated as the difference between the price of the terminated portion of the contract (in this instance, the uncompleted Task Order work) and the reprocurement contract for the same or similar work. *See Double B Enterprises, Inc.*, ASBCA No. 52010, 01-1 BCA ¶ 31,396 (Apr. 24, 2001); *see also Fischer I* and *Fischer II, supra.*

Based upon the foregoing, terminating BearingPoint's BPA for default would not be in the best interest of the DOI. In such event, the DOI would lose the financial and time investment made in the FBMS program thus far. It would need to find a replacement contractor, which task likely will entail considerable time. Finally, DOI would need to fund the new effort without significant reprocurement funds. It would seem unreasonable for the DOI to take this risk in light of BearingPoint's commitment to the FBMS program and the company's demonstrated willingness to continue working with DOI toward a mutully acceptable solution that is fully consistent with the terms of the BPA and the Task orders issued thereunder.

## D. The May 12th Meeting

BearingPoint always has been consistent and candid with DOI. The Department's June 8 letter, however, states that, in a May 12, 2005 meeting, BearingPoint "indicated that it has known that additional [Oracle] licenses would be required since August, 2004, yet it did not share this information with the Government." The letter characterizes this as a "pronounced discourtesy," and suggests that BearingPoint may have withheld this information from DOI.

This description of the May 12th meeting, however, inaccurately captures what was said at that meeting. First, BearingPoint did not state that it knew since August 2004 that additional Oracle licenses would be needed. Second, BearingPoint pointed out that, while certain BearingPoint *technical personnel working on the system architecture* may have been aware in 2004 of the number of Oracle licenses that would be needed on the FBMS program, those individuals were not aware of the number of Oracle licenses that had been listed in BearingPoint's original proposal. Those individuals did not, therefore, have any reason to bring the required number of Oracle licenses to anyone's attention, and, in fact, did not do so.

Third, as BearingPoint indicated during that May 12th meeting, the development of the FBMS system architecture was accomplished in collaboration with DOI personnel. Those DOI technical personnel would have had the same information as did BearingPoint technical personnel so as to ascertain the necessary number of Oracle licenses. In addition, the May 12th meeting attendees discussed the fact that BearingPoint provided all the system architecture information, including the required number of Oracle licenses, to NBC (DOI) in the summer of 2004.

Mr. Peter Hunter
Department of the Interior
June 20, 2005
Page 14

Thus, it simply is incorrect to say that BearingPoint withheld from the Government any information concerning the required number of Oracle licenses. Equally important, we do not believe that speculative accusations such as this are either appropriate or constructive.

**E. Proposed Remedy**

Throughout this project, BearingPoint has enjoyed a cooperative, constructive, and result-oriented working relationship with the Department of the Interior. It seems to us that the "remedy" to the current "problem" lies in a continuation of that relationship. BearingPoint recognizes that the cost of the Oracle licenses that DOI must acquire in order to implement FBMS is higher than the Department (and BearingPoint) expected. Nonetheless, we are confident that more than 24 licenses will be necessary. We also are confident that it is the responsibility of the DOI, pursuant to the terms of the BPA and as described herein, to obtain and pay for such licenses.

We believe, however, that we will be able to assist DOI to reduce the cost of those licenses. The "government estimate" referenced in your June 8, 2005 letter seems to us to be significantly overstated. By modifying the types of licenses acquired, for example, we likely can reduce that estimate. Additionally, there may be some modifications to the system itself that can reduce that cost further without negatively affecting the performance or capabilities of the FBMS.

In light of the foregoing, we propose that we create a small technical integrated team to sit down together to discuss and evaluate the different solutions to what you have referred to as the "Oracle problem." Such discussions would touch on the potential solutions noted above, but would not stop there. We believe that, by continuing to work together, we can reduce DOI's anticipated costs significantly in this matter.

**F. Conclusion**

We request that BearingPoint and DOI work together to bring about a mutually acceptable, *global solution* to any and all contractual differences between the parties. A piecemeal approach to resolving differences does neither party any good.

We trust that you have found this letter responsive to your request. As emphasized at the outset of this letter, and as stated to DOI personnel on countless occasions, BearingPoint is, and always has been, fully committed to performing all work ordered by a Task Order or otherwise directed by the DOI Contracting Officer.

Mr. Peter Hunter
Department of the Interior
June 20, 2005
Page 15

Should you have any questions, please do not hesitate to contact me by phone at (703) 747-5566 or via email at virginia.baxter@bearingpoint.com.

Sincerely,

Virginia A. Baxter

Virginia A. Baxter
Senior Contract/Subcontracts Administrator
DOI FBMS Project

cc: Robin Lineberger
Tom DeGarmo
Brad Bends
Susan Weersing
Matt Peebles
William Lieth

# EXHIBIT C

BearingPoint

1676 International Drive
McLean, VA 22102-4828
Tel: +1.703.747.3000
Fax: +1.703.747.8500

www.bearingpoint.com

July 8, 2005

Mr. Peter Hunter
Contracting Officer
Gov. Works
381 Elden Street, MS 2510
Herndon, Virginia 20170

Re: Adequate Assurance of Future Performance

Dear Mr. Hunter:

This is in response to your email of July 7, 2005, in which you seek a "formal acknowledgment that BearingPoint cannot meet its obligations under Order #37408 to deploy three bureaus in October of 2005."

We are puzzled by your request because your email includes two quotations of our written position on this issue. Moreover, DOI and BearingPoint have been engaged in discussions relative to a new go-forward schedule that is predicated on an acknowledgment that the October "go-live" date is unrealistic. With that said, BearingPoint appreciates the opportunity to reiterate its position.

As indicted in our earlier correspondence to you, BearingPoint has worked at risk since April 7, 2005 because BearingPoint has yet to receive a valid contractual document extending the funding of Order # 37408 beyond April 6, 2005. In so performing, BearingPoint specifically advised DOI that BearingPoint's continued performance should not be construed by DOI as acceptance of Modification 6. Thus, since BearingPoint has no current obligation to perform under Order # 37408, there is no contractual obligation "to deploy three bureaus in October of 2005."

In addition and apart from the issue caused by the lack of a valid contractual document, the FBMS program has encountered various delays that warrant schedule and other relief. While some of the delays were caused by DOI and some of the delays were caused by BearingPoint, the net effect is that there has been excusable delay that has rendered an October "go-live" for all three bureaus unrealistic.

Mr. Peter Hunter
Department of the Interior
July 8, 2005
Page 2

We have been and are prepared to continue in good faith negotiations to resolve our outstanding contractual issues. As you know, you previously requested an adequate assurance from BearingPoint on June 8, 2005. As indicated in our June 20th response to that request, there are some fundamental issues that require discussion. We remain prepared to discuss those and all other issues relative to the program.

Should you have any questions, please do not hesitate to contact me by phone at (703) 747-5566 or via email at virginia.baxter@bearingpoint.com.

Sincerely,

Virginia A. Baxter
Senior Contract/Subcontracts Administrator
DOI FBMS Project

cc: Robin Lineberger
Tom DeGarmo
Brad Bends
Susan Weersing
Matt Peebles
Timothy Harris
William Lieth

# EXHIBIT D

DECLARATION OF APRELL JOYCE

I, Aprell Joyce, pursuant to 28 U.S.C. § 1746, declare:

1. I make this declaration based upon my personal knowledge, and if called and sworn as a witness, I could and would testify under oath to the facts as set forth below.

2. I am the Department of the Interior's Contracting Officer for the Financial and Business Management System (FBMS).

3. The FBMS contract was awarded to BearingPoint, Inc. by Blanket Purchase Agreement No. 73873 under the General Services Administration (GSA) MAS Contract No. GS-35F-4338D.

4. Beginning in mid-August, 2005, I began making numerous attempts to contact Ms. Jacqulin Draughn, the General Services Administration's Schedule Contracting Officer for the BearingPoint Schedule contract due to the potential termination for cause of BearingPoint. These attempts included speaking with Ms. Draughn's supervisor, Montrez Nicholson. After speaking with Ms. Nicholson, I was contacted by Ms. Draughn.

5. On September 7, 2005, I spoke with Ms. Draughn to discuss the meaning and effect of Schedule 70 Contract clause I-FSS-249-B (Default), GSA's rationale for including the clause, and the fact that it conflicted with the current Federal Acquisition Regulation (FAR) clauses, FAR 8.406-4 and 8.406-6. In that conversation, Ms. Draughn speculated that the clause had been drafted to "protect the contractor," although she had no further information. She said that it was a "tailored clause" approved by GSA's lawyers and that she would check with them to gain a greater understanding of the intent and purpose of the clause.

6. On September 9, 2005, I followed up by sending an email to Ms. Draughn, stating that:

I was hoping to hear from you or GSA attorney today regarding the clause in Schedule 70 contract I-FSS-249-B (Default).

I understand that you are researching this and attempting to contact the attorney, but in addition to the questions that I have previously asked, I would like to add the following:

Is it possible for you as the Contracting Officer or GSA to delegate the authority of making the determination on whether the failure is excusable? [Can you please get] back to me? I can submit the request via a formal letter if needed.

Thank you and I look forward to talking with you soon.

7. On September 12, 2005, Ms. Draughn responded via email to me, stating as follows:

Generally, when a dispute arises that relates solely to the task order (i.e., does not impact the schedule contract), the contracting officer responsible for issuing a final decision is the task order CO. If, however, there is a dispute that goes to the terms and conditions of the schedule contract, the matter must be referred to the schedule contracting officer for resolution.

Late delivery seems like a performance issue, a matter for resolution at the task order level. Also, note that FAR 8.406-4 governs terminations for cause under the schedules program. Although it requires compliance with FAR 12.403, it is important to start with and follow the 8.4 procedures. Please call me with any questions on (703) 605-2715.

8. Following the September 12, 2005 email, I immediately called Ms. Draughn. I asked whether Ms. Draughn's emailed response had been coordinated with GSA legal counsel. Ms. Draughn replied affirmatively. I further pursued the matter, asking again whether there was any rationale for inclusion of the I-FSS-249-B clause in the Schedule contract. Ms. Draughn indicated that she had no further information than contained in her email. Ms. Draughn also advised, in response to my continued questioning, that in her years as a contracting officer on the BearingPoint Schedule contract, she had not encountered any issues related to the clause. I then

asked if Ms. Draughn knew of anyone else at GSA who had encountered issues related to the clause. Ms. Draughn knew of no one else. I also asked about Ms. Draughn's experience assisting non-GSA contracting officers with performance issues arising under task orders issued against GSA Schedule contracts. Ms. Draughn related no direct experience and knew of only one contracting officer who had such experience.

9. Additionally in the conversation following the September 12, 2005 email, I asked Ms. Draughn whether authority to make all relevant determinations could be delegated to me. Ms. Draughn said she would consider the question.

10. In this and previous conversations, I advised Ms. Draughn of serious BearingPoint performance issues resulting in escalating correspondence including cure notices. Copies of the cure and termination notices sent to BearingPoint, along with selected other BearingPoint correspondence, were provided to Ms. Draughn the same day or within a couple of days of issuance.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 20, 2007.

Aprell Joyce
Aprell Joyce

# EXHIBIT E

**Joyce, Aprell**

**From:** jacqulin.draughn@gsa.gov
**Sent:** Monday, September 12, 2005 10:01 AM
**To:** Joyce, Aprell
**Cc:** Joyce, Aprell; Michael_J_Johnston@fbms.doi.gov
**Subject:** Re: GSA Clause

Joyce,

Generally, when a dispute arises that relates solely to the task order (i.e., does not impact the schedule contract), the contracting officer responsible for issuing a final decision is the task order CO. If, however, there is a dispute that goes to the terms and conditions of the schedule contract, the matter must be referred to the schedule contracting officer for resolution.

Late delivery seems like a performance issue, a matter for resolution at the task order level. Also, note that FAR 8.406-4 governs terminations for cause under the schedules program. Although it requires compliance with FAR 12.403, it is important to start with and follow the 8.4 procedures. Please call me with any questions on (703) 605-2715..

"Joyce, Aprell" <Aprell.joyce@mms.gov>
09/09/2005 03:38 PM

To
jacqulin.draughn@gsa.gov
cc
Michael_J_Johnston@fbms.doi.gov, "Joyce, Aprell" <Aprell.joyce@mms.gov>
Subject
GSA Clause

Hello Jacqulin,

I was hoping to hear from you or GSA attorney today regarding the clause in Schedule 70 contract ? I-FSS-249-B (Default).

I understand that you are researching this and attempting to contact the attorney, but in addition to the questions that I have previously asked, I would like to add the following:

Is it possible for you as the Contracting Officer or GSA to delegate the authority of making the determination on whether the failure is excusable ?
back to me? I can submit the request via a formal letter if needed.

Thank you and I look forward to talking with you soon.

V/r,

Aprell Joyce
Contracting Officer
Minerals Management Service/GovWorks
381 Elden Street
Herndon, VA 20170-4817
703.787.1161
aprell.joyce@mms.gov

**Joyce, Aprell**

**From:** jacqulin.draughn@gsa.gov
**Sent:** Friday, September 09, 2005 4:00 PM
**To:** Joyce, Aprell
**Subject:** Jacqulin M. Draughn/FCI/CO/GSA/GOV is out of the office.

I will be out of the office starting 09/08/2005 and will not return until 09/12/2005.

I will reply to your message upon my return. You may contact Evangeline O'Neal on (703) 605-2713 for assistance.