# EXHIBIT F

GovWorks
FEDERAL ACQUISITION CENTER
Government working with government

October 20, 2005

Ms. Virginia Baxter
BearingPoint, Inc.
1676 International Drive
McLean, VA 22102

Subject: Cure Notice Regarding Remaining Deployments under BearingPoint FBMS Proposal—BPA No. 73873

Dear Ms. Baxter:

You are hereby notified that the Government considers deployment of the Financial and Business Management System (FBMS) under BPA No. 73873 to be endangered on the following grounds:[1]

A. Continuing, express unwillingness to be bound to contractual obligations

By letter dated June 20, 2005, BearingPoint took the position, among other things, that it is not obligated to accept individual task orders issued by the Department of the Interior (DOI); it is not obligated to honor any order for a combination of items in excess of the Federal Supply Schedule contract maximum order threshold; and the quantities contained in BearingPoint's proposal are not binding.

On September 2, 2005, we advised BearingPoint that its "fundamental obligation is to perform this contract diligently at the agreed firm-fixed price and within schedule." We noted that the understanding of the parties at the time of award was that this was a firm-fixed price commitment, to be compliant with set schedule milestones, and incorporative of BearingPoint's detailed proposal. We stated our view that, by its June 20 letter, BearingPoint "disavowed" and "renounce[d]" its promised performance and, because of this, we reserved the right to consider BearingPoint to be in anticipatory breach. Yet, in its letter of September 20, 2005, BearingPoint's response was merely to state that, as "set forth in [BearingPoint's] letter of June 20, 2005, BearingPoint has a different view."

You are hereby notified that the Government considers the position stated in Bearing-Point's letter of September 2, 2005, and also communicated in other instances, to be an

[1] We regard each ground to be an independent, legally sufficient basis on which to issue this cure notice.

express and unequivocal manifestation of BearingPoint's intention not to provide its promised performance within the time and at the cost agreed. BearingPoint's response of September 20, 2005, has not provided any assurance to the contrary.

B. Lack of accountability with respect to number of Oracle licenses

In addition to BearingPoint's blanket disavowal of its obligations, there is another noteworthy instance of BearingPoint failing to adhere to its promises. At pages 2-5 through 2-7 (in paragraph 2.6.2 and Figure 2-6) of its proposal, BearingPoint represented that twenty (20) *Oracle 9i* and four (4) *Oracle 9iAS* licenses would be required to "fully satisfy all of DOI's FBMS functional business requirements." Later, BearingPoint announced that up to *202* Oracle licenses would be required, increasing the cost to DOI by some $29 million. This unexpected change to the very foundation of BearingPoint's proposed solution—and attendant disruption to DOI's expectations—only further demonstrates a critical and troubling lack of accountability.[2]

C. Failure to make adequate progress

BearingPoint's failure to make adequate progress, among other identified deficiencies, under Task Order 0404D037408 (Task Order 3), and its failure to provide adequate assurances after receiving a cure notice, resulted in DOI terminating that Task Order for cause on September 29, 2005.[3] This is yet another reason for the Government to deem performance under the remainder of the contract (Deployments 3 and 4) endangered.

D. MITRE Analysis: Demonstrated inability to develop and implement a schedule

Finally, in August 2005, DOI contracted with The MITRE Corporation to conduct an independent assessment of BearingPoint's ability to achieve project milestones. In

---

2 Indeed, the contracting officer, by letter of June 8, 2005, identified this seven-fold increase in required Oracle licenses as cause to ask BearingPoint for "Adequate Assurance of Future Performance." On June 20, 2005, BearingPoint responded by expressly disavowing its contractual obligations.

3 In its letter of October 11, 2005, BearingPoint suggests that DOI's termination for cause of Task Order 0404DO37408 (Task Order 3) "render[s] impossible BearingPoint's continued performance of its contractual obligations." It is noteworthy that DOI did not terminate Task Order 3 until September 29, 2005. Prior to this, BearingPoint was given ample opportunity, but repeatedly failed, to give adequate assurances both regarding Task Order 3 *and* the balance of its contractual obligations beyond Task Order 3. Despite repeated opportunities to provide an explanation, BearingPoint never met its burden of proving the requisite connection between specific events and any period of delay to which it seems now to be claiming entitlement. When we requested adequate assurance of BearingPoint's ability to fulfill its obligations, BearingPoint did not provide a plan of action, but merely proferred a general intention to proceed with performance.

addition to conducting numerous interviews with BearingPoint and government personnel, MITRE evaluated BearingPoint's revised 2A Deployment schedule, dated September 6, 2005 (and also a "resource loaded" version dated September 7). MITRE presented its findings both to government and BearingPoint management on September 22, 2005. Among other things, MITRE found that project "activities and dependencies" were missing from the schedule, the schedule did not tie into earlier past-due activities ("dependencies"), it was not compliant with industry standard practices in several respects, and it was not useful as a management tool. In addition, MITRE found that project team members were working in "stove-pipe" environments, preventing the development of an integrated solution, "resource loading" had not been accomplished, and unlimited government resources were assumed. This all led MITRE to conclude that BearingPoint's deployment schedule was incomplete, unreasonable, and unlikely to be achieved.

BearingPoint's demonstrated inability to schedule and execute complex "activities and dependencies" —a critical capability under this requirement—is an additional reason for the Government to deem performance under the remainder of this contract to be endangered.

Accordingly, the Government will terminate the remainder of this contract for cause, and will reserve the right to acquire similar services and items from another contractor and charge BearingPoint with any excess reprocurement costs, unless, within five (5) days of receipt of this notice, BearingPoint cures its failures by setting forth:

- An affirmation of the accuracy of the representations set forth in its original FBMS proposal (*e.g.*, the amount and types of software that must be provided by the Government) and intent to be bound by its representations;

- A plan of action that details how BearingPoint intends to fulfill its obligations under the BPA with respect to the remaining deployments under the BPA; and

- Assurances that BearingPoint will abide by its promises.

This cure notice does not apply to the work that BearingPoint is currently performing under **Delivery Order 0405DO40356, *Task Order Hosting Infrastructure Support*, and Task Order 0405TO41264**, ***Application Management Support***, nor to **Task Order 0404DO37408 (Task Order 3)**, which was previously terminated for cause on September 29, 2005.

Any explanations of why BearingPoint cannot meet any of its obligations or affirm the representations in its original proposal will be considered so long as they set forth details that include a clear demonstration of the causal connection between any event(s) that occurred subsequent to award of the contract and BearingPoint's inability to cure the foregoing deficiencies.

If you have any questions or would like to discuss these issues, please contact me at (703) 787-1161, or by email at aprell.joyce@mms.gov.

Sincerely,

Aprell Joyce
Contracting Officer

Cc: GSA Schedule Contracting Officer

# EXHIBIT G

BearingPoint

1676 International Drive
McLean, VA 22102-4828
Tel: +1.703.747.3000
Fax: +1.703.747.8500

www.bearingpoint.com

September 2, 2005

Ms. Aprell Joyce
Contracting Officer
GovWorks Federal Acquisition Center
Department of the Interior
Mail Stop 2500
381 Elden Street
Herndon, VA 20170-4817

Subject: Cure Notice for Task Order 0404DO37408

Dear Ms. Joyce:

This letter sets forth BearingPoint's timely response to the Cure Notice issued by your office and received by BearingPoint on August 23, 2005 ("Cure Notice").

BearingPoint was surprised to receive the Cure Notice at this time. Both parties have been working closely together for the last several months in an effort to resolve outstanding issues and to develop a mutually acceptable revised schedule for the completion of Task Order 0404DO37408 ("Task Order 3"), and we have made significant progress in this regard, while continuing to move the technical delivery forward. We are hopeful that your letter does not reflect a fundamental shift, at this late date, in the Department's interest in achieving a bilateral solution to the current situation.

BearingPoint believes that there exists no basis for the Department to default terminate Task Order 3. This is especially true since the cause of any schedule delay is due in material part to the actions of DOI, not BearingPoint. Equally important, the Department is without legal authority to terminate a task order under a GSA Schedule contract where the contractor has alleged an excusable delay, as BearingPoint has done here.

Furthermore, as a practical matter, a termination of Task Order 3 at this time would impact DOI as negatively as it would impact BearingPoint. The Department is far more likely to minimize schedule delay and consequent funding constraints by continuing to work with BearingPoint to establish a new schedule than if it were to attempt to conduct a wholly new

procurement and begin work with a new contractor. Like DOI, BearingPoint wants to see the FBMS Program be successful. While the original Task Order 3 schedule clearly has been delayed; there is no reason to believe that, with the adoption of a reasonable, mutually acceptable schedule and the resolution of pending non-schedule issues, the program still cannot be eminently successful.

## PLAN OF ACTION

The Cure Notice requests that "[s]hould BearingPoint wish to pursue Task Order 03 to completion under revised terms, please propose a detailed plan of action." Our understanding of your request for the detailed the plan of action is to set out the actions required to complete the negotiation of the revised Task Order 3. As we have previously stated, BearingPoint and DOI have been working closely together for the last several months in an effort to resolve a number of outstanding issues and to develop a mutually acceptable revised schedule for the completion of Task Order 3. BearingPoint, like DOI wants to see the FBMS Program be successful, and we believe that, with the adoption of a reasonable, mutually acceptable schedule and the resolution of pending non-schedule issues, the program still can be successful.

BearingPoint is prepared to begin discussions with DOI immediately, and continue those discussions (daily if necessary) to resolve all outstanding issues related to Task Order 3. BearingPoint will commit executives who have the authority to conclude an agreement, including, Tom DeGarmo, Senior Vice President, Susan Weersing, Managing Director, Domingo Maradiegue, Associate General Counsel, and Virginia Baxter, Senior Contracts Manager to such negotiations, and would expect a similar commitment on the part of the Government. BearingPoint believes that such discussions can and should drive to promptly reach agreement on the issues you have raised.

Accordingly, we believe that the best course for this group is to work to resolve the specific structural issues raised in your letter along with any associated contractual issues.

Specifically these are:

- Resolution of the proposed system enhancements
- Payment schedules tied to specific Milestones
- Control of travel costs
- Personnel planning
- Resource Commitment

BearingPoint has below addressed each of these issues from our perspective, and we would like to continue to work with you to resolve them. We would like to begin this process as soon as the schedules of all participants can be coordinated.

## RESPONSE TO REQUEST TO CURE

The Cure Notice asserts that DOI views performance of Task Order 3 as endangered by BearingPoint's failure to perform its obligations under the contract. Specifically, the Notice relies on asserted failures of BearingPoint to provide: (1) timely delivery of Deployment 2A, (2) project control reporting, and (3) project quality assurance. Our detailed response to each of these assertions is set forth below.

### A. Non-Delivery of Deployment 2A by October 2005 is Factually and Legally Excused

Task Order 3, as amended, contemplated Deployment 2A delivery by October 2005. Events occurring after issuance of Task Order 3, however, have relieved BearingPoint from a requirement to achieve delivery of Deployment 2A by October 2005. These events included (a) encountering excusable delay (b) a waiver of the October 2005 delivery schedule and (c) a failure of DOI to properly fund completion of Task Order 3.

#### 1. BearingPoint's Performance Delays Are Excusable

The Government may not terminate a contract based upon performance delays for which the contractor is not responsible. *See, e.g., L&H Constr. Co.*, ASBCA No. 43833, 97-1 BCA ¶ 28,766 ("The Government cannot terminate for default for a failure to complete the work on time during a period of excusable delay."). This prohibition is embodied in FAR 52.212-4(f), incorporated by reference into the BPA by virtue of its inclusion in BearingPoint's GSA Schedule 70 contract. In relevant part, FAR 52.212-4(f) provides that:

> [t]he Contractor shall be liable for default unless nonperformance is caused by an occurrence beyond the reasonable control of the Contractor and without its fault or negligence such as . . . acts of the Government in either its sovereign or contractual capacity. . . .

*See also Double B Enters., Inc.*, ASBCA No. 52010, 01-1 BCA ¶ 31,396 (interpreting FAR 52.212-4(f)).

Where the elements of excusable delay are present, the contractor is entitled to additional time to complete performance. *See, e.g., Ragsdale, Beals, Hooper & Seigler*, GSBCA No. 13142-TD, 96-1 BCA ¶ 27,930 ("The remedy for excusable delay is additional time to perform . . . ."). If the Government does not provide the contractor additional time, but instead terminates the contract for default, the Board will convert the termination for default into one for the convenience of the Government. *See, e.g., SPS Mech. Co.*, ASBCA No. 48643, 01-1 BCA ¶ 31,318 (converting termination for default into termination for convenience where contracting officer improperly denied request for additional time based upon excusable delay).

To establish excusable delay, the contractor has the burden to prove that:

- The delay was caused by factors beyond the contractor's control and occurred without the contractor's fault or negligence;
- Those factors delayed the overall completion of performance; and

- The contractor provided the Government timely notice of the delay.

*See* FAR 52.212-4(f); *Double B Enters., supra; CJP Contractors, Inc. v. United States*, 45 Fed. Cl. 343, 372 (1999) (converting termination for default into termination for convenience based upon, *inter alia*, excusable delay).

In the present case, DOI has interfered with and failed to cooperate with BearingPoint in the performance of its obligations under the BPA. Those actions significantly delayed performance.

**a. The Delay Was Caused by Factors Beyond BearingPoint's Control, Occurred Without BearingPoint's Fault or Negligence, and Affected the Overall Completion of Performance**

The Government may not terminate a contract based upon performance delays for which it is responsible. *See* FAR 52.212-4(f); *Gaffny Corp*, ASBCA No. 37639, 94-1 BCA ¶ 26,522; *DCX, Inc.*, ASBCA No. 37669, 92-3 BCA ¶ 25,125; *Marty's Maid & Janitorial Serv.*, GSBCA No. 10614, 93-1 BCA ¶ 25,284. In this regard, the Boards have held that causes of excusable delay include omissions such as the Government's failure to review and approve submissions in a timely manner, to grant access to government facilities, to provide materials necessary for performance, or, in more general terms, to "do whatever is necessary to enable the [contractor] to perform." *L&H Constr., supra; see also Gaffny, supra* (approval); *DCX, supra* (facilities); *Marty's Maid & Janitorial Serv., supra* (materials).

In the present case, termination of BearingPoint for cause would be improper because DOI has contributed significantly to BearingPoint's inability to render timely performance. By way of non-limiting example, DOI: DOI contrib.

- Failed to provide timely decisions regarding the infrastructure to be used by the Financial and Business Management System ("FBMS"), causing the unanticipated reallocation of resources, overlapping installations, and resulting delays and ripple effects;
- Failed to provide BearingPoint with information and data necessary for performance, including, without limitation, design information necessary for ETravel integration, content for portal development, and contractually required data regarding legacy systems (*i.e.*, CBS, OAS billing and Maximo), thereby adversely impacting BearingPoint's productivity and the product schedule;
- Failed to provide, per contract requirements, DOI personnel in the manner and number required for training, thereby impacting performance and schedule;
- Failed to provide adequate facilities for testing or use by the project team, including the failure to provide testing facilities with adequate connectivity for full productivity;

- Failed to ensure that BearingPoint team members had timely access to the project facility, thereby disrupting the work of those personnel and their coworkers; and
- Directed BearingPoint to perform various changes that impacted the scope and schedule of performance, (*e.g.*, by changing the conversion design for historical data, which had been accepted previously in the Blueprint document).

### b. BearingPoint Timely Notified the Government of the Delay

Throughout the FBMS project, BearingPoint prepared and shared with the Government weekly "FBMS Project Status Reports." BearingPoint sent those reports directly to the Contracting Officer, the Contracting Officer's Technical Representative, the DOI Executive Sponsor, the DOI Project Director, and the DOI Project Manager. The reports identified project status, missed milestones, and near term issues and risks categorized by color according to the severity of those issues and risk. Areas designated "yellow" signified a "significant issue" that had to "be addressed to avoid missing milestones." Areas designated "red" denoted "immediate attention required" to avoid missing milestones. The following examples taken from the company's December 10, 2004 Report illustrate the notices provided to DOI:

- RED: No known date by which Travel functional specifications will be delivered – development timeline will be impacted"
- RED: "IXOS implementation may be delayed to 2A – eGrantsPlus functionality used in the interim"
- RED: "Completion of vendor evaluation has been delayed many times. Negative impact on testing for interfaces with Financial and Business Management System is seriously considered"
- RED: Project Plan for 1B has been reviewed but finalizing this plan won't be possible before vendor selection"
- Near Term Risk: "FDS delivery for 2A interfaces and conversaions are not fully delivered – puts development timeline at risk"
- Near Term Risk: "Cost structure mapping for FPPS must be provided by 12/16 or develolpment timeline will be at risk"

Other Project Reports contain similar notices regarding schedule risk that put the Government on notice that its actions were delaying BearingPoint's performance.

But the submission of weekly Project Status Reports was not all that put DOI on notice of the delay in BearingPoint's performance. BearingPoint held a meeting with DOI every Friday throughout the FMBS System project to discuss the week's Status Report. These meetings typically were attended by all of the recipients of the Report with the exception of the Contracting Officer. *See Guiliana Assocs., Inc.*, ASBCA No. 51672, 03-2 BCA ¶ 32,368 (imputing Contracting Officer's Technical Representative's knowledge of differing site condition

to Contracting Officer). Furthermore, BearingPoint submitted a monthly invoice to the Contracting Officer that included a consolidated monthly status report as well as all of the weekly status reports for the relevant month.

The message to DOI regarding BearingPoint's delayed performance emerged nowhere more clearly than in reports and meetings leading up to the start of Integration Testing (including the Executive Steering Committee meeting held on May 10, 2005), where BearingPoint made clear to DOI that the deadline to begin Integration Testing would be missed. And if there were any doubt in DOI's mind as a result of these reports and meetings, that doubt should have been laid to rest at the May 25, 2005 Test Readiness Review, which clearly demonstrated that Integration Testing would not be entered into within the time frame identified by DOI.[1]

Based on the foregoing, it is clear that DOI, at a minimum, contributed significantly to the delay experienced in performing Task 3 and was informed in a timely fashion of that fact by BearingPoint. As such, that delay is excusable and default termination is neither factually nor legally justified.

**2. DOI Has Waived Its Right to Terminate BearingPoint for Cause by Waiving the Task Order 3 Delivery Schedule**

If the Government intends to terminate a contract for cause, it must do so within a reasonable time after an act of default by the contractor. An inability to meet the express contract delivery schedule comprises such a default. That inability to meet the delivery schedule may manifest itself either prior to the delivery date or by a failure to make timely delivery. *See, e.g., Applied Companies*, ASBCA No. 43210, 94-2 BCA ¶26,837; *Phil Rich Fan Mfg. Co.*, ASBCA 12770, 71-1 BCA ¶8694. If the Government fails to terminate within a reasonable time after an act of default, or otherwise demonstrates an intent to continue work under the contract, and the contractor continues to perform in reliance upon the fact that it will not be terminated, the Government will be deemed to have waived the original delivery date. In *De Vito v. United States*, the leading case on the Government's waiver of its right to terminate a contract for default, the Court of Claims stated this rule as follows: reliance

> Where the Government elects to permit a delinquent contractor to continue performance past a due date, it surrenders its alternative and inconsistent right

---

1 BearingPoint's contract facially requires a contractor to "notify the Contracting Officer in <u>writing</u> as soon as it is reasonably possible after the commencement of an excusable delay." FAR 52.212-4(f) (Emphasis added). Notwithstanding this requirement for written notification, "[o]ral notice is generally considered sufficient where the Government has not been prejudiced by the lack of written notice." *Steve Rose Constr. Co., Inc.*, AGBCA No. 95-142-3, 95-2 BCA ¶ 27,905 (oral notice of delay was sufficient where Government was not prejudiced by lack of written notice). A contractor's failure to provide even oral notice may not be fatal to the excusable delay defense unless prejudice to the Government results. *See, e.g., Southwest Marine, Inc.*, DOTBCA No. DTCG-31-83-10099, 94-2 BCA ¶ 26,641 (notice requirement was waived where contracting officer's actions demonstrated his recognition that the contractor had encountered delay).

under the Default clause to terminate, assuming the contractor has not abandoned performance and a reasonable time has expired for a termination notice to be given.

*DeVito v. United States*, 413 F.2d 1147, 1153 (Ct. Cl. 1969) (Government waived delivery schedule by failing to terminate contract for 48 days notwithstanding knowledge of contractor's considerable efforts to catch up on delivery requirements); *see also S.T. Research Corp.*, ASBCA No. 39600, 92-2 BCA ¶ 24,838 (Government waived right to terminate for default by failing to do so "shortly after the missed . . . delivery"); *accord Marci Enter., Inc.*, GSBCA No. 12197, 94-1 BCA ¶ 26,563; *Amecom Div., Litton Sys., Inc.*, ASBCA No. 19687, 77-1 BCA ¶ 12,329, *recons. denied*, 77-2 BCA ¶ 12,554 (same).

To show that the Government waived its right to terminate a contract for default, a contractor must establish that (1) the Government either (a) failed to exercise its right to terminate for default within a reasonable time after default by BearingPoint or (b) otherwise demonstrated an intent to continue work under the contract by way of taking "affirmative actions" inconsistent with an intent to default terminate; and (2) the contractor continued to perform in reliance upon the fact that it would not be terminated. *See, e.g., Westinghouse Elec. Corp.*, ASBCA No. 20306, 76-1 BCA ¶ 11,883 (Government waived right to terminate by failing to take any action for 57 days following receipt of contractor's letter indicating that it would continue to perform); *Prestex, Inc.*, ASBCA No. 21284, 81-1 BCA ¶ 14,882 (same where Government took no action for 60 days following issuance of show cause letter); *Aargus Poly Bag*, GSBCA No. 4314, 76-2 BCA ¶ 11,927 (same where Government accepted late partial delivery); *Automated Servs., Inc.*, GSBCA No. EEOC-2, 81-2 BCA ¶ 15,303 (same where Government accepted deliverables after due date and met with contractor to discuss establishing revised delivery schedule); *Baifield Indus. Div. of A-T-O, Inc.*, ASBCA No. 14582, 72-2 BCA ¶ 9676 (same where Government urged corrective action to meet specifications).

As set forth below, BearingPoint can establish a waiver of the delivery schedule by DOI.

**a. DOI Failed to Terminate BearingPoint Within a Reasonable Time After it Knew That BearingPoint Likely Would Not Meet the Schedule Set Forth in Task Order 3**

DOI knew or should have known that BearingPoint's performance would be delayed no later than May 2005. As detailed above, BearingPoint's various weekly reports to various DOI personnel, including the Contracting Officer, sent clear notice to the Government that BearingPoint would be unable to meet the original Task Order 3 schedule due, in great part, to the actions of the Government.

Despite this knowledge, DOI proceeded for more than three months without issuing a "Cure Notice" or default termination.

BearingPoint continued to perform in good faith and incurred significantly increased costs as a result of DOI's failure to terminate. The significant funds, manpower, and resources that BearingPoint has continued (and continues to this day) to dedicate to the FBMS effort is illustrative of the company's detrimental reliance on DOI's election not to terminate BearingPoint

upon learning that the company would not meet the original schedule set forth in Task Order 3. Further, BearingPoint has continued to pay its subcontractors throughout the last three months of schedule discussions with DOI.

**b. Because DOI Has Undertaken Affirmative Acts Inconsistent with Termination a Waiver of the Delivery Schedule Has Occured**

Since learning of BearingPoint's inability to meet the Task Order 3 schedule, DOI has acted in a manner consistent with an agency that had elected not to terminate BearingPoint's Task Order. *See Automated Servs., Inc.*, GSBCA EEOC-2, 81-2 BCA ¶ 15,303 (acceptance of work after due date and meetings with contractors to discuss new schedule); *Baifield Indus., Div of A.T.O., Inc.*, ASBCA 14582, 72-2 BCA ¶ 9676 (urging corrective action to meet specifications). By way of non-limiting example, DOI has for some time and continues to take various affirmative actions inconsistent with an intent to terminate, including:

- Holding meetings with BearingPoint to negotiate a new schedule;
- Supporting BearingPoint's Task Order 3 activities;
- Funding the IV&V contractor's contract;
- Converting its legacy system data to ensure the proper interface with BearingPoint's proposed system; and
- Providing data conversion and data cleanup support to BearingPoint in a manner that is consistent with BearingPoint's proposed approach.
- Initiating discussions to enter into a bilateral modification to Task Order 3, so that the program could move forward.

In short, DOI's affirmative actions legally establish an election to not terminate BearingPoint. BearingPoint relied on that election in opting to continue to perform for the last several months. It defies logic to think that the company would have continued to perform had it believed that DOI intended to terminate it for default. Based on these affirmative acts, DOI has waived the Task Order 3 delivery schedule.

**3. DOI Lacks the Authority to Terminate BearingPoint for Cause Because BearingPoint Has Alleged That Its Delay was Excusable**

Because BearingPoint has encountered excusable delay, DOI does not have the authority to unilaterally terminate Task Order 3 for default. In the context of a Schedule contract, the rule is that the GSA contracting officer resolves disputes related to the Schedule contract itself, while ordering activities resolve disputes related to orders issued under that contract. *See* I-FSS-249-B (Default) (May 2000). Where the contractor alleges excusable delay, however, this rule does not apply, and the dispute must be resolved by the GSA:

> [W]hen failure to deliver articles or services is alleged by the Contractor to be excusable, the determination of whether the failure is excusable ***shall be made***

> ***only by the Contracting Officer of the General Services Administration***, to whom such allegation shall be referred by the ordering office and from whose determination appeal may be taken as provided in the clause of this contract entitled 'Disputes.'

*Id.* (emphasis added).

In the present case, BearingPoint has alleged the defense of excusable delay. Accordingly, by the express terms of BearingPoint's GSA Schedule contract, incorporated by reference into the BPA, DOI lacks authority to terminate BearingPoint. *Id.* Rather, any termination decision must be made by BearingPoint's GSA Schedule Contracting Officer, and any appeal from that decision may be filed at the GSA Board. *Id.*

**4. Any Failure of BearingPoint to Timely Perform is Legally Excused by DOI's Failure to Properly Fund Task Order 3**

Any failure of BearingPoint to timely perform is legally excused by DOI's failure to properly fund Task Order 3. Because Task Order 3 was not properly funded, BearingPoint has no legal obligation to perform. Without a legal obligation to perform, the company cannot be default terminated for failure to perform.

DOI awarded an ***unfunded*** GSA Schedule indefinite quantity/indefinite delivery BPA to BearingPoint. Pursuant to the terms of the BPA, DOI issued multiple, incrementally funded firm, fixed price Task Orders.

Task Order 3 was issued on September 20, 2004, in the amount of $7,800,000.00. The language of Task Order 3 indicated that work under the order would be funded incrementally:

> The period of performance for this Task Order is August 1, 2004 to December 31, 2005. It is the Government intent to award this order in individual segments. This first segment will provide funds to 'complete the deliverable 'Deployment 2A Baseline Complete' due on November 24, 2004, including Services, Travel ILS (DSL) Hardware and Holdback.

Task Order 3, Block 17 (Sept. 9, 2004).

Modification 1 to Task Order 3 was issued on November 29, 2004, and contained the following language.

> The funds on the modification for this task order covers the period from November 25, 2004 through April 06, 2005, concluding with Bearing Point's completion of the delivery of four (4) cycle tests that is due on April 06, 2005. This modification covers the following cost breakdown: $6,760,793.00 for Services, $552,301.00 for Travel and $63,993 is for ILS (DSL) Hardware. Total funds currently available and allotted to the contract are $15,177,086.00. Additional funds in the amount of $14,040,914.00 may be allocated by a modification to this Task Order up to the full Not-to-Exceed amount of $29,218,186.00 to cover the entire period of performance. However, the

> Government shall not be obligated to reimburse the Contractor for costs in excess of the current allotment, ***nor will the Contractor be obligated to continue performance and incur costs in excess of the amount allotted.***

Task Order 3, Modification 1, Block 14 (Nov. 29, 2004) (emphasis added). Thus, Modification 1 expressly relieves BearingPoint from the obligation to continue performance once the funds allotted to Task Order 3 have been expended.

As of Modification 5, the total amount of funds allotted to Task Order 3 was $15,182,930.00, BearingPoint has invoiced up to that amount and DOI has paid all Task Order 3 invoices.

On April 18, 2005, DOI provided BearingPoint with a draft Modification 6, which would have increased the amount of funds allotted to Task Order 3 to $27,572,218.00. BearingPoint reviewed the draft task order, met with the Contracting Officer, and provided the Contracting Officer with its objections regarding the amount of funding available for travel and the terms and conditions that had been added to the modification.

On April 26, 2005, DOI provided BearingPoint with a unilaterally signed Modification 6 and explained the funding increase as follows:

> Attached please find modification # 0006 to order # 0404DO37408. Please note that CLIN 0013 on this order is not fully funded. The remaining $1,651,812.00 on CLIN 0013 is not currently funded and is subject to the availability of funds clause at FAR 52.232-18. The remainder of the CLINs and SUBCLINs are fully funded. Thank you for your continued help in making this project a great success.

E-mail from Pete Hunter, Contracting Officer, DOI ("Mr. Hunter") to Virginia Baxter, Senior Contract/Subcontract Administrator, BearingPoint ("Ms. Baxter") (Apr. 26, 2006).

If accepted by BearingPoint, Modification 6 would have changed the material terms of Task Order 3 by:

- Changing the reimbursement of travel from a not-to-exceed ("NTE") for the entire funding period to a NTE amount for each month of performance;
- Reallocating QASP funds; and
- Failing to fund fully Task Order 3.

These material changes to Task Order 3 were unacceptable to BearingPoint. Accordingly, BearingPoint exercised its right to reject the draft Modification 6, as permitted by the terms of its GSA Schedule contract. *See* FAR 52.212-4(c) ("Changes in the terms and conditions of this contract may be made *only* by written agreement of the parties.") (emphasis added).

BearingPoint informed the Contracting Officer, by letter dated April 26, 2005, that it considered Modification 6 unacceptable because the Modification would vary the terms of both the BPA and BearingPoint's proposal for Task Order 3. Letter from Ms. Baxter to Mr. Hunter 1

(Apr. 26, 2005). BearingPoint further explicitly advised DOI that any continued performance by BearingPoint should not be construed by DOI as acceptance of Modification 6:

> Please be advised that while we are still continuing to perform under this task order, and have been working at risk since April 7, 2005, we do not agree with the changes proposed by DOI in its modification, and our continued performance should not be construed as acceptance of this modification.

*Id.*

On April 29, 2005, the Contracting Officer informed BearingPoint that he did not intend to cure the deficiencies in or otherwise reissue Modification 6 in any fashion. Later that day, he confirmed by e-mail his intent not to "alter or re-issue the modification." E-mail from Mr. Hunter to Ms. Baxter (Apr. 29, 2005). On June 30, 2005, however, the Contracting Officer indicated to BearingPoint, through the issuance of a revised proposed bilateral agreement, that he was willing to revise and reissue Modification 6. To date, the parties have not executed any such revision.

By letter dated May 9, 2005, BearingPoint again advised DOI of its rejection of Modification 6. Letter from Ms. Baxter to Mr. Hunter 1 (May 9, 2005). BearingPoint's letter summarized the reasons for its rejection of Modification 6 as follows:

> BearingPoint cannot accept the modification to our task order as written. This cannot be considered a permissible unilateral 'administrative' modification because it results in material changes to the contract to which BearingPoint has not agreed. The changes include limitations on reimbursable travel, additional reporting requirements and failure to fund the contract performance holdback. Additionally, BearingPoint must protest the recurring periods where we are being required to continue performance at risk due to the government's delays in providing funding increments.

*Id.* To date, DOI has not responded to BearingPoint's May 9, 2005 letter.

As a result of the parties' failure to reach a bilateral agreement, draft Modification 6 never became effective and, consequently, Task Order 3 remains unfunded. Accordingly, pursuant to the express terms of Modification 1 to Task Order 3, BearingPoint had no obligation "***to continue performance and incur costs*** . . ." Task Order 3, Modification 1, Block 14 (emphasis added).[2]

---

[2] DOI's actions demonstrate that, like BearingPoint, it understands that Modification 6 never became effective. For example, in its "Proposed Bilateral Modification of Task Order 0404D037408," presented to BearingPoint on June 30, 2005, DOI set forth its "Proposed Approach for Completing Task Order 03: Bilateral Modification." *Id.* at 1. Similarly, within the same presentation, DOI proposed that "Invoice # 70276327 (for services from April 1, 2005, through April 6, 2005, received this week) shall be the last invoice that the Department of the Interior receives (other than monthly invoices for travel and ILS (DSL) Hardware) until the system is deployed at one bureau." *Id.* at 3.

**B. BearingPoint Has Complied Substantially With Its Project Control Reporting Obligations**

The August 23 Cure Notice asserts that BearingPoint has failed to provide project control reporting for Earned Value Management Data in accordance with ANSI/EIA 748-A. As a result of its failures, the letter asserts that BearingPoint is in breach of the contract.

BearingPoint strongly disagrees that it is in breach of the contract. First, information required for the EVM project control reporting was defined in the Schedule Management Plan, Appendix D, EVM Definitions and Reporting. The Schedule Management Plan was a deliverable accepted in December 2004. In addition, BearingPoint began supplying EVM reporting to DOI as set forth in the accepted deliverable, as early as October 2004, the first full month after the accepted Task Order 3. Second, to the degree that DOI asserts that reports did not strictly comply with ANSI/EIA 748-A, such a failure would not represent a material breach of the contract. In order to support a default termination, the contractual obligation must be found to be a "material" requirement of the contract, <u>and</u> the contractor's actions must represent a "material" breach of that obligation. *Precision Products*, ASBCA No. 25280, 82-2 BCA ¶ 15,981; *American Business Systems*, GSBCA Nos. 5140, *et al.*, 80-2 BCA ¶ 14,461. DOI can establish neither of these predicates to a valid default.

As noted above, BearingPoint has supplied project control reports and information to DOI throughout the life of this project, and DOI has accepted those reports and information. In order to resolve any questions that may exist concerning such reporting in the future, BearingPoint will implement a project control system structured around the Primavera Project Management product. BearingPoint will use Primavera as the primary scheduling and cost management tool for the program. The project schedule and cost control structure will be governed by the ANSI standard for Earned Value Management. As part of out Program Control process and toolset we will implement the necessary guidelines from the ANSI standard appropriate for fixed priced contract performance. We will incorporate best business practices to provide enhanced benefits for program control. The processes will include integration of program scope, schedule, and representative cost objectives, establishment of a baseline plan for accomplishment of program objectives, and the use of earned value techniques for performance measurement during the execution of a the overall effort. The system will provide a sound basis for problem identification, corrective actions, and management re-planning as may be required.

The specifics of our project control system will be identified in the Schedule Management Plan and the Project Status and Reporting Plan and will be delivered as identified on the new baselined schedule.

**C. BearingPoint Has Met Contract Requirements For Project Quality Assurance**

DOI asserts that BearingPoint has failed to provide project control and failed to meet contract quality assurance requirements of the contract. The Cure Notice asserts that the company's failures represent a "breach of this portion of our contract." It is unclear whether DOI

considers this asserted breach to justify a termination for default. Regardless, BearingPoint disagrees that it has failed to perform its project control or quality assurance functions. A full delineation of our position in this regard is set forth below. If DOI is, in fact, asserting that the alleged failures justify a default termination, BearingPoint disagrees. As with DOI's assertions regarding project control reporting, the assertions here do not rise to the level of material breaches of material provisions of the contract.

The Cure Notice asserts that:

> Task Order 03 requires BearingPoint to provide project controls and quality assurance requirements (see Task Order 03, Sections 2.1.1 and 2.1.2, and BPA 73873, Technical Proposal, Sections 3.1.8 and 3.2). The requirements for this task have not been met by BearingPoint.

In fact, BearingPoint has met each of the cited requirements. The assertion in the cure notice that BearingPoint has not met these requirements appears to be based on the incorrect assumption that the requirements for quality control reporting system have not been met if the reporting generated by the system indicate that there are problems with the project. This misapprehension is repeated when it is asserted in the Cure Notice that:

> The overall effect of this poor project quality has significantly impacted the successful completion and deployment of the entire project. Therefore, we regard BearingPoint to be in actual breach of this portion of our contract.

The fact that DOI believes that there is "poor project quality" cannot constitute a breach of the cited requirements. Those cited requirements are for the creation of a system that will identify quality issues, but cannot be read, as DOI appears to, as a "guaranty" that there will never be problems with the project to report. The Cure Notice itself provides evidence that the quality system is working properly when it includes the table showing the status of various elements of the project. The quality reporting system did precisely what it is required to do – identify areas that need attention.

Further, the Quality Assurance audit dated June 07, 2005, referenced in the Cure Notice, was titled "Quality Audit Report Realization and Final Prep Phases Deployment 1A." This document was not an internal Quality Assurance Audit but one that was delivered to DOI. The report, like all former Phase Exit Quality Reviews, included an Evaluation Area, Finding/Comments, Rating, and Recommendations. The recommendations within the report are intended for consideration by management (both DOI and BearingPoint).

This document was delivered in accordance with Section 2.1.2 of Task Order 03, that BearingPoint "[c]onduct and communicate quality reviews as input to the Phase Exit and QA Review Meeting conducted by the PMO" and in accordance with Section 2.1.1 of Task Order 03, that BearingPoint "conduct meetings at the conclusion of each Phase in the project plan to manage the closure of each Phase and to review the output of the Quality Assurance Reviews." At the weekly Project Management Meeting on Thursday, June 23rd, BearingPoint announced the submission of this report and gave DOI the opportunity to comment in that meeting or in subsequent discussions. BearingPoint has, to date, received no comments from DOI, and

therefore, the Cure letter incorrectly states that the requirements for Project Quality Assurance have not been met.

In fact, BearingPoint has gone beyond these contractual requirements of the task order by acting upon many of the recommendations in the report. Upon recent review of this report, 34 of those recommendations were potential actions for FBMS Project Management (both BearingPoint and DOI). Of the recommendations for BearingPoint action, 26 have been implemented or have a plan for resolutions (in most of these cases they are recommendations incorporated within the new schedule).

To the extent that DOI is asserting that the table indicating problems with the program is an independent breach of the cited quality requirements, then as described in detail in Section A.1.a. above, these listed problems were not caused solely by BearingPoint, and DOI clearly must share responsibility. BearingPoint cannot, therefore, be found to be in default with regard to the quality assurance requirements.

Likewise, BearingPoint disputes the assertion in the Cure Notice that "BearingPoint has forfeited any claim to the QASP withholding." Because of the documented excusable delays, BearingPoint is entitled to an extension of the December 5, 2005 date for the completion of the QASP elements, and BearingPoint continues, therefore, to be eligible to receive the QASP withholding.

**D. Termination For Default Is In The Best Interest of <u>Neither</u> BearingPoint Nor DOI**

As noted at the outset, a termination for default is in the best interest of neither BearingPoint nor DOI. As set forth above, BearingPoint does not believe it is factually or legally in default. If DOI were to attempt to default terminate the contract, we believe such action is likely to be reversed in litigation, in which case the default termination will be converted to a termination for convenience. DOI then would be responsible for payment to BearingPoint of its convenience termination costs.

Even if DOI believes it can prevail in a default termination against BearingPoint, such action would not be in the best interest of the Government. Set forth below, for example, are the limitations on recovery that would apply to the termination. As a result of these limitations, DOI likely would find it challenging to secure funding to complete the FBMS Program.

Assuming DOI can establish a valid basis for terminating Task Order 3, the agency potentially would be entitled, at most, to the return of unliquidated progress payments, as well as excess reprocurement costs that DOI incurred in obtaining another contractor to perform the work pending under Task Orders 3.

**1. DOI May Not Recover Damages for Unordered Work**

BearingPoint is not contractually obligated to perform work that DOI has not yet ordered. Accordingly, DOI may not recover damages for work that it may order, but has not yet ordered, under the BPA.

### 2. DOI May Not Recover Damages Under Task Orders 1, 2, or 4

DOI may not terminate Task Orders 1, 2, or 4 because each of those Task Orders has been completed billed and accepted. Accordingly, DOI would not be entitled to collect any damages under those Task Orders.

### 3. DOI May Not Recover Damages for Deliverables That Have Been Accepted Under Task Orders 3

DOI may not terminate work that it already has accepted. The termination for cause provision included in BearingPoint's contract provides that "the Government shall not be liable to the Contractor for any amount for supplies or services ***not*** accepted, and the Contractor shall be liable to the Government for any and all rights and remedies provided by law." FAR 52.212-4(m) (emphasis added). Thus, under open Task Order 3, payment for deliverables duly accepted by the Government cannot be withheld or recovered. *See e.g., Trinity Installers, Inc.*, AGBCA No. 2004-139-1, 05-1 BCA ¶ 32,868 (termination for cause converted to one for convenience where Government withheld funds far in excess of work remaining to be completed, question existed as to whether work was unacceptable as opposed to merely mediocre, and Government continued to use contract deliverables despite alleged deficiencies).

### 4. Damages Recoverable for Work in Progress Under Task Orders 3

Excess reprocurement costs are defined as recoverable under BearingPoint's GSA Schedule contract and identified as the "preferred remedy" in applicable regulations. *See* BearingPoint GSA Schedule contract at § C.34; FAR 12.403(c)(2) ("The Government's preferred remedy will be to acquire similar items from another contractor and to charge the defaulted contractor with any excess reprocurement costs together with any incidental or consequential damages incurred because of termination."). This measure of damages may include:

- The price actually paid by DOI to other contractors for the procurement of services substantially similar to those terminated (the remaining unperformed portion of Task Order 3); ***less***
- The price at which BearingPoint was contractually obligated to provide the terminated services.

*See, e.g., Grimco Pneumatic Corp.*, ASBCA No. 50977, 00-1 BCA ¶ 30,727 (*citing Cascade Pac. Int'l v. United States*, 773 F.2d 287, 293 (Fed. Cir. 1985)).

DOI's entitlement to excess reprocurement costs, however, would not be automatic. Rather, DOI would bear the burden to establish that

> (1) the reprocured supplies are the same as, or similar to those involved in the terminated contract; (2) the [DOI] actually incurred excess costs; and (3) the [DOI] acted reasonably to minimize the excess costs resulting from the default.

*Grimco, supra* (*quoting Cascade Pac. Int'l*, 773 F.2d at 293); *see also Puroflow Corp.*, ASBCA No. 36058, 93-3 BCA ¶ 26,191.

E. **Additional Issues Requiring Resolution**

Enclosure 2 to the Cure Notice lists five items upon which DOI states "we also need to reach agreement." The following is BearingPoint's response to each of those issues.

1. **Enhancements**

BearingPoint is in agreement with DOI's comment that the enhancements provided on the spreadsheet that accompanied DOI's letter require immediate resolution. BearingPoint and DOI need to reach a bilateral agreement regarding the processes that must be in place in order to ensure that when an enhancement to the FBMS solution is identified, that a decision regarding whether it is approved or disapproved is made timely, and if approved, that the Contracting Officer processes a change order.

Regarding the list of enhancements that was attached to Cure Letter, of the forty-one (41) enhancements listed, BearingPoint has not received formal authorization from the government's contracting officer to proceed for fifteen (15) of them, despite the fact that several of them were approved by the ESC as long ago as February 2005.

For twenty-six (26) of the enhancements, BearingPoint received written authorizations to proceed with the work from the Contracting Officer on March 21, 2005 and March 28, 2005. We have not yet, however, received a task order from DOI, despite responding to an RFQ with a formal proposal on April 28, 2005, and despite having made repeated inquiries as to the status of the task order since that time. A draft task order was finally provided to us a month and a half later on June 14, 2005, but it did not incorporate our full proposal, was not clear as to the type of travel that would be permitted pursuant to the task order, needed revised delivery dates for the enhancements, had an incorrect amount for travel expenses, mentioned, but did not fund an enhancement that had been approved by the ESC and identified as critical back in December, 2004, and contained additional terms and conditions that BearingPoint had not agreed to. To date, despite a request made to the contracting officer a month ago to meet and discuss this issue, DOI has not met with BearingPoint, nor have we received an acceptable task order for our signature. We have proceeded diligently with the work despite these issues. We have done the same with the other enhancements identified on the list that was provided, even though we have received no formal authorization from the Contracting Officer to proceed with these. We are proceeding without formal authorization from the Contracting Officer because some of these enhancements are critical to the success of the project.

We would very much like to discuss with DOI possible approaches for a procedure that will result in the timely processing of enhancements required by the government to meet its objectives with regard to the functionality of the system.

2. **Payment Schedule**

BearingPoint agrees to accept a payment schedule based for Task Order 3 on specific milestones, with a majority of the remaining payment tied to successful bureau implementations. BearingPoint believes that it should be entitled to milestone payments prior to bureau implementations because, while BearingPoint is willing to forego monthly payments associated

with monthly accomplishments as was originally proposed, BearingPoint is required to pay its subcontractors prior to bureau implementations.

BearingPoint requests, therefore, that any revision to Task Order 3 include the following milestone payments. The percentages relate to the original 2B proposal percentages for the remaining funding. This does not include the payment schedule for any amounts associated with Enhancements and Change Orders, whether they be documented as a separate Task Order or as a modification to the current Task Order.

| **Milestone** | **Amount of Payment** |
|---|---|
| Start of 2B User Acceptance Testing | 20% of remaining 2B funding |
| Approval of 2B Deployment Readiness Assessment | 20% of remaining 2B Funding |
| Completion of Deployment 2B Go-Live | 60% of remaining 2B Funding |
| Start of 2A User Acceptance Testing | 20% of remaining 2A Funding |
| Approval of 2A Final Readiness Assessment | 20% of remaining 2A Funding |
| Completion of Deployment 2A Go-Live | 60% of remaining 2A Funding |
| Completion of Deployment 1A Go- Live | Remaining funding for 1A not already paid |

To determine the funding amounts for 2A, the new baselined schedule will be used to determine what percentage of dollars remaining for 2A should be split among the following four entities: OSM, MMS, GovWorks, and BLM. Subsequently, it will be split among the milestones for each entity.

The funding amounts for 2B will not be split among entities. Therefore, it is the remaining amount for 2B based on the Task Order Proposal that would be split among the milestones. The amount remaining on the task order proposed under "General Systems Integration Activities" will be added to the amounts for 2A.

### 3. Travel

BearingPoint commits to making a significant effort to control its travel costs in connection with the FBMS project. BearingPoint agrees to accept a ceiling amount of $1,429,008 for the remaining reimbursable travel costs through the completion of the Task Order, which reflects the remaining amount of the travel dollars that BearingPoint proposed in Task Order 3. BearingPoint requests, however, that the reimbursement for these travel costs not be tied to the payment schedule for labor, but instead BearingPoint be permitted to submit invoices for incurred travel costs on a monthly basis. In addition, BearingPoint requests that there be no ceiling on the individual monthly reimbursable amount, up to the cumulative ceiling amount of $1,429,008. Because these travel costs represent actual out-of-pocket expenses that are recognized in the Task Order as reimbursable items separate from any fixed price for services, BearingPoint believes that it would be inequitable for BearingPoint to be required to defer reimbursement for these costs, as we have agreed for labor costs.

BearingPoint is willing to discuss implementing a new, reasonable process for Government pre-approval of travel costs, but BearingPoint must take issue with DOI's

characterization of these costs as being for "commuter travel." BearingPoint believes that all travel costs for which it has requested reimbursement under this BPA qualify as allowable "business travel" costs. To the extent that DOI is asserting that BearingPoint has received reimbursement for something DOI is calling "commuter travel" costs and that these costs are not properly included within allowable "business travel" costs, then BearingPoint respectfully disagrees.

BearingPoint has been making every effort to achieve the successful implementation of FBMS, and this has included the utilization of the most qualified resources, even when these resources are not based in the local area. BearingPoint's experience is that the work for this project is performed most efficiently and effectively when there is a collaborative effort, primarily at a single location. From the outset of the FBMS project, BearingPoint has requested payment for expenses related to resources traveling to the local area, and DOI has approved and reimbursed BearingPoint for these expenses. At no time has DOI denied any of these allowable expenses as being for "commuter travel," or otherwise not reimbursable. Based on the prior practice of DOI's approval and payment of these costs, BearingPoint submitted a fixed price for the services to be performed under Task Order 3, based on the assumption that DOI would continue its policy of reimbursing BearingPoint for the expenses of resources traveling to the local area to perform under the BPA.

Had BearingPoint been informed at the time it submitted its proposal for Task Order 3 that DOI would no longer reimburse BearingPoint for the expenses of resources traveling to the local area (as DOI had done since the inception of the BPA), then BearingPoint would have been able to adjust the resources it intended to employ on Task Order prior to submitting its fixed price proposal. It is simply inequitable, therefore, for BearingPoint to agree to honor the fixed price proposed for the services under Task Order 3, while DOI is insisting that BearingPoint not be reimbursed for the type of travel expenses upon which that fixed price was predicated.

4. **Key Personnel**

BearingPoint takes strong issue with the statement in the Cure Notice that "inexperienced personnel who lacked qualifications, certifications, and sufficient skills to complete the tasks associated with this project have been assigned by BearingPoint to less critical positions." BearingPoint believes that every individual assigned to perform services on the FBMS project has been fully qualified to perform the tasks assigned. BearingPoint is not aware of any prior indication from DOI of any individuals that DOI believed were unqualified.

In addition, BearingPoint takes issue with DOI's implication that the manner in which BearingPoint has staffed the project is somehow contrary to contract requirements. DOI made the decision that the FBMS project be "performance based," which means that the contractor is permitted to make all decisions concerning the manner in which the work is performed. This is confirmed by the fact that Task Order 3 has no individuals designated as "key personnel." DOI's request that BearingPoint designate "key personnel" and commit "that these personnel will remain on the project as long as they are in BearingPoint's employ," constitutes a fundamental change.

BearingPoint will work with DOI to mutually identify those personnel who are critical to the continued efforts of the program, and, to the extent that it is in the control of BearingPoint, BearingPoint will maintain continuity of these resources on the task order. If replacement of certain BearingPoint resources is required or warranted, BearingPoint will replace the resources with resources of similar or advanced skills, and facilitate the appropriate transfer of knowledge at no additional cost to the government.

**5. Resource Planning**

BearingPoint provided an initial staffing profile by month on the 23rd of August based on the initial draft project schedule. We will continue to revise that profile based on the refinement iterations up through the date the schedule is baselined. After the schedule is baselined we will provide monthly staffing profile updates that compares actual staffing to staffing projected in the schedule as well as forecasts of future staffing levels based on actual and expected work execution.

## CONCLUSION

BearingPoint has demonstrated that there is no legitimate basis for DOI to terminate Task Order 3 for default, and that such a termination is not in either party's best interest. BearingPoint has consistently shown its commitment to the FBMS project and the willingness to discuss and resolve outstanding issues. BearingPoint renews that commitment and is willing to resolve issues in an expeditious manner. BearingPoint has continued to work diligently and in good faith, despite the issues that have existed during the past several months, and we have made clear our desire to make FBMS a successful project. We believe that our previous discussions concerning a modification to Task Order 3 were leading in the right direction and we look forward to continuing those discussions and reaching a mutually agreeable path for going forward.

Should you have any questions, please do not hesitate to contact me by phone at (703) 747-5566 or via email at virginia.baxter@bearingpoint.com.

Sincerely,

Virginia A. Baxter
Senior Contract/Subcontracts Administrator
DOI FBMS Project

cc: Robin Lineberger
Tom DeGarmo
Brad Bends
Susan Weersing
Matt Peebles