**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **BEARINGPOINT, INC.,**<br><br>**Plaintiff,**<br>**v.**<br><br>**THE UNITED STATES OF AMERICA,**<br><br>**Defendant.** | **Case No. 07-631(C)**<br>**(Judge Wheeler)** |

**PLAINTIFF BEARINGPOINT, INC.'S REPLY IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**

Jonathan S. Aronie
SHEPPARD MULLIN RICHTER & HAMPTON, LLP
1300 I Street, NW
11th Floor, East
Washington, DC 20005-3314
Tel: (202) 218-0039
Fax: (202) 218-0020

Attorney for BearingPoint, Inc.

Of Counsel:

Louis D. Victorino
Christopher M. Loveland
Keith R. Szeliga
Marko W. Kipa
SHEPPARD MULLIN RICHTER & HAMPTON LLP

Domingo Maradiegue
BEARINGPOINT, INC.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .......... ii

INTRODUCTION .......... 1

ARGUMENT .......... 3

I. DOI'S IMPROPER TERMINATIONS WERE CONVERTED INTO TERMINATIONS FOR CONVENIENCE, WHICH DOES NOT REQUIRE ANY SHOWING OF PREJUDICE. .......... 3

A. DOI's Unauthorized And Invalid Terminations For Cause Were Converted To Terminations For Convenience By Operation Of Law. .......... 3

B. DOI's Improper Termination Was A Fundamental Error, Which Does Not Require A Showing Of Prejudice. .......... 6

C. Although A Showing Of Prejudice Is Not Required, DOI's Improper Termination Has Been Unduly Prejudicial To BearingPoint. .......... 9

D. The Cases Cited By BearingPoint Support Converting DOI's Improper And Unauthorized Terminations For Cause Into Terminations For Convenience. .......... 12

E. The Cases Cited By the Government Are Inapposite. .......... 13

1. The Government Incorrectly Contends That It Can Rely On Any Termination Ground That Existed At The Time Of Termination. .......... 13

2. The Government Cites A Litany Of Cases That Fail To Establish That Fundamental Errors Are Subject To A Prejudice Analysis. .......... 15

3. Royal Lumber And M.E.S. Support BearingPoint's Position Because The GSA CO Never "Ratified" DOI's Invalid And Unauthorized Terminations. .......... 17

II. BEARINGPOINT'S CLAIM FOR DECLARATORY RELIEF IS NEITHER MOOT NOR BARRED BY COLLATERAL ESTOPPEL. .......... 19

# TABLE OF AUTHORITIES

**Cases**

BearingPoint, Inc. v. United States,
77 Fed. Cl. 189 (2007) ........ *passim*

C. H. Guernsey & Co. v. United States,
65 Fed. Cl. 582 (2005) ........ 19

College Point Boat Corp. v. United States,
267 U.S. 12 (1925) ........ 14, 15

Comptroller Gen. McCarl to the Sec. of War,
B-66806, Jan. 16, 1936, 15 Comp. Gen. 618, 1936 WL 650 ........ 13

Cross Aero Corp.,
ASBCA No. 14801, Sept. 14, 1971, 71-2 BCA ¶ 9,075 ........ 14

DCX, Inc. v. United States,
79 F.3d 132 (Fed. Cir. 1996) ........ 16

Decker & Co. v. West,
76 F.3d 1573 (Fed. Cir. 1996) ........ 15, 16

Doyle v. United States,
599 F.2d 984 (Ct. Cl. 1979) ........ 6, 7, 8

England v. Sherman R. Smoot Corp.,
388 F.3d 844 (Fed. Cir. 2004) ........ 19

G.C. Casebolt Co. v. United States,
421 F.2d 710 (Ct. Cl. 1970) ........ 15

Int'l Tel. & Tel. Corp., ITT Def. Commc'ns Div. v. United States,
509 F.2d 541 (Ct. Cl. 1975) ........ 12

John Reiner & Co. v. United States,
325 F.2d 438 (Ct. Cl. 1963) ........ 15

Joseph Morton Co., Inc. v. United States,
757 F.2d 1273 (Fed. Cir. 1985) ........ 13, 14

Kelso v. Kirk Brothers Mech. Contractors, Inc.,
16 F.3d 1173 (Fed. Cir. 1994) ........ 13, 14

Lafayette Coal,
ASBCA No. 32174, May 9, 1989, 89-3 BCA ¶ 21,963 ........ 16

Marmac, Industries, Inc.,
ASBCA No. 11861, Dec. 15, 1969, 69-2 BCA ¶ 8,067 ........ 14

M.E.S., Inc.,
PSBCA No. 4462, Feb. 7, 2001, 01-1 BCA ¶ 31268 ........ 18

Moreland Corp. v. United States,
76 Fed. Cl. 268 (2007) ........ 19

Philadelphia Regent Builders v. United States,
634 F.2d 569 (Ct. Cl. 1980) ........ 15, 16

Pots Unlimited, Ltd. v. United States,
600 F.2d 790 (Ct. Cl. 1979) ........ 13, 14

Rowe, Inc. v. GSA,
GSBCA No. 14211, Sept. 28, 2001, 01-2 BCA ¶ 31,360 ........ 17

Royal Lumber Co., Inc.,
ASBCA No. 2847, Dec. 20, 1955, 1955 WL 9052 ........ 17, 18

State of Florida Dep't of Ins. v. United States,
81 F.3d 1093 (Fed. Cir. 1996) ........ 15, 16

Timberland Paving & Const. Co. v. United States,
8 Cl. Ct. 653 (1985) ........ 9, 12, 13, 15, 18

Trio Mach. Works,
NASABCA 480-6, Nov. 31, 1981, 82-1 BCA ¶ 15,465 ........ 13

Wagner v. United States,
365 F.3d 1358 (Fed. Cir. 2004) ........ 6, 7, 8, 18

Wilner v. United States,
24 F.3d 1397 (Fed. Cir. 1994 ) ........ 19

**Statutes**

41 U.S.C. § 609(a)(1) ........ 19

FAR 1.108(a) ........ 4

FAR 2.101 ........ 3

FAR 8.405-5 ........ 10

FAR 9.104-3 ........ 10

FAR 12.403(a) ........ 4

FAR 15.305(a)(2)(i) ........ 11

FAR 49.402-3(e)(4) ........ 17

FAR 49.402-3(f) ........ 16, 17

FAR 52.209-5(a)(1)(ii) ........ 10

FAR 52.212-4(m) ....................3, 4, 5, 6, 17

FAR 52.249-8 ....................4

**Treatises**

FAR Drafting Guide, Chapter 2, Section (f) ....................4

FAR Drafting Guide, Chapter 5 ....................3

**Miscellaneous**

BLACK'S LAW DICTIONARY (8th ed. 2004) ....................4

R. NASH & J. CIBINIC, FEDERAL PROCUREMENT LAW (3rd Ed. 1980) ....................17

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002) ....................5

## INTRODUCTION

In Defendant's Response in Opposition to Plaintiff's Motion for Partial Summary Judgment (the "Opposition" or "Opp'n Br."), the Government, as it did in issuing its improper termination notices, ignores the plain language of the contract it wrote and executed. Upon this Court's holding that DOI's termination notices were "jurisdictionally invalid" and to be "treated as legal nullities," no other rational conclusion can be reached than the DOI's purported terminations for cause were "improper" and terminations for convenience occurred by operation of law. For the Government to contend otherwise ignores (1) the plain language of BearingPoint's GSA Schedule 70 Contract and the FAR, (2) the fact that the purported terminations were indeed issued, and (3) this Court's prior express holding.

Notwithstanding the contract language and the particular facts of this case, the Government contends that no termination for convenience occurred as a result of the improper DOI terminations, and that BearingPoint must prove specific prejudice to prevent the Government from terminating now -- two years *after* the company received the termination notices and was removed from the project.[1] Contrary to the Government's contention, no finding of prejudice is necessary where, as here, a fundamental error is at issue. Indeed, as explained below, the prejudicial effect of DOI's failure to comply with its express, material contractual and legal obligations to have BearingPoint's claims of excusable delay timely considered by the GSA Contracting Officer is simply not capable of being "quantified" on an after-the-fact basis and must, therefore, be assumed.

---

[1] As admitted in the Government's Answer (¶¶ 217, 234), it is important to note that BearingPoint *repeatedly* brought to the attention of DOI the need to follow the termination procedures in the contract *before* DOI issued its termination notices and *before* BearingPoint filed its Complaint. Notwithstanding this fact, it took more than two years and an Order from this Court for GSA to even "consider" BearingPoint's excusable delay claims.

But, even assuming, *arguendo*, that a showing of prejudice is somehow required here, there can be no question that BearingPoint has been severely harmed by DOI's improper conduct. By delaying more than two years before issuing its purported Final Decision, the Government has significantly extended the period of time that BearingPoint is required to disclose the purported FBMS terminations in connection with its responses to any new solicitations. Because of DOI's improper terminations, the company will be required to certify the termination for *more than five years*. Each such certification carries with it the risk of a downgraded evaluation of its offer, at best, and potential disqualification. Additionally, the fact that it took more than two years for GSA to consider BearingPoint's excusable delay arguments also has had a direct, negative impact on the company's ability to prepare for and present its defenses to the terminations.

Finally, BearingPoint's claim for declaratory relief is neither moot nor barred by the doctrine of collateral estoppel. Under established law, the *entirety* of the Final Decision is before this Court, including, arguably, the GSA's reasoned conclusion that the BPA is a not a contract. Given the potential resulting uncertainty, the fact that the GSA Contracting Officer concurs with BearingPoint's position does not moot this Court's authority to independently rule that the BPA is not a contract subject to default termination. Moreover, the issue of whether DOI's termination of the BPA was improper "[b]ecause the BPA was not a binding contract" was not "actually litigated" in the prior litigation before this Court; nor was it "essential to a final judgment in the first action."

Accordingly, as set forth in greater detail below and in its opening Memorandum of Law, partial summary judgment is warranted in favor of BearingPoint on Counts I, III and X of its Amended Complaint.

## ARGUMENT

### I. DOI'S IMPROPER TERMINATIONS WERE CONVERTED INTO TERMINATIONS FOR CONVENIENCE, WHICH DOES NOT REQUIRE ANY SHOWING OF PREJUDICE.

#### A. DOI's Unauthorized And Invalid Terminations For Cause Were Converted To Terminations For Convenience By Operation Of Law.

The Termination for Cause provision contained in BearingPoint's GSA Schedule 70 Contract, which was incorporated into the BPA and Task Order 3, leaves no doubt that DOI's unauthorized and invalid terminations for cause[2] were converted automatically to terminations for convenience. Specifically, that provision, which mirrors FAR 52.212-4(m), states as follows:

> (m) Termination for cause. The Government may terminate this contract, or any part hereof, for cause in the event of any default by the Contractor, or if the Contractor fails to comply with any contract terms and conditions, or fails to provide the Government, upon request, with adequate assurances of future performance.... *If it is determined that the Government **improperly** terminated this contract for default, such termination **shall** be deemed a termination for convenience.*

See Ex. 2 to BearingPoint's Findings of Facts, at ¶ C.1(m) (emphasis added); see also FAR 52.212-4(m). Thus, if DOI's attempt to terminate BearingPoint in 2005 was "improper," the contract "shall" be deemed terminated for convenience.[3]

---

[2] DOJ's Opposition materially misrepresents DOI's termination notice for Task Order 3 by adding an additional basis that was not included in the notice sent to BearingPoint. Specifically, BearingPoint was never terminated for "failure to make progress on Deployment[] . . . 2B." See Opp'n Br. at 6. The Government should only be permitted to rely upon the termination grounds set forth specifically in the respective cure notices and termination notices sent to BearingPoint. It is worth noting that, as part of its "careful examination," GSA made this same error in its Final Decision, despite the fact that it was repeatedly and expressly pointed out to the agency.

[3] It is well established that the term "shall means the imperative." See FAR 2.101; see also FAR Drafting Guide, Chapter 5 ("Use the terms 'shall' and 'must' to indicate an obligation to act. In the FAR 'shall' and 'must' have the same meaning."). Thus, if the purported terminations were "improper," they "must" be converted to terminations for convenience.

The language employed in FAR 52.212-4(m) is distinct from that utilized in the standard default provision for fixed-price supply and service contracts, FAR 52.249-8. In contrast to the applicable Commercial Item Termination for Cause provision, FAR 52.249-8(g) provides that:

> If, after termination, it is determined that the Contractor was not in default, or that the default was excusable, the rights and obligations of the parties shall be the same as if the termination had been issued for the convenience of the Government.

This language plainly differs from that contained within FAR 52.212-4(m). If the drafters had intended such language to appear in FAR 52.212-4(m), they easily could have included it. However, they did not. See FAR 12.403(a) (explaining that FAR 52.212-4(m) "contain[s] concepts which differ from those contained in the termination clauses prescribed in Part 49").

To define the term "improper" as used in the Commercial Item Termination for Cause provision, reference must be made to the "ordinary meaning" of the term. The definitions in FAR Part 2 "apply to the entire [FAR] unless specifically defined in another part, subpart, section provision or clause." See FAR 1.108(a). The FAR is clear, however, that "[u]ndefined words retain their common dictionary definition." See id. The FAR's preference for affording terms their ordinary meaning also is reflected in the FAR Drafting Guide. See, e.g., FAR Drafting Guide, Chapter 2, Section (f) (stating that drafters should "[u]se words with their most common meaning" and "if there is no common meaning, [drafters should] define the term.").  Because the term "improper" is not defined in FAR Part 2 or in the applicable FAR Part 52 provision, it must be given its "common dictionary definition."

This conclusion begs the question: What is the "common dictionary definition" of the term "improper"? Black's Law Dictionary defines "improper" as "incorrect" or "unsuitable or irregular." See BLACK'S LAW DICTIONARY at 773 (8th ed. 2004). Moreover, Webster's

Dictionary defines the term as "not in accord with fact, truth or *right procedure*." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY at 1137 (2002) (emphasis added).[4]

Based on the foregoing, it is clear that DOI's invalid and unauthorized terminations for cause converted automatically to terminations for convenience upon issuance of the Court's April 30, 2007 decision. Moreover, an examination of that Opinion and the Court's subsequent clarification Order reveals that the Government's argument to the contrary is unsupportable. This Court held explicitly that BearingPoint was entitled to have its allegations of excusable delay reviewed by the GSA Schedule Contracting Officer. BearingPoint, Inc. v. United States, 77 Fed. Cl. 189, 195 (2007). As a result, the Court found that DOI's failure to follow proper procedures – to afford BearingPoint the "substantive rights" guaranteed to it by the contract provisions and regulations – resulted in terminations for default that were "jurisdictionally invalid" and were to be "treated as legal nullities." Id. By doing so, the Court necessarily had to conclude that DOI's purported terminations for cause were "improperly" issued – *i.e.*, were the result of an "incorrect" decision-making process and were "not in accord with . . . [the] right procedure." For the Government to argue otherwise is to ignore the plain language of the FBMS Contract and the FAR (*e.g.*, Part 2 and Part 52.212-4(m)), the common dictionary definition afforded to the term "improper," and the Court's April 30, 2007 decision and May 15, 2007 clarification order.

The fact that the Court did not take the final step in its Opinion and convert the DOI's unauthorized and invalid terminations to terminations for convenience provides no support to the Government's position. Without a jurisdictionally valid Final Decision, the Court lacked the power to render such a result. Moreover, the Court's clarification Order merely stated that "the

[4] Notably, even the GSA Contracting Officer equates the terms "improper" and "nullity." See GSA Decision (dated Dec. 19, 2007) at 29 (concluding interchangeably that "the termination of the BPA [was] a nullity" and that "DOI's attempt to terminate the BPA was improper").

BPA and Task Order [3] were not terminated *through the affirmative actions of an authorized contracting officer*." BearingPoint, Inc. v. United States, No. 07-631 (Fed. Cl. May 15, 2007) (clarification order) (emphasis added). BearingPoint acknowledges and embraces this statement. BearingPoint is not asserting that Task Order 3 and the BPA were terminated "through the affirmative actions of an authorized contracting officer." Id. Rather, BearingPoint has established that the terminations were converted to terminations for convenience *by operation of law* in accordance with the Contract and FAR 52.212-4(m). In fact, the Court recognized specifically this possibility when it stated that Task Order 3 and the BPA "may have expired for some other reason." Id. BearingPoint's position raises a far different point than that argued by the Government, and is wholly consistent with the Court's Opinion and Order.

In sum, DOI's unauthorized and invalid terminations for cause were converted automatically to terminations for convenience as a matter of law pursuant to section C.1(m) of the Contract and FAR 52.212-4(m), and BearingPoint is entitled to summary judgment on Counts I and III of its Amended Complaint.

**B. DOI's Improper Termination Was A Fundamental Error, Which Does Not Require A Showing Of Prejudice.**

No showing of prejudice is required for the Court to convert DOI's improper termination for default into a termination for convenience. DOI's conduct was not a mere "harmless" or "technical" error as contended by the Government. See Opp'n Br. at 12-13. Instead, it was a fundamental error, the *impact of which* is not capable, by its nature, of being reviewed by a court. See Wagner v. United States, 365 F.3d 1358, 1363-64 (Fed. Cir. 2004); Doyle v. United States, 599 F.2d 984 (Ct. Cl. 1979).

In Wagner, Army regulations required pre-approval of the Secretary of the Army before separation proceedings could be initiated against servicemen with more than 18 years of active

federal service. Wagner, 365 F.3d at 1359. Notwithstanding that regulation, Army officer Donald Wagner, who had more than 18 years of service, was processed for separation without the prior approval of the Secretary. Id. at 1360. Afterward, the Army recognized that Mr. Wagner had over 18 years of service and that the Secretary's approval should have been obtained prior to initiating separation proceedings. Id. In an attempt to rectify the problem, the Army sought post-hoc approval from the Assistant Secretary to discharge Mr. Wagner, and the Acting Assistant Secretary retroactively approved Mr. Wagner's release from active duty. Id.

The Federal Circuit in Wagner concluded that the effect of the Government's error was "not quantifiable and is therefore incapable of review." Id. at 1364. That is because any review of how the Secretary may have acted would be purely speculative:

> While the Secretary might have made the same decision prior to the commencement of the separation proceedings, ample reasons exist for why, on a fresh review of Wagner's record, he might instead have refused to permit proceedings and instead opted to retain him in active federal service.

Id. Under such a circumstance, "[w]here the effect of an error on the outcome of a proceeding is unquantifiable [the Court] will not speculate as to what the outcome might have been had the error not occurred." Id. at 1365.

Likewise, in Doyle, the Court explained that the doctrine of harmless error cannot be applied "when it is not possible for a reviewing body to determine what effect the error had on the judgment of the original proceeding . . . . Courts are not qualified nor is it desirable for them to delve into the . . . exercise of discretion." Doyle, 599 F.2d at 304. The Court likened issues of procedural errors in the decision-making process to violations of constitutional rights that "are 'so basic to a fair trial that their infraction can never be treated as harmless error . . . .'" Id. at 302 (citations omitted).

Here, as in Wagner and Doyle, it would be impossible for a court to determine what the GSA CO would have done had she been properly and timely presented with BearingPoint's excusable delay claims.[5] A timely presentation would have enabled a decision *before* (1) the default termination notices were issued; (2) BearingPoint was ordered to vacate the premises; (3) DOI issued a contract to a third party ostensibly to replace BearingPoint on the FBMS project; (4) the parties were in the heat of litigation; and (5) GSA had to consider that an invalidation of DOI's termination decisions might result in significant termination for convenience costs or breach of contract damages. As in Wagner and Doyle, such an exercise by a court would be purely speculative, at best. It is simply impossible to determine at this late date, *well after DOI committed itself publicly and financially to proceed in another direction*, how the GSA CO would have acted in September 2005 if DOI had not breached its contractual duties.

In fact, DOI's violations of its regulatory and contractual obligations placed GSA in the position of having to uphold or invalidate DOI's unauthorized decisions, as opposed to directly reviewing BearingPoint's allegations on a "clean slate." The very fact that, more than two years after the purported terminations, the GSA CO found concurrent delay regarding DOI's failure to timely undertake data conversion extracts certainly could have been enough for the government to reconsider issuing a termination for cause had BearingPoint's arguments been timely considered. See GSA Decision at 29 (finding that data conversion delay "is clearly due to poor communication on the project and both parties are equally at fault."). DOI's failure to comply

[5] Notably, the Federal Circuit, in Wagner, excluded from its analysis any reliance on the period of time that had transpired between the Navy's original improper decision and its subsequent attempt at retroactive approval. Under Wagner, a fundamental error is not subject to review, regardless of the time period in question between the two purported decisions. Accordingly, the Government's "weekend" example (See Opp'n Br. at 11-12) is simply irrelevant.

with the contract is not something that can be undone, and there is no way to ascertain the true impact of the agency's improper conduct on the process.

Moreover, the Government's suggestion that an unauthorized termination decision is a mere "technical error" is simply unfounded. Timberland Paving & Const. Co. v. United States, 8 Cl. Ct. 653, 660 n.17 (1985) ("Defendant's suggestion that the purported termination should not be invalidated by purely technical defects . . . has no merit. The absence of authority to act as a contracting officer is scarcely a technical defect.") (internal quotations and citations omitted). Indeed, this Court has already recognized that DOI's failure to comply with express contractual procedures interfered with BearingPoint's fundamental, bargained-for rights. See BearingPoint, Inc., 77 Fed. Cl. at 195 ("The contract provisions and regulations here certainly constitute such 'substantive rights.'"). Accordingly, DOI's conduct constitutes a fundamental error that requires no showing of prejudice by BearingPoint.

### C. Although A Showing Of Prejudice Is Not Required, DOI's Improper Termination Has Been Unduly Prejudicial To BearingPoint.

Although no showing of prejudice is required to convert DOI's improper termination for cause into a termination for convenience, it cannot be disputed that the Government's conduct has unduly prejudiced BearingPoint. In fact, this Court previously recognized that BearingPoint has been harmed to its "detriment" by DOI's failure to comply with the contract:

> The contract provisions and regulations here certainly constitute such "substantive rights." *To disturb those rights would undoubtedly cause a detriment to BearingPoint*, who bargained for the benefit of review by the GSA Contracting Officer in the event that BearingPoint asserted excusable delay in response to a termination by the DOI Contracting Officer.

See BearingPoint, 77 Fed. Cl. at 195 (emphasis added). This finding alone conclusively demonstrates that BearingPoint has been prejudiced as a result of DOI's failure to comply with the parties' contractual termination procedures.

Additionally, BearingPoint has been and continues to be prejudiced by DOI's failure to comply with its obligations under the FAR. FAR 8.405-5 plainly provides that:

> Should the contractor claim that the failure was excusable, the ordering office [DOI] shall *promptly* refer the matter to the schedule contracting office [GSA].

BearingPoint, 77 Fed. Cl. at 192 (citing FAR 8.405-5) (emphasis added). BearingPoint was unquestionably harmed by the fact that the Government did not *promptly* consider the company's excusable delay arguments until Ordered to do so by this Court more than two years *after* DOI's improper terminations. Under the circumstances presented here, (a) DOI never referred the matter to GSA and (b) GSA's consideration of BearingPoint's excusable delay arguments was anything but prompt – both express violations of FAR 8.405-5. Had BearingPoint's allegations been timely referred and considered in accordance with the parties' contract, it is certainly possible that they would have been accepted by GSA and no terminations for cause would ever have been issued.

Moreover, once BearingPoint was terminated by the DOI CO, certain mandatory past performance disclosure requirements were triggered for new solicitations. FAR 52.209-5(a)(1)(ii) requires that an offeror certify that:

> The Offeror ☐ has ☐ has not, within a three-year period preceding this offer, had one or more contracts terminated for default by any Federal agency.

In addition, most solicitations require reporting of defaulted contracts in a "Past Performance" section. DOI, for example, requires offerors to certify that they:

> Have not within a three-year period preceding this application/proposal had one or more public transactions (Federal, State or local) terminated for cause or default.

See DOI Form 2010 (1995). Disclosure of a prior default termination can result in an automatic presumption that the company is nonresponsible. See, e.g., FAR 9.104-3 ("A prospective contractor that is or recently has been seriously deficient in contract performance shall be

presumed to be nonresponsible . . . ."); see also FAR 15.305(a)(2)(i) ("Past performance information is one indicator on an offeror's ability to perform the contract successfully").

Thus, notwithstanding the impropriety of DOI's terminations, BearingPoint had no choice but to disclose the terminations when it sought new contracts beginning in September 2005. Because the Government delayed until December 19, 2007 to issue what it now purports to be its actual termination for cause, BearingPoint arguably must report the termination for another three years starting on December 19, 2007. Thus, the company will be required to report the termination for *more than five years*. Each such disclosure could, at best, result in a downgraded evaluation of its offer, as well as potential disqualification. As a result, there can be no doubt that DOI's improper September 2005 termination has prejudiced BearingPoint.

Finally, DOI's failure to seek timely consideration by GSA of BearingPoint's excusable delay claims has also prejudiced the company's ability to prepare for and present its defenses to the terminations. A number of employees who previously worked on the FBMS project are no longer employed by BearingPoint – indeed, many are now working on the FBMS project for other organizations. Others have become fully involved with other projects or have relocated to other parts of the country. Moreover, as time progresses, memories fade, compounding the difficulties BearingPoint will face in presenting its case. Had DOI promptly sought GSA's consideration of BearingPoint's excusable delay claims, these problems never would have arisen. It is simply unfounded for the Government to contend that its failure to follow the required termination procedures has not caused significant prejudice to BearingPoint.

**D. The Cases Cited By BearingPoint Support Converting DOI's Improper And Unauthorized Terminations For Cause Into Terminations For Convenience.**

The Government's attempts to distinguish the cases relied upon by BearingPoint, IT&T and Timberland, are unpersuasive. First, the Government argues that "[i]t is precisely [a] lack of prejudice that distinguishes [BearingPoint's] case from [IT&T]." See Opp'n Br. at 16. The quotation relied upon by the Government, however, addresses a totally different issue. The Government in IT&T had mistakenly assumed that the tender of a preproduction item for acceptance testing equated to a tender of delivery of an end item. As a result, the Government terminated the contract for failure to make timely delivery rather than a failure to make progress. The material quoted in the Government's Opposition merely addresses the fact that, in IT&T, the Government's attempt to rely on a failure to make progress after-the-fact was belied by its conduct. The quoted material does not address the need for a showing of prejudice.

On the other hand, IT&T specifically makes clear that:

> This court has repeatedly stated the remedy available under the contract when a contractor has been improperly terminated for default. Provided that the contract contains a termination for convenience clause, the wrongful default is treated as if the contractor had been terminated for the convenience of the Government.

Int'l Tel. & Tel. Corp., ITT Def. Commc'ns Div. v. United States, 509 F.2d 541, 554 (Ct. Cl. 1975) (citation omitted). The Government also overlooks that BearingPoint is *not required* to demonstrate prejudice (see § I.B, *supra*) and that BearingPoint has shown that it was prejudiced by the DOI's failure to timely forward its allegations of excusable delay to the GSA (see § I.C, *supra*). Therefore, the holding in IT&T applies with full force and mandates that the DOI's unauthorized and invalid terminations be converted to terminations for convenience because the DOI "[failed] to follow proper procedures in its default attempts." IT&T, 509 F.2d at 553.

Second, with respect to Timberland, the Government asserts that the case "stands for the proposition that an unauthorized termination for default that is not subsequently ratified must be

converted to a termination for convenience." See Opp'n Br. at 18 (emphasis in original). Rather than supporting the Government's position, the quoted language confirms BearingPoint's position. The GSA Contracting Officer could not have ratified the DOI's unauthorized and invalid terminations for cause because (1) the terminations were converted automatically to terminations for convenience (see § I.A, *supra*), and (2) the DOI's unauthorized actions constituted a fundamental error, which cannot be ratified subsequently (see § I.B, *supra*). [6]

Accordingly, although the Government seizes on the Court's language indicating that the case involved "strange and narrow facts," Timberland actually stands for a very basic proposition, as the Government itself acknowledges: an unauthorized termination for cause that is not subsequently ratified must be converted to a termination for convenience.

### E. The Cases Cited By the Government Are Inapposite.

#### 1. The Government Incorrectly Contends That It Can Rely On Any Termination Ground That Existed At The Time Of Termination.

Relying on Pots Unlimited, Kirk Brothers and Joseph Morton – all cases involving a different termination for default clause – the Government incorrectly posits that it is entitled to "justify a termination upon any adequate ground that existed at the time, whether known or unknown, unless the contractor can demonstrate prejudice." Opp'n Br. at 12-13. It is well

---

[6] In this regard, GSA is without authority to ratify DOI's actions because its relationship with DOI cannot be characterized as one of principal and agent. Timberland, 8 Cl. Ct. at 661 n.22. Moreover, GSA is precluded from ratifying DOI's purported terminations because DOI's original actions were improper. See Comptroller Gen. McCarl to the Sec. of War, B-66806, Jan. 16, 1936, 15 Comp. Gen. 618, 1936 WL 650 ("The attempted ratification some 4 months after the date of the contract is not sufficient to make it legal if, in fact, it was illegal at the inception thereof."); Trio Mach. Works, NASABCA 480-6, Nov. 31, 1981, 82-1 BCA ¶ 15,465 ("The Contracting Officer would not have had the authority to ratify any such illegal agreement any more than [the agent] had authority to make the alleged agreement in the first place."), *reconsideration denied*, 82-2 BCA ¶ 15,968. GSA cannot ratify DOI's actions because, as this Court held, DOI did not have authority to terminate Task Order 3 and the BPA in the first place.

established that the Government may not rely on post-hoc justifications in *failure to make progress* situations – where a cure notice is required to be issued – as is the case here. Cross Aero Corp., ASBCA No. 14801, Sept. 14, 1971, 71-2 BCA ¶ 9,075, at 42,085; Marmac, Industries, Inc., ASBCA No. 11861, Dec. 15, 1969, 69-2 BCA ¶ 8,067, at 37,520.

In both Kirk Brothers and Joseph Morton, the post-hoc termination grounds relied on by the Government (violations of federal labor reporting requirements and fraud) fell into discrete exceptions to the specific rule – exceptions which are *not* applicable here. Joseph Morton Co., Inc. v. United States, 757 F.2d 1273, 1277 (Fed. Cir. 1985); Kelso v. Kirk Brothers Mech. Contractors, Inc., 16 F.3d 1173, 1175-76 (Fed. Cir. 1994). Moreover, in Pots Unlimited, the termination provision at issue provided that the "[a]greement could be forfeited without any legal process whatsoever" – which is certainly not the case here. Pots Unlimited, Ltd. v. United States, 600 F.2d 790 (Ct. Cl. 1979). Accordingly, Pots Unlimited, Kirk Brothers and Joseph Morton do not support the Government's position.

Likewise, the Government's reliance on College Point for the proposition that "[a]n *unconditional right to cancel* can be availed of for the purpose of terminating a contract, even after suit is brought, unless some intervening change in position of the other party renders that course inequitable" is misplaced. See Opp's Br. at 13 (emphasis added). College Point involved the Government's statutorily based right to terminate for convenience in the face of a breach of contract claim – *not* the Government's right to belatedly terminate for default after an improper termination decision was issued by an unauthorized contracting officer, as demonstrated here. In addition, unlike College Point, there is no "unconditional right to cancel" in this case. First, upon DOI's failure to properly terminate for default, the attempted terminations were immediately converted to terminations for convenience – there are no contracts to terminate. Second, the

Government does not have an "unconditional" right to terminate where a cure notice is required. The Government is limited to the grounds set forth in the cure and termination notices. Therefore, College Point fails to advance the Government's argument.

The Government also contends incorrectly that G.C. Casebolt and John Reiner stand for the proposition that "a contractor is required to show actual harm before it could establish liability based upon the Government failure to follow termination procedures required by the contract or regulation." Opp'n Br. at 13. G.C. Casebolt and John Reiner do not stand for that proposition. Rather, G.C. Casebolt and John Reiner primarily adopt the same line of reasoning employed by College Point – and, as such, fail to apply here for the very same reasons as discussed above. G.C. Casebolt Co. v. United States, 421 F.2d 710, 712 (Ct. Cl. 1970); see also John Reiner & Co. v. United States, 325 F.2d 438, 443 (Ct. Cl. 1963).

**2. The Government Cites A Litany Of Cases That Fail To Establish That Fundamental Errors Are Subject To A Prejudice Analysis.**

The Government cites several cases that purportedly "support[] the proposition that harmless procedural deficiencies will not invalidate an otherwise justified default termination where the contractor would essentially be awarded a windfall." See Opp'n Br. at 14 (emphasis in original). Each of the cited cases is inapplicable. In Philadelphia Regents, the Court plainly labeled the defects in the termination notice as "technical defects." Philadelphia Regent Builders v. United States, 634 F.2d 569, 573 (Ct. Cl. 1980). In stark contrast, "[t]he absence of a authority to act as a contracting officer is scarcely a technical defect." Timberland, 8 Cl. Ct. at 660 n.17.[7] Moreover, although the contractor argued that the contracting officer lacked authority

[7] This same line of reasoning operates to defeat the Government's reliance on State of Florida Dep't of Ins. v. United States, 81 F.3d 1093 (Fed. Cir. 1996) and Decker & Co., v. West, 76 F.3d 1573 (Fed. Cir. 1996). Akin to Philadelphia Regent Builders (which was relied upon by both Decker and State of Florida), those cases too involved mere "technical" defects the impact of (footnote continued)

to terminate the contract, the Court rejected this argument and held that the Government had complied with the applicable contract terms and that the CO did have authority to terminate the contract for default. Philadelphia Regent Builders, 634 F.2d at 573.

DCX likewise does not advance the Government's position because that decision was premised primarily on the fact that there had been no violation. DCX, Inc. v. United States, 79 F.3d 132, 135 (Fed. Cir. 1996) (finding that CO complied with both of the regulatory provisions relied upon by the contractor). Further, the Court made it clear that one of the regulatory provisions relied upon by the contractor – FAR 49.402-3(f) – "does not confer rights on a defaulting contractor." Id. Thus, it is hardly surprising that the Court would rule the way it did where those factors are neither "prerequisites to a valid termination" nor "confer rights on a defaulting contractor." Id. Conversely, the Court in this case has held that the procedure not followed by DOI constituted substantive, bargained-for rights. BearingPoint, 77 Fed. Cl. at 195.

The Government's reliance here on Lafayette Coal is similarly unsound. In that case, the contractor had argued, as it did in DCX, that the contracting officer failed to consider the factors set forth in FAR 49.402-3(f). Lafayette Coal Co., ASBCA No. 32174, May 9, 1989, 89-3 BCA ¶ 21,963 at 110,482-83. When viewed against the Federal Circuit's subsequent holding in DCX that the factors were neither "prerequisites to a valid termination" nor "confer[ed] rights on a defaulting contractor," the Board in Lafayette Coal was justified in not converting the termination to one for the Government's convenience. DCX, 79 F.3d at 135.[8]

---

which could be reviewed by a court, as opposed to a fundamental error that, by its nature, cannot be reviewed by a court. Moreover, neither Decker nor State of Florida involved a challenge to the authority of the contracting officer to issue the termination decision, as is the case here.

[8] Moreover, with respect to the other FAR 49.402-3 provisions at issue, the Court had first concluded that there was no violation because, in part, neither a cure notice nor a show cause notice was required. Lafayette Coal, 89-3 BCA at 110,483.

Rowe also does not support the Government's position. Rowe, Inc. v. GSA, GSBCA No. 14211, Sept. 28, 2001, 01-2 BCA ¶ 31,360. The Board concluded that the Government had complied with FAR 49.402-3(f) – which, as discussed, does not "confer rights on a defaulting contractor." In addition, the Board found that the Government had complied with certain aspects of FAR 49.402-3(e)(4) and that other aspects of that regulation "[did] not provide a basis for relief . . . [because] [t]he requirement is imposed for informational purposes only." Id. at 156,277. Lastly, the CO's failure in Rowe to "consult" with the small business specialist "whenever practicable," certainly does not give rise to a fundamental error – as here.

### 3. Royal Lumber And M.E.S. Support BearingPoint's Position Because The GSA CO Never "Ratified" DOI's Invalid And Unauthorized Terminations.

The Government's reliance on Royal Lumber is misplaced. Royal Lumber Co., Inc., ASBCA No. 2847, Dec. 20, 1955, 1955 WL 9052. The Government asserts that Royal Lumber stands for the proposition that the Board will sustain a termination for default "notwithstanding the fact that it had been preceded by an unauthorized and invalid termination action taken by the contracting officer's representative." Opp'n Br. at 15. At the outset it should be noted that Royal Lumber involved a contract awarded in 1954. Default clause language and applicable legal principles regarding conversion of a defective default termination to one of convenience differed materially from that applicable to the case at hand. See R. NASH & J. CIBINIC, FEDERAL PROCUREMENT LAW (3rd Ed. 1980) at 1121-24, and Note 1. In addition, a critical element of Royal Lumber is lacking here – a subsequent "ratification" by the proper contracting officer. As discussed, the GSA Contracting Officer could not have ratified the DOI's unauthorized and invalid terminations for default because (1) they were converted automatically to terminations for convenience pursuant to the FBMS Contract and FAR 52.212-4(m) – a clause not at issue in

Royal Lumber; and (2) the DOI's unauthorized actions constituted a fundamental error, which cannot be subsequently ratified (as discussed above).

In addition, the Board's decision was premised on the contractor's failure to deliver by the contract delivery date whereas BearingPoint was terminated prior to delivery. Here, it cannot be overlooked that BearingPoint was "kicked-off" the project – *i.e.*, the company was ordered to "promptly exit the building," leave hardcopies of documents at the workstations, turn-in all access keys and badges, and exit only through the front doors.

The Government also can find no solace under M.E.S., Inc., PSBCA No. 4462, Feb. 7, 2001, 01-1 BCA ¶ 31268. The contractor in M.E.S. argued, citing Timberland, that an "unauthorized action cannot be ratified afterwards." Id. at 154,454. Although not decided by the Board, it is important to note that the "policies and procedures" at issue in M.E.S. did not "create any [enforceable] right or benefit, substantive or procedural ...." Id. In addition, the case involved the U.S.P.S. Purchasing Manual as opposed to the Commercial Item Termination for Cause provision in BearingPoint's contract. Id. Further, for the reasons discussed repeatedly herein, the GSA CO here never "ratified" the DOI's improper and unauthorized termination decisions.

Finally, it should be noted that the Royal Lumber "ratification" occurred within 2 weeks of the original invalid termination (Royal Lumber, 1955 WL 9052), and in M.E.S within 5 months of the original unauthorized decision (M.E.S., 01-1 BCA at ¶ 154,454). In contrast, approximately 2 ½ years have elapsed since DOI's invalid and unauthorized terminations for cause. In any event, the amount of elapsed time is entirely irrelevant because the very nature of DOI's breach is not capable of being reviewed. Wagner, 365 F.3d at 1364.

## II. BEARINGPOINT'S CLAIM FOR DECLARATORY RELIEF IS NEITHER MOOT NOR BARRED BY COLLATERAL ESTOPPEL.

Nowhere in its Opposition does the Government counter BearingPoint's argument that the BPA is not a contract. Nor does the Government contend in any way that DOI's attempt to terminate the BPA was somehow proper or appropriate.[9] Instead, the Government opposes the declaratory relief sought by BearingPoint in Count X of its Amended Complaint on the grounds of mootness and collateral estoppel. Neither of these arguments is appropriate here.

The purported GSA Final Decision does not render moot BearingPoint's claim for declaratory judgment. It is well established that this Court has *de novo* review of the findings in a CO's final decision. See 41 U.S.C. § 609(a)(1); C. H. Guernsey & Co. v. United States, 65 Fed. Cl. 582, 595 (2005) ("'any action under [the CDA] . . . shall proceed *de novo* in accordance with the rules of the appropriate court.'") (citations omitted); see also Moreland Corp. v. United States, 76 Fed. Cl. 268, 284 (2007) ("Under the Contract Disputes Act, the Court conducts a *de novo* review of a contracting officer's default termination.") (citations omitted).

Based on the foregoing, the *entirety* of the Final Decision is before this Court, including, arguably, GSA's conclusions "that DOI's attempt to terminate the BPA was improper," "a BPA is not a contract," and "the termination of the BPA [was] a nullity." See England v. Sherman R. Smoot Corp., 388 F.3d 844, 856 (Fed. Cir. 2004) ("Congress made it clear in the CDA that any findings of fact by a contracting officer in a final decision are not binding in any subsequent proceeding."); Wilner v. United States, 24 F.3d 1397, 1401-02 (Fed. Cir. 1994) ("The plain language of the CDA and our decision in Assurance also make it clear that, in court litigation, a contractor is not entitled to the benefit of any presumption arising from the contracting officer's

[9] The Government's silence on these issues is an admission that BearingPoint's underlying contention is legally and factually correct.

decision. *De novo* review precludes reliance upon the presumed correctness of the decision.") (citation omitted). Given the potential uncertainty, the fact that the GSA CO concurs with BearingPoint's position does not moot this Court's authority to independently rule that the BPA is not a contract properly subject to default termination. Moreover, interests of judicial economy suggest that this issue be concluded now.

In Count X of its Amended Complaint, BearingPoint seeks a declaratory ruling that DOI's termination of the BPA was improper "[b]ecause the BPA was not a binding contract ...." See Am. Compl. ¶ 287. This issue was not "actually litigated" in the prior litigation before this Court; nor was it "essential to a final judgment in the first action." The Court's April 30, 2007 decision never reached the issue of whether the BPA was a binding contract in concluding that the BPA termination for cause was to be "treated as [a] legal nullit[y]." That holding was based entirely on "whether the GSA Contracting Officer alone had authority to issue the termination notices . . . ." See BearingPoint, 77 Fed. Cl. at 193. Accordingly, to ensure BearingPoint a "full and fair opportunity to litigate the issue," it is appropriately before this Court and is not barred by the doctrine of collateral estoppel. Additionally, a declaratory judgment finding, as the GSA Contracting Officer did in her purported Final Decision, that "a BPA is not a contract. . . [and] that DOI's attempt to terminate the BPA was improper" is not barred by collateral estoppel because the Final Decision was issued on December 19, 2007 – well *after* the Court's April 30, 2007 ruling on BearingPoint's Motion to Dismiss. Thus, a declaratory judgment on Count X of BearingPoint's Amended Complaint is entirely appropriate.

Respectfully submitted,

/s/ Jonathan S. Aronie
Jonathan S. Aronie
SHEPPARD MULLIN RICHTER & HAMPTON, LLP
1300 I Street, NW

11th Floor, East
Washington, DC 20005-3314
Tel: (202) 218-0039
Fax: (202) 218-0020

March 3, 2008

Attorney for BearingPoint, Inc.

Of Counsel:

Louis D. Victorino
Christopher M. Loveland
Keith R. Szeliga
Marko W. Kipa
SHEPPARD MULLIN RICHTER
& HAMPTON LLP

Domingo Maradiegue
BEARINGPOINT, INC.

**CERTIFICATE OF FILING**

I hereby certify that on March 3, 2008, a copy of "PLAINTIFF BEARINGPOINT, INC.'S REPLY IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT" was filed electronically. I understand that notices of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

__/s/ Jonathan S. Aronie________
JONATHAN S. ARONIE
ATTORNEY FOR BEARINGPOINT, INC.